# EXHIBIT 1

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| WHITE WINSTON SELECT<br>ASSET FUNDS, LLC | ) | |
| | ) | |
| | ) | |
| and | ) | |
| | ) | |
| GT ACQUISITION GROUP, INC., | ) | C.A. No. _____ |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| GOOD TIMES RESTAURANTS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## <u>VERIFIED COMPLAINT</u>

Plaintiffs White Winston Select Asset Funds, LLC ("White Winston") and

GT Acquisition Group, Inc. ("GTAG") bring this action for specific performance

of a Stock Purchase Agreement between GTAG and Good Times Restaurants, Inc.

("GTRI"), under which GTRI agreed to sell its subsidiary Good Times Drive Thru,

Inc. ("GTDT") to GTAG. Although the parties have not signed the final Stock

Purchase Agreement, the parties agreed to every term in it and are bound by it.

The parties viewed the signing of the Stock Purchase Agreement as a mere

formality and never agreed that it had to be signed to be binding. Plaintiffs are

entitled either to an order directing GTDT to perform its obligations under the

Stock Purchase Agreement or to money damages for GTRI's breach when it

refused to proceed unless plaintiffs paid it more than $4 million in additional cash, representing a more than 40% increase in the agreed purchase price. In the alternative, White Winston and GTAG are entitled to reliance damages from GTRI because it repeatedly reassured them over a period of many months that it wanted to complete the transaction, stringing them along until the last minute — literally, the day the Stock Purchase Agreement was supposed to be signed — when it misguidedly thought it had leverage to coerce a higher purchase price.

In support of this Verified Complaint, White Winston and GTAG allege as follows:

## NATURE OF THE ACTION

1. Since December 2018, plaintiffs have engaged in intensive negotiations with GTRI to purchase GTDT, a drive-through hamburger restaurant chain that operates in Colorado and Wyoming under the name "Good Times Burgers & Frozen Custard."

2. The parties reached final agreement on every substantial term of a Stock Purchase Agreement, attached as Exhibit A, on July 26, 2019, and were ready to engage in the formality of signing it on August 13, 2019, when GTRI's CEO, Boyd Hoback, left a voice mail for White Winston partner Todd Enright demanding more than $4 million in additional cash.

3. As the Stock Purchase Agreement shows on its face, it is clear and definite and readily enforceable by a decree of specific performance directing GTRI to proceed to close the transaction in accordance with the Stock Purchase Agreement's requirements.

## PARTIES

4. Plaintiff White Winston is a Delaware limited liability company that engages in debt and equity investing in private companies and small-cap public companies.

5. Plaintiff GTAG is a Delaware corporation that is to acquire GTDT under the Stock Purchase Agreement attached as Exhibit A.

6. Defendant GTRI is a Nevada corporation that agreed to sell its subsidiary GTDT to GTAG under the Stock Purchase Agreement.

## JURISDICTION

7. This Court has subject matter jurisdiction over this action pursuant to 10 Del. C. § 341.

8. This Court has personal jurisdiction over GTRI because, among other reasons, GTRI agreed in the Stock Purchase Agreement that "[a]ny action or proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement shall be brought against any of the parties in the courts of the State of Delaware, or, if it has or can acquire jurisdiction, in the United States

District Courts in the State of Delaware, and each of the parties consents to the jurisdiction of such courts (and of the appropriate appellate courts) in any such action or proceeding and waives any objection to venue laid therein. Process in any action or proceeding referred to in the preceding sentence may be served on any party anywhere in the world." Stock Purchase Agreement § 11.5.

## FACTS

9.    In December 2018, White Winston began to have discussions with GTRI about acquiring GTDT. White Winston was already invested in LarkBurger, a gourmet burger chain that, like GTDT, operates in Colorado. In addition, White Winston had formed a business relationship with the owners of Hat Creek Burger Company, which operates in Texas. White Winston expected that it could significantly enhance GTDT's performance, growth and value by integrating it with these other businesses.

10.    Discussions between White Winston and GTRI stalled temporarily in mid-January 2019 over the purchase price. GTRI wanted $9 million in cash for GTDT, which was more cash than White Winston was willing to pay.

11.    By the end of January, the parties had resolved their differences on the purchase price and agreed to a total price of $10 million, structured as $8 million in cash with a $2 million limited recourse promissory note from the acquiring entity (the later formed GTAG) to be paid from GTDT's franchise and sublease revenue.

12.     The parties further agreed that the purchase price would be subject to a post-closing adjustment based on GTDT's net working capital at closing.

13.     On February 1, 2019, GTRI's CEO, Mr. Hoback, informed White Winston by email that "[o]ur board has elected to move forward with the transaction," subject to agreement on certain items, including "mak[ing] clear that the working capital true up post-closing will be to bring it to zero. If there's negative working capital, we owe it to Newco [the acquiring entity, GTAG]. If there's positive working capital, Newco owes it to us."

14.     Consistent with these terms, White Winston and GTRI signed a letter of intent on February 11, 2019 (the "Initial Letter of Intent," attached as Exhibit B).

15.     The Initial Letter of Intent described the price, structure and timeline of the transaction, and included as an exhibit a detailed Summary of Certain Key Terms. *See* Exhibit 1 to Exhibit B.

16.     Just as the parties had agreed, the Initial Letter of Intent stated that a Delaware corporation to be formed by White Winston (GTAG) would purchase GTDT for $10 million, consisting of $8 million in cash and $2 million in the form of a limited recourse promissory note to be paid out of franchise and sublease revenue over an eight year term. Initial Letter of Intent ¶ 1. Consistent with Mr. Hoback's February 1 email the purchase price was subject to post-closing

adjustments based on GTDT's working capital at closing. The parties agreed that the target working capital at closing was to be zero. *Id.*

17.    The Initial Letter of Intent recited that the transaction "would be effected in accordance with the terms of a definitive purchase or merger agreement (the 'Definitive Agreement')," and set forth a nonbinding schedule by which "[t]he Definitive Agreement would be prepared and finalized." Initial Letter of Intent ¶ 4.

18.    The Stock Purchase Agreement attached to this Complaint as Exhibit A is the "Definitive Agreement" contemplated in the Initial Letter of Intent.

19.    The parties acknowledged that while certain terms of the Initial Letter of Intent respecting confidentiality, exclusive dealings and other matters "constitut[ed] a binding agreement," the Initial Letter of Intent was "not binding upon any person." Initial Letter of Intent ¶ 8.  Instead, "[a]ll obligations or commitments to proceed with the Acquisition shall be contained only in the Definitive Agreement." *Id.*

20.    Nowhere does the Initial Letter of Intent state that the Definitive Agreement must be signed to be binding.

21.    Although the Initial Letter of Intent specifies a date and time by which it must be accepted by GTRI, it does not specify any termination date once accepted.

22.     The parties further agreed that the Initial Letter of Intent was to be "governed by and construed in accordance with the laws of the State of Delaware." Initial Letter of Intent ¶ 8.

23.     The Summary of Certain Key Terms attached to the Initial Letter of Intent as Exhibit 1 similarly stated that the Definitive Agreement would be governed by Delaware law and would contain a Delaware forum selection clause. Initial Letter of Intent, Exhibit 1 (Summary of Certain Key Terms) at 2.

24.     Mr. Ryan Zink, GTRI's Chief Financial Officer, signed the Initial Letter of Intent on GTRI's behalf, indicating that GTRI "wished to proceed with the Acquisition on the terms set forth herein." Initial Letter of Intent at 4.

25.     The nonbinding schedule in the Initial Letter of Intent indicated that the parties aimed to execute the Definitive Agreement 60 days after signing the Initial Letter of Intent.

26.     The parties were, of course, not bound to that schedule and their negotiations extended beyond the 60-day time period.

27.     In early April, GTRI proposed reducing the promissory note to $1.85 million because sublease premium revenue it was expecting at a particular location had not materialized.

28.     Shortly thereafter, GTRI proposed reducing the note by another

$100,000, to $1.75 million, because of the lack of sublease premium revenue at

another location.

29.     In addition, it became clear to both White Winston and GTRI that

GTDT would have a working capital deficit at closing of approximately $-750,000.

GTRI wanted the negative working capital to be applied to reducing the

promissory note, rather than the cash component of the purchase price, so that the

cash it received from the sale would not fall below $8 million.

30.     On April 8, 2019, Mr. Enright sent Mr. Hoback an email (part of a

string attached as Exhibit C) stating:

> While I am happy to discuss the benefit of the [working
> capital] adjustment to the buyer, or what each party
> "thought" about [working capital] when agreeing to a
> stock sale vs. an asset sale, however, what I can't ignore
> is what is written in the LOI on the bottom on the first
> page: "In addition to the forgoing, the purchase price
> would be subject to a post-closing adjustment based on
> working capital at the closing. Target working capital at
> closing will be zero."
>
> There is no question in my mind that the parties know
> what working capital at zero means and I am surprised
> this is even an issue for discussion at this point. Now if
> you need some help shoehorning this deal in a way that
> addresses the timing on the calculation/payment of
> working capital that is one thing; I will work with you to
> make that happen. But to ask us to eat $750,000 on
> something that is so clearly defined in the LOI (and was a
> material deal-point) is quite another. I'm a fair guy and
> will work to address optics regarding the deal, but let's

call a spade-a-spade; this 11th hour WC grab is about net cash at closing not about what the parties "thought" vis-a-vis working capital and purchase price.

31.    In his response (included in Exhibit C), Mr. Hoback did not dispute

that the working capital adjustment was "clearly defined in the LOI" and "was a

material deal-point," nor did Mr. Hoback dispute that he was attempting to revise a

material deal point in the Initial Letter of Intent at the eleventh hour in order to

preserve the amount of cash GTRI would receive at closing.  Instead, he

responded:

> I'll take responsibility for the working capital issue for not quantifying & clarifying that up front with my team. What we anticipated to be a $10m transaction is now $9m which makes it a much more difficult decision for our board.  For clarification, we're not asking you to eat $750,000 as we're taking the total hit for that in the transaction value with full allocation to the Buyer.  It's simply allocated to the note(s) vs the cash, which makes the $1m reduction in value from our original expectations a bit more palatable.  You will immediately recoup that $750,000 in working capital within the first 4 weeks.

32.    White Winston agreed to GTRI's request to apply the working capital

deficit to the promissory note rather than the cash component of the purchase price.

The parties executed a new Amended and Restated Letter of Intent (the "Amended

Letter of Intent," attached as Exhibit D) on April 29, 2019, to reflect this new

understanding, among other matters.

33. Consistent with their discussions in early April, the parties agreed in the Amended Letter of Intent to reduce the purchase price to $9.75 million, consisting of (a) $8 million in cash, (b) a $600,000 full recourse promissory note from GTAG to GTRI, but still to be paid from GTDT's franchise and sublease revenue; and (c) a $1.15 million promissory note with recourse limited to a collateral assignment of franchise and sublease revenue from GTDT to GTRI. Amended Letter of Intent ¶ 1.

34. The Amended Letter of Intent also reflected the parties' agreement that if GTDT's working capital was less than zero at closing, which the parties expected it to be, the $1.15 million promissory note would be reduced by the amount of the deficit.

35. The Amended Letter of Intent further provided that a separate agreement would be entered into between GTRI and GTDT prior to closing, wherein GTDT would provide repair and maintenance services for another chain of restaurants (Bad Daddy's Burger Bar) that would remain under GTRI's ownership. *See* Amended Letter of Intent ¶ 1a. The parties negotiated a final repair and maintenance services agreement, as the Amended Letter of Intent contemplated, along with several other collateral agreements, discussed further below.

36. The Amended Letter of Intent stated that under the "desired schedule for completing the Acquisition," the parties "should" execute the Definitive

Agreement on or before June 25, 2019, and the transaction would close the next day, on June 26, 2019. Amended Letter of Intent ¶ 4.

37.     Mr. Hoback executed the Amended Letter of Intent for GTRI, indicating, once again, that the terms of the Amended Letter of Intent were "acceptable to [GTRI]" and that GTRI "wish[ed] to proceed with the Acquisition on the terms set forth herein." Amended Letter of Intent at 6.

38.     Like the Initial Letter of Intent, the Amended Letter of Intent is "governed by and construed in accordance with the laws of the State of Delaware." Amended Letter of Intent ¶ 8.

39.     Like the Initial Letter of Intent, the Amended Letter of Intent includes an attached Summary of Certain Key Terms stating that the "terms and conditions of the Transaction" would be governed by the law of "Delaware, with litigation in the state or federal courts located in Delaware." Amended Letter of Intent, Exhibit 1, at 2.

40.     Like the Initial Letter of Intent, the Amended Letter of Intent specifies a date by which it must be accepted, but has no termination date after acceptance.

41.     On May 24, 2019, the parties agreed to revise the desired schedule in paragraph 4 of the Amended Letter of Intent to build in more time (up to 30 days) between execution of the "Definitive Agreement," *i.e.*, the Stock Purchase Agreement, and the closing of the transaction. *See* Exhibit E.

42.    The parties built in additional time because there were a number of components, including certain collateral agreements, that the parties each had to deliver at closing.  These collateral agreements are:

- a Noncompetition Agreement under which GTRI will covenant not to compete with GTDT;

- the $600,000 and $1,115,000 Promissory Notes;

- a Collateral Assignment of franchise and sublease revenue to secure payments under the Promissory Notes;

- a Deposit Account Control Agreement governing accounts into which the franchise and sublease revenue subject to the Collateral Assignment is to be deposited; and

- the Services Agreement, mentioned above, under which GTDT will provide repair and maintenance services to GTRI's remaining burger business, Bad Daddy's.

43.    On June 26, 2019, Mr. Hoback, for GTRI, announced by email (attached as Exhibit F) that "[t]here are two issues that we're hung up on internally right now that look like they will delay the signing of the [Stock Purchase Agreement], but shouldn't affect the closing date."

44.    GTRI had guaranteed some of GTDT's leases and expected that the landlords would be unwilling to release the guarantees.  Mr. Hoback said that this

12

in turn would affect GTRI's ability to borrow from its primary lender, Cadence Bank, N.A.

45. Over the next four weeks, the parties discussed various options to address this issue. On July 24, 2019, approximately a month after raising the issue, Mr. Hoback proposed a solution in an email, attached as Exhibit G:

> Todd;
>
> Have you come to a conclusion with your group on how we can handle the lease guarantees? In thinking about it more, our proposal is as follows:
>
> - We will cover issues related to the guarantees on all 7 stores except store 103 with our bank, putting up additional cash collateral. We will require a one year letter of credit or cash bond for one year's rent on store 103.
>
> - We will modify existing leases so that GTIM will be released as a guarantor if the lease is modified or extended by Landlord & GTDT beyond the existing base term and option periods (GTDT cannot negotiate lease extensions whereby our guarantee continues).

46. Not getting a response, Mr. Hoback sent a follow-up email the next day (attached as Exhibit H) expressing GTRI's anxiousness to sign the Stock Purchase Agreement:

> Todd;
>
> Any update? We had hoped to get the SPA signed this week & are concerned there are other issues that we're unaware of. Is it only the lease guaranty issue?
>
> Boyd

47.     As this email from Mr. Hoback makes clear, "the lease guaranty issue" was the sole issue that GTRI viewed as open with respect to the Stock Purchase Agreement on July 25, 2019.

48.     On July 26, 2019, Mr. Enright summarized GTRI's proposal in an email back to Mr. Hoback and others, part of a string attached as Exhibit I. Below Mr. Enright's email in the string is an email of the same date from counsel for White Winston and GTAG stating that, like GTRI, "we believe [the lease guarantee issue] to be the only open issue in the Stock Purchase Agreement."

49.     In his July 26 email, Mr. Enright summarized GTRI's proposal as follows:

> To be clear, on the lease guaranty, we understand that you will be addressing all the issues with respect to the leases except for store 103. In regard to that lease, I understand that the parent [GTRI] will remain as a guarantor for that lease during the current term and all option periods (if so exercised-under the current lease).
>
> In addition, we are advised that your lender is requiring that the purchaser post an LC or cash bond equal to one-year rent (for the current lease year) to secure the purchasers' obligations under the lease and indemnification agreement.
>
> Please let us know if this is your understanding. Thanks again.

50.     Later that day, Mr. Zink, GTRI's CFO, replied for GTRI (see Exhibit I):

As it relates to guarantor issues, I believe us to be in general agreement in the understanding below. Seller will address the guarantor issues with our lender for all leases other than #103. For the purpose of clarifying the L/C or cash bond for #103, the L/C is required to be in-place for so long as we remain a guarantor to the lease, and in an amount equal to one year of rent payments for the *then current* lease year.

I discussed this with our credit officer [at Cadence Bank] a short while ago and he confirmed his individual approval. Given that we have agreement on this, he will present this solution officially to their credit committee Thursday morning but does not see any issue and indicated we should be in a place to execute the SPA mid-morning Thursday (8/1). He confirmed their counsel's ability to draft consents and amendments to our credit agreement for execution by our August 20 targeted closing date.

51.     Mr. Enright responded to Mr. Zink's email, agreeing to GTRI's proposal (see Exhibit J):

Thanks Ryan, I was trying to keep the LC [letter of credit] static but it appears based on the "then current year" it will require the cash-bond or LC to be increased as rents increased. Not a real issue, just an administrative pain. *In the spirt on getting things done, we will agree.* Thanks again.

52.     Thus, by July 26, 2019, the parties had reached agreement on the last remaining open issue and therefore had agreed on all substantial terms of the Stock Purchase Agreement.

53.     On August 1, 2019, GTRI prepared a draft press release announcing that the parties had entered into the Stock Purchase Agreement. *See* Exhibit K.

54.     Over the next few days, the parties prepared final versions of the collateral agreements that would be delivered at closing as required under the Stock Purchase Agreement. *See supra* ¶ 42.

55.     The parties had reached agreement on the terms of the Noncompetition Agreement weeks earlier, on June 26, 2019.

56.     On August 6, 2019, the parties' counsel conferred by telephone to finalize the remaining agreements.

57.     Following the call, Mr. Hoback forwarded to Mr. Enright final copies of the Collateral Assignment, the Services Agreement and the Deposit Account Control Agreement.  Mr. Hoback reported that counsel for White Winston and GTAG was "generating the final [Stock Purchase Agreement]." *See* Exhibit L.

58.     Mr. Enright responded (*see* Exhibit M):

> Boyd, thank[s] for your follow-up. I think we are of the mind-set that we are ready to sign as soon as we get through any final edits to the SPA you guys have. We will review [the] attached documents and get with Keith on any open items /issues on the SPA [with] the plan to sign as soon as the lawyers have addressed any final issues.

59.     Agreeing, Mr. Hoback replied (also in Exhibit M): "Thanks Todd.  I think after today's call we should be there.   Let me know if you think otherwise." Mr. Enright did not think otherwise.

60.    On August 8, 2019, counsel for White Winston and GTAG sent GTRI's counsel the final Stock Purchase Agreement attached as Exhibit A. *See* Exhibit N.

61.    In his August 8 email, counsel for White Winston and GTAG raised one question about GTDT's ability to charge for its employees' travel time under the Services Agreement. He proposed "[a]s a compromise," that "travel time be charged only one way, or in the alternative, we could express it as billing the entire travel time at half the stated fee."

62.    GTRI's counsel responded that travel time was already included in the $110 hourly fee that GTDT is to charge for its employees' services under the Services Agreement.

63.    The next day, Friday, August 9, 2019, Mr. Enright stated in an email to Mr. Hoback, "I think it sounds like we are ready to sign Monday AM," meaning Monday, August 12, 2019. *See* Exhibit O.

64.    On August 12, 2019, Mr. Enright wrote to Mr. Hoback: "Boyd, just following up on the [Stock Purchase Agreement]. Are we good to go?" *See* email string attached as Exhibit P.

65.    Mr. Zink responded for GTRI (*see* Exhibit P):

Todd-

Boyd's out today but I think the only remaining item was on the R&M services agreement related to drive time.  I

was thinking Boyd would reach out to you today to get that covered. I have a call with him early tomorrow so if he doesn't respond today, I'll make sure we get that addressed tomorrow.

66. Thus, the sole "remaining item" identified by GTRI on the day the parties were to engage in the formality of signing the Stock Purchase Agreement related not to the Stock Purchase Agreement but to one of the collateral agreements, the Services Agreement under which GTDT is to provide repair and maintenance services to GTRI's Dad Daddy's restaurants.

67. Mr. Enright promptly responded (*see* Exhibit P):

Thanks. It's a non issue for me. If you baked drive time into the $110 an hour I'm cool with no drive time split as long as that's the rep your giving us as part of the deal. I'm agnostics either way.

68. Thus, the parties were in agreement on the sole putative "remaining item" identified by GTRI on August 12.

69. However, even if the parties had not been in agreement on how to handle GTDT's employees' travel time under the Services Agreement, that would not mean that the parties had not reached agreement on all substantial terms of the Stock Purchase Agreement. The Services Agreement, and the other collateral agreements, while they are exhibits to the Stock Purchase Agreement, are not incorporated into it and represent separate contractual obligations that will be created only when the transaction closes.

18

70.     The Stock Purchase Agreement provides that "[*t*]*his* Agreement [meaning the Stock Purchase Agreement, as opposed to the collateral agreements] constitutes the legal, valid, and binding obligation of Seller [GTRI], enforceable against Seller in accordance with its terms. *Upon the execution and delivery by Seller of the Seller's Releases and the Noncompetition Agreement* (collectively, the "Seller's Closing Documents"), the Seller's Closing Documents *will* constitute the legal, valid, and binding obligations of the Seller, enforceable against Seller in accordance with *their* respective terms." Stock Purchase Agreement § 3.2(a) (emphasis added).

71.     Similarly, the Stock Purchase Agreement provides that "[t]his Agreement constitutes the legal, valid, and binding obligation of Buyer [GTAG], enforceable against Buyer in accordance with its terms. Upon the execution and delivery by Buyer of the $600,000 Purchase Note and the $1,150,000 Purchase Note (collectively, the "Buyer's Closing Documents"), the Buyer's Closing Documents will constitute the legal, valid, and binding obligations of Buyer in accordance with *their* respective terms." Stock Purchase Agreement § 4.2(a) (emphasis added).

72.     The parties having reached agreement on all substantial terms of the Stock Purchase Agreement by July 26, 2019, they were bound by the Stock Purchase Agreement and obligated to engage in their best efforts to satisfy all

conditions of closing the transaction, as the Stock Purchase Agreement requires. *See* Section 5.8 of the Stock Purchase Agreement.

73.     The Stock Purchase Agreement contemplates a Closing Date for the sale of GTDT of September 25, 2019. *See* Stock Purchase Agreement § 2.3. However, the Stock Purchase Agreement further provides that "[s]ubject to the provisions of Section 9, failure to consummate the purchase and sale provided for in this Agreement on the date and time and at the place determined in this Section 2.3 will not result in the termination of this Agreement and will not relieve any party of any obligation under this Agreement." *Id.* Section 9 in turn provides that the Stock Purchase Agreement does not terminate if "the Closing has not occurred" due to "the failure of any party seeking to terminate this Agreement to comply fully with its obligations under this Agreement." *Id.* § 9.1(d).

74.     The Closing has not occurred precisely because GTRI has failed to comply with its obligations under the Stock Purchase Agreement.

75.     There is no positive agreement between the parties that the Stock Purchase Agreement must be signed to be binding. Indeed, the parties by their conduct made clear that they viewed signing the Stock Purchase Agreement as a mere formality, as evidenced by, among other things, GTRI's anxiousness to announce the transaction *even before the Stock Purchase Agreement was signed*, going so far as to prepare a draft press release on August 1.

76.     On August 13, 2019, Mr. Hoback left Mr. Enright a voicemail

message:

>       Hey Todd, Boyd Hoback. Um, I just got off a board call, and, um, this won't be coming as good news, obviously, um, but, um, our board has decided to back away from the transaction, for a number of reasons, one, uh, the length of time that it's taken, but more importantly it's just the value of the deal, given Good Time's performance. We continue to run in the mid to high single digit same store sales increases. Um, the, the net of Cadence's position on our liquidity requirement, and the restricted cash required for the lease guarantees, has brought us down to about $7 million of investible cash, and we think the business is worth a lot more than that. It's on about a $2 million run rate. So even factoring in the note payments, uh, this ends up being a below 5x deal for us, which, uh, is, is not, is not good. So, we were, if you want another bite at the apple, we're certainly willing to discuss that, but our expectations are $11 million net cash, uh, for the business, realizing that you're probably not gonna be excited about that, uh, but, but uh, it's, uh, it's either that or we're gonna walk away from, from the transaction. Unfortunately, you're on vacation, I'm on vacation. Uh, try my cell [redacted]. Thank you.

77.     Mr. Hoback's voicemail message did not cite any open issue in the

Stock Purchase Agreement as the basis for GTRI's attempt to "back away" from

the transaction unless it got more money.

78.     In short, despite having reached agreement on all substantial terms of

the Stock Purchase Agreement, and even on the sole "remaining item" under the

Services Agreement (travel time) identified by GTRI on August 12, and thus being

obligated by the Stock Purchase Agreement to undertake its best efforts to close the transaction, GTRI disregarded its obligations under the Stock Purchase Agreement and attempted to coerce more than $4 million in additional cash from White Winston and GTAG.

## COUNT ONE
### Specific Performance

79.     Plaintiffs GTAG and White Winston incorporate the foregoing paragraphs 1 through 78 as if fully set forth herein.

80.     The Stock Purchase Agreement attached as Exhibit A is a valid, binding contract setting forth a framework under which the parties are to undertake their best efforts to close the acquisition of GTDT by GTAG. *See* Section 5.8 of the Stock Purchase Agreement.

81.     The Stock Purchase Agreement is clear and definite, and no essential terms need be supplied by the Court. Indeed, as Exhibit A shows, the Stock Purchase Agreement is a final written agreement that lacks only the formality of the parties' signatures.

82.     GTAG is ready, willing and able to perform its obligations under the Stock Purchase Agreement, and indeed already has performed such obligations by negotiating each of the collateral agreements that are conditions of closing the acquisition pursuant to the terms of the Stock Purchase Agreement.

83.    The balance of equities favors specific performance because GTAG and White Winston have invested hundreds of thousands of dollars in the negotiations, and created other business arrangements which are to be integrated with GTDT.

84.    By contrast, GTRI's asserted desire for more cash, after the parties had agreed on all terms of the Stock Purchase Agreement, and specifically had agreed to the purchase price for GTDT since April 2019, does not create any equitable basis in its favor to deny specific performance.

85.    Money damages are an inadequate remedy for GTAG and White Winston because GTDT is a unique business.  There is no alternative investment opportunity that could be integrated with the other businesses that White Winston planned to combine with GTDT.

WHEREFORE, plaintiffs White Winston and GTAG pray that the Court enter a decree of specific performance against GTRI and in favor of GTAG and White Winston directing GTRI to perform its obligations under the Stock Purchase Agreement.  Plaintiffs further ask that the Court award them all of their expenses in this action, including attorneys' fees, and all such other relief as the Court deems just and proper.

## COUNT TWO
## Breach of Contract

86.    Plaintiffs GTAG and White Winston incorporate the foregoing paragraphs 1 through 85 as if fully set forth herein.

87.    No later than July 26, 2019, GTAG and GTRI had agreed on all substantial terms of the Stock Purchase Agreement and were obligated to undertake their best efforts to satisfy all conditions of closing the transaction, as required by the Stock Purchase Agreement.

88.    Indeed, the parties not only had negotiated the final Stock Purchase Agreement, they had reached agreement on all of the collateral agreements that are conditions of closing the transaction.

89.    By June 26, 2019, the parties had reached final agreement on the terms of the Noncompetition Agreement.

90.    On August 6, 2019, the parties reached final agreement on the Collateral Assignment and the Deposit Account Control Agreement.

91.    On August 12, 2019, Mr. Zink, for GTRI, informed Mr. Enright, for White Winston and GTAG, that "the only remaining item was on the R&M services agreement related to drive time." Mr. Enright responded that this was a "non issue" and accepted GTRI's representation that it "baked drive time into the $110" rate.

92. Mr. Zink did not suggest on August 12 that there were any other remaining open terms under the Noncompetition Agreement, the Collateral Assignment, the Deposit Account Control Agreement or the Services Agreement, and even if he had attempted to make such a suggestion, the terms of those agreements are not substantial terms of, or incorporated by reference into, the Stock Purchase Agreement. Those collateral agreements are conditions of *closing* the transaction under the Stock Purchase Agreement, not conditions of *entering into* the Stock Purchase Agreement itself. If there had been any substantial open issues in any of the collateral agreements (which there were not), the parties' obligations under the Stock Purchase Agreement would be to exercise their best efforts to resolve such open issues as part of closing the transaction.

93. The parties never positively agreed that there would be no binding contract until the Stock Purchase Agreement was executed. The February 11 and April 29 Letters of Intent state only that "[a]ll obligations and commitments to proceed with the Acquisition shall be contained only in the Definitive Agreement," *i.e.*, the Stock Purchase Agreement, as to which the parties reached final agreement no later than July 26, 2019. It follows that the Stock Purchase Agreement contains the parties' binding "obligations and commitments to proceed with the acquisition."

94.     Nowhere does either Letter of Intent state that the Definitive Agreement, *i.e.*, the Stock Purchase Agreement, must be *signed* to be binding.

95.     GTRI breached the Stock Purchase Agreement by demanding more than $11 million dollars in cash, more than $4 million more in cash than the parties agreed in Section 2.4(b)(i) of the Stock Purchase Agreement. Indeed, the $8 million cash component of the purchase price had been agreed to between the parties since the February 11 Initial Letter of Intent and not once revisited.

96.     Further, by refusing to proceed with the Stock Purchase Agreement after the parties had reached agreement on all of its substantial terms, unless plaintiffs paid more than $4 million in additional cash, GTRI breached its obligation to exercise its best efforts to close the transaction pursuant to Section 5.8 of the Stock Purchase Agreement.

97.     GTRI's breach of the Stock Purchase Agreement caused damages to GTAG and White Winston by depriving them of the profits they would have received from GTDT, as well as depriving them of the returns they expected from the combined businesses with which GTDT was to be integrated.

WHEREFORE, plaintiffs White Winston and GTAG pray that the Court enter judgment in their favor and award damages sufficient compensate them for the lost profits and other economic benefits they reasonably expected to receive from GTDT and the other businesses with which they intended to integrate it.

Plaintiffs further ask that the Court award them all of their expenses in this action, including attorneys' fees, and all such other relief as the Court deems just and proper.

## COUNT THREE
### Promissory Estoppel

98.   Plaintiffs GTAG and White Winston incorporate the foregoing paragraphs 1 through 97 as if fully set forth herein.

99.   In the alternative, plaintiffs are entitled to all of the expenses they incurred, which total more than $332,638.84 for counsel fees, consultants and other expenses, relying on GTRI's repeated promises that it would sell GTDT to plaintiffs.

100.   Since February 2019, GTRI repeatedly promised and represented to White Winston and GTAG that it wanted to sell GTDT, and lured White Winston and GTAG into months of negotiations which they were led to believe would end in a consummated transaction.

101.   Plaintiffs repeatedly accommodated GTRI's negotiating positions, each time being reassured by GTRI that the transaction would be completed if they did so.

102.   In January 2019, White Winston accommodated GTRI's desire for a greater cash component on the sale price and agreed to an $8 million cash component with a $2 million limited recourse promissory note.

103. On February 1, 2019, GTRI represented that its "board has elected to move forward with the transaction based on your latest LOI."

104. On February 11, GTRI signed the Initial Letter of Intent, representing that it "wish[ed] to proceed with the Acquisition on the terms set forth herein."

105. Three days later, White Winston engaged Plante Moran to undertake due diligence. Plante Moran's fees for its work have been more than $55,000.00.

106. White Winston also engaged the law firms of Gravel & Shea P.C. and McCarter & English L.L.P. to advise it, prepare the numerous transaction documents, and address other issues related to the transaction. Gravel & Shea's fees for its work have been more than $47,107.48. McCarter & English's fees for its work have been more than $78,671.45.

107. In due diligence during late March and early April, it became clear to both parties that the combined $10 million purchase price in the Initial Letter of Intent ($8 million cash plus $2 million limited recourse note) was too high. GTRI itself proposed reducing the promissory note to $1.85 million, then proposed a further reduction to $1.75 million, making the combined purchase price (prior to the pre-closing capital adjustment) $9.75 million.

108. GTRI also wanted its negative net working capital at closing to be applied to the promissory note component of the purchase price, rather than the cash component.

109. On April 29, 2019, the parties signed the Amended Letter of Intent, reflecting GTRI's new lower proposed combined price of $9.75 million, and the parties' agreement that GTDT's working capital deficit would be applied to reducing the amount of the limited recourse promissory note.

110. By signing the Amended Letter of Intent, GTRI once again represented that it "wish[ed] to proceed with the Acquisition on the terms set forth herein."

111. In June 2019, when the parties were supposed to sign the Stock Purchase Agreement, GTRI announced that the deal could go forwarded only if plaintiffs gave it a letter of credit or cash deposit equal to one year's rent at one of the store locations where GTRI had guaranteed GTDT's lease.

112. Plaintiffs once again agreed, relying on GTRI's statements that this lease guarantee issue was supposedly the sole issue standing in the way of the transaction.

113. Having spent significant time and resources resolving this purportedly sole remaining issue under the Stock Purchase Agreement, and then still more expenses reaching the final terms of the collateral agreements to be delivered at closing, plaintiffs were led by GTRI to believe that the parties would sign the Stock Purchase Agreement on August 12, 2019, only to have the rug pulled out from under them yet again on August 13, 2019, when Mr. Hoback announced that

GTRI would "back away" from the transaction unless it got $11 million in net cash.

114. Plaintiffs reasonably relied on GTRI's repeated promises and reassurances that the parties would complete the sale of GTDT, and took action to their detriment, including incurring hundreds of thousands of dollars of attorneys' and consultants' fees.

115. Justice can be avoided only by enforcing GTRI's repeated promises because White Winston's other investments, with which it intended to combine GTDT, as GTRI well knew, are much less valuable to it without GTDT, which is a unique business that cannot be replaced by another investment opportunity.

WHEREFORE, plaintiffs White Winston and GTAG pray in the alternative that the Court enter judgment in their favor and award as damages all of the expenses they incurred in attorneys' fees, consultants' fees, and other costs, in reliance on GTRI's promises over the more than seven months that the parties' negotiated the transaction. Plaintiffs further ask that the Court award them all of their expenses in this action, including attorneys' fees, and all such other relief as the Court deems just and proper.

SCHNADER HARRISON SEGAL & LEWIS LLP

/s/  Daniel M. Pereira
Richard A. Barkasy, Esquire (#4683)
Daniel M. Pereira, Esquire (#6450)
Schnader Harrison Segal & Lewis LLP
824 N. Market Street, Suite 800
Wilmington, DE 19801
(302) 888-4554 (telephone)
(302) 888-1696 (fax)
rbarkasy@schnader.com
dpereira@schnader.com

*Of Counsel*
Stephen A. Fogdall
Schnader Harrison Segal & Lewis LLP
1600 Market Street, Suite 3600
Philadelphia, PA 19103
(215) 751-2581

Words: 6,646

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

WHITE WINSTON SELECT )
ASSET FUNDS, LLC )
)
and )
)
GT ACQUISITION GROUP, INC., )     C.A. No. _____
)
Plaintiffs, )
)
v. )
)
GOOD TIMES RESTAURANTS, INC., )
)
Defendant. )

## VERIFICATION OF TODD M. ENRIGHT

Todd M. Enright, being duly sworn according to law, hereby deposes

and says:

I am a partner of White Winston Select Asset Funds, LLC ("White

Winston") and am authorized to make this verification on behalf of plaintiffs

White Wintson and GT Acquisition Group, Inc. I have reviewed the Verified

Complaint, and the facts averred therein are true and correct to the best of my

knowledge, information and belief.

_____
Todd M. Enright

SWORN TO AND SUBSCRIBED
BEFORE ME THIS 24 DAY OF
SEPTEMBER, 2019

_____
Notary Public



BENJAMIN G. GUNTHER
Notary Public
COMMONWEALTH OF MASSACHUSETTS
My Commission Expires
August 2, 2024

EFiled: Sep 24 2019 05:11PM EDT
Transaction ID 64238574
Case No. 2019-0771-

# EXHIBIT A

STOCK PURCHASE AGREEMENT

between

GT ACQUISITION GROUP, INC.

and

GOOD TIMES RESTAURANTS, INC.

# TABLE OF CONTENTS

Page

**ARTICLE 1 DEFINITIONS** ........................................................................................................ 1
   SECTION 1.1.   DEFINITIONS ........................................................................................... 1

**ARTICLE 2 SALE AND TRANSFER OF SHARES; CLOSING** ............................................ 8
   SECTION 2.1.   SHARES .................................................................................................... 8
   SECTION 2.2.   PURCHASE PRICE ...................................................................................... 8
   SECTION 2.3.   CLOSING .................................................................................................. 8
   SECTION 2.4.   CLOSING OBLIGATIONS ........................................................................... 8
   SECTION 2.5.   WORKING CAPITAL RECONCILIATION ...................................................... 10

**ARTICLE 3 REPRESENTATIONS AND WARRANTIES OF SELLER** ............................ 12
   SECTION 3.1.   ORGANIZATION AND GOOD STANDING ...................................................... 12
   SECTION 3.2.   AUTHORITY; NO CONFLICT ...................................................................... 12
   SECTION 3.3.   CAPITALIZATION AND SUBSIDIARIES ....................................................... 13
   SECTION 3.4.   FINANCIAL STATEMENTS .......................................................................... 14
   SECTION 3.5.   BOOKS AND RECORDS .............................................................................. 14
   SECTION 3.6.   TITLE TO PROPERTIES; ENCUMBRANCES ................................................. 14
   SECTION 3.7.   CONDITION AND SUFFICIENCY OF ASSETS ............................................... 15
   SECTION 3.8.   ACCOUNTS RECEIVABLE ........................................................................... 15
   SECTION 3.9.   INVENTORY ............................................................................................. 15
   SECTION 3.10.   NO UNDISCLOSED LIABILITIES .............................................................. 15
   SECTION 3.11.   TAXES .................................................................................................. 16
   SECTION 3.12.   NO MATERIAL ADVERSE CHANGE .......................................................... 16
   SECTION 3.13.   EMPLOYEE BENEFITS ............................................................................. 17
   SECTION 3.14.   COMPLIANCE WITH LEGAL REQUIREMENTS; GOVERNMENTAL AUTHORIZATIONS .................. 18
   SECTION 3.15.   LEGAL PROCEEDINGS; ORDERS. ............................................................ 19
   SECTION 3.16.   ABSENCE OF CERTAIN CHANGES AND EVENTS ....................................... 20
   SECTION 3.17.   CONTRACTS; NO DEFAULTS .................................................................. 21
   SECTION 3.18.   INSURANCE ........................................................................................... 23
   SECTION 3.19.   ENVIRONMENTAL MATTERS ................................................................... 25
   SECTION 3.20.   EMPLOYEES .......................................................................................... 26
   SECTION 3.21.   LABOR RELATIONS; COMPLIANCE ......................................................... 27
   SECTION 3.22.   INTELLECTUAL PROPERTY ..................................................................... 27
   SECTION 3.23.   CERTAIN PAYMENTS .............................................................................. 30
   SECTION 3.24.   DISCLOSURE ......................................................................................... 30
   SECTION 3.25.   RELATIONSHIPS WITH RELATED PERSONS ............................................. 30
   SECTION 3.26.   RELATIONSHIPS WITH FRANCHISEES ...................................................... 31
   SECTION 3.27.   BROKERS OR FINDERS ........................................................................... 31
   SECTION 3.28.   LEASE AND SUBLEASES .......................................................................... 31
   SECTION 3.29.   REPAIR AND MAINTENANCE PROCESS .................................................... 31

**ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF BUYER** ............................ 31
   SECTION 4.1.   ORGANIZATION AND GOOD STANDING ...................................................... 31
   SECTION 4.2.   AUTHORITY; NO CONFLICT ...................................................................... 31
   SECTION 4.3.   INVESTMENT INTENT ............................................................................... 32
   SECTION 4.4.   CERTAIN PROCEEDINGS ........................................................................... 32
   SECTION 4.5.   BROKERS OR FINDERS ............................................................................. 32

**ARTICLE 5 COVENANTS OF SELLER** ............................................................................. 32
   SECTION 5.1.   ACCESS AND INVESTIGATION................................................................... 32
   SECTION 5.2.   OPERATION OF THE BUSINESS OF THE COMPANY ................................... 32

| SECTION 5.3. | NEGATIVE COVENANT | 33 |
| SECTION 5.4. | REQUIRED APPROVALS | 33 |
| SECTION 5.5. | NOTIFICATION | 33 |
| SECTION 5.6. | PAYMENT OF INDEBTEDNESS BY RELATED PERSONS | 33 |
| SECTION 5.7. | NO NEGOTIATION | 33 |
| SECTION 5.8. | BEST EFFORTS | 34 |
| SECTION 5.9. | TAX ELECTIONS | 34 |
| SECTION 5.10. | PURCHASE PRICE ALLOCATION | 34 |
| SECTION 5.11. | TAX CLEARANCE | 34 |
| SECTION 5.12. | UNCLAIMED PROPERTY | 34 |

**ARTICLE 6 COVENANTS OF BUYER** .................................................................................. **34**

| SECTION 6.1. | APPROVALS OF GOVERNMENTAL BODIES | 34 |
| SECTION 6.2. | BEST EFFORTS | 35 |
| SECTION 6.3. | EFFORTS FOR FRANCHISES | 35 |
| SECTION 6.4. | PAYMENT OF PURCHASE NOTES | 35 |
| SECTION 6.5. | LEASE GUARANTEES | 35 |

**ARTICLE 7 CONDITIONS PRECEDENT TO BUYER'S OBLIGATION TO CLOSE** ............................ **35**

| SECTION 7.1. | ACCURACY OF REPRESENTATIONS | 35 |
| SECTION 7.2. | SELLER'S PERFORMANCE | 35 |
| SECTION 7.3. | BRING DOWN CERTIFICATE | 36 |
| SECTION 7.4. | CONSENTS | 36 |
| SECTION 7.5. | ADDITIONAL DOCUMENTS | 36 |
| SECTION 7.6. | NO PROCEEDINGS | 36 |
| SECTION 7.7. | NO CLAIM REGARDING STOCK OWNERSHIP OR SALE PROCEEDS | 36 |
| SECTION 7.8. | NO PROHIBITION | 36 |
| SECTION 7.9. | REPAIR AND MAINTENANCE | 36 |
| SECTION 7.10. | STORE 172 LEASE | 36 |
| SECTION 7.11. | NO MATERIAL ADVERSE CHANGE | 37 |

**ARTICLE 8 CONDITIONS PRECEDENT TO SELLER'S OBLIGATION TO CLOSE** ........................... **37**

| SECTION 8.1. | ACCURACY OF REPRESENTATIONS | 37 |
| SECTION 8.2. | BUYER'S PERFORMANCE | 37 |
| SECTION 8.3. | CONSENTS | 37 |
| SECTION 8.4. | ADDITIONAL DOCUMENTS | 37 |
| SECTION 8.5. | NO INJUNCTION | 37 |

**ARTICLE 9 TERMINATION** ........................................................................................... **38**

| SECTION 9.1. | TERMINATION EVENTS | 38 |
| SECTION 9.2. | EFFECT OF TERMINATION | 38 |

**ARTICLE 10 INDEMNIFICATION; REMEDIES** .................................................................. **38**

| SECTION 10.1. | SURVIVAL; RIGHT TO INDEMNIFICATION NOT AFFECTED BY KNOWLEDGE | 38 |
| SECTION 10.2. | INDEMNIFICATION AND PAYMENT OF DAMAGES BY SELLER | 39 |
| SECTION 10.3. | INDEMNIFICATION AND PAYMENT OF DAMAGES BY SELLER – ENVIRONMENTAL MATTERS | 39 |
| SECTION 10.4. | INDEMNIFICATION AND PAYMENT OF DAMAGES BY BUYER | 40 |
| SECTION 10.5. | TIME LIMITATIONS | 40 |
| SECTION 10.6. | LIMITATIONS ON AMOUNT – SELLER | 41 |
| SECTION 10.7. | LIMITATIONS ON AMOUNT – BUYER | 41 |
| SECTION 10.8. | RIGHT OF SET-OFF | 41 |
| SECTION 10.9. | PROCEDURE FOR INDEMNIFICATION – THIRD PARTY CLAIMS | 41 |
| SECTION 10.10. | PROCEDURE FOR INDEMNIFICATION – OTHER CLAIMS | 42 |

**ARTICLE 11 GENERAL PROVISIONS** ............................................................................. **43**

| SECTION 11.1. | EXPENSES | 43 |

SECTION 11.2. PUBLIC ANNOUNCEMENTS..................................................................43
SECTION 11.3. CONFIDENTIALITY............................................................................43
SECTION 11.4. NOTICES..........................................................................................43
SECTION 11.5. JURISDICTION; SERVICE OF PROCESS....................................................44
SECTION 11.6. FURTHER ASSURANCES.......................................................................44
SECTION 11.7. WAIVER............................................................................................44
SECTION 11.8. ENTIRE AGREEMENT AND MODIFICATION ............................................44
SECTION 11.9. DISCLOSURE LETTER..........................................................................44
SECTION 11.10. ASSIGNMENTS, SUCCESSORS AND NO THIRD-PARTY RIGHTS ..................45
SECTION 11.11. SEVERABILITY .................................................................................45
SECTION 11.12. SECTION HEADINGS, CONSTRUCTION.................................................45
SECTION 11.13. TIME OF THE ESSENCE......................................................................45
SECTION 11.14. GOVERNING LAW.............................................................................45
SECTION 11.15. COUNTERPARTS...............................................................................45
SECTION 11.16. EFFECTIVE DATE .............................................................................45

# STOCK PURCHASE AGREEMENT

This Stock Purchase Agreement ("Agreement") is by and between **GT ACQUISITION GROUP, INC.**, a to-be-formed Delaware corporation, ("Buyer") and **GOOD TIMES RESTAURANTS, INC.**, a Nevada corporation ("Seller").

## Background

Seller desires to sell and Buyer desires to purchase all of the issued and outstanding shares (the "Shares") of capital stock of Good Times Drive Thru, Inc., a Colorado corporation (the "Company") for the consideration and on the terms set forth in this Agreement.

## NOW, THEREFORE,

In consideration of the foregoing and the mutual covenants and agreements herein set forth, the parties hereby agree as follows:

## ARTICLE 1
## Definitions

Section 1.1. **Definitions**. For purposes of this Agreement, the following terms have the meanings specified or referred to in this Section 1.1:

"Adjustment Amount" – as defined in Section 2.5(b).

"Applicable Contract" – any Contract: (a) under which the Company has or may acquire any rights; (b) under which the Company has or may become subject to any obligation or liability; or (c) by which the Company or any of the assets owned or used by it is or may become bound.

"Balance Sheet" – as defined in Section 3.4.

"Benefit Plan" – as defined in Section 3.13.

"Best Efforts" – the efforts that a prudent Person desirous of achieving a result would use in similar circumstances to ensure that such result is achieved as expeditiously as possible.

"Breach" – a "Breach" of a representation, warranty, covenant, obligation, or other provision of this Agreement or any instrument delivered pursuant to this Agreement will be deemed to have occurred if there is or has been: (a) any inaccuracy in or breach of, or any failure to perform or comply with, such representation, warranty, covenant, obligation, or other provision; or (b) any claim (by any Person) or other occurrence or circumstance that is or was inconsistent with such representation, warranty, covenant, obligation, or other provision, and the term "Breach" means any such inaccuracy, breach, failure, claim, occurrence, or circumstance.

"Buyer" – as defined in the first paragraph of this Agreement.

"Closing" – as defined in Section 2.3.

"Closing Date" – the date and time as of which the Closing actually takes place.

"Collateral Assignment" – as defined in Section 2.4

"Company" – as defined in the Recitals of this Agreement.

"Consent" – any approval, consent, ratification, waiver, or other authorization (including any Governmental Authorization).

"Contemplated Transactions" – all of the transactions contemplated by this Agreement, including:

(a)     the sale of the Shares by Seller to Buyer;

(b)     the execution, delivery, and performance of the $600,000 Purchase Note, the $1,150,000 Purchase Note, the Noncompetition Agreement, and the Seller' Releases;

(c)     the performance by Buyer and Seller of their respective covenants and obligations under this Agreement; and

(d)     Buyer's acquisition and ownership of the Shares and exercise of control over the Company.

"Contract" – any agreement, contract, obligation, promise, or undertaking (whether written or oral and whether express or implied) that is legally binding.

"Damages" – as defined in Section 10.2.

"Disclosure Letter" – the disclosure letter delivered by Seller to Buyer concurrently with the execution and delivery of this Agreement.

"Effective Date" – as defined in Section 11.16.

"Encumbrance" – any charge, claim, community property interest, condition, equitable interest, lien, option, pledge, security interest, right of first refusal, or material restriction of any kind, including any restriction on use, voting, transfer, receipt of income, or exercise of any other attribute of ownership.

"Environment" – soil, land surface or subsurface strata, surface waters (including navigable waters, ocean waters, streams, ponds, drainage basins, and wetlands), groundwaters, drinking water supply, stream sediments, ambient air (including indoor air), plant and animal life, and any other environmental medium or natural resource.

"Environmental, Health, and Safety Liabilities" – any material cost, damages, expense, liability, obligation, or other responsibility arising from or under Environmental Law or Occupational Safety and Health Law and consisting of or relating to:

(a)     any environmental, health, or safety matters or conditions (including on-site or off-site contamination, occupational safety and health, and regulation of chemical substances or products);

(b)     fines, penalties, judgments, awards, settlements, legal or administrative proceedings, damages, losses, claims, demands and response, investigative, remedial, or inspection costs and expenses arising under Environmental Law or Occupational Safety and Health Law;

(c)      financial responsibility under Environmental Law or Occupational Safety and Health Law for cleanup costs or corrective action, including any investigation, cleanup, removal, containment, or other remediation or response actions ("Cleanup") required by applicable Environmental Law or Occupational Safety and Health Law (whether or not such Cleanup has been required or requested by any Governmental Body or any other Person) and for any natural resource damages; or

(d)      any other compliance, corrective, investigative, or remedial measures required under Environmental Law or Occupational Safety and Health Law.

The terms "removal," "remedial," and "response action," include the types of activities covered by the United States Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. Section 9601 et seq., as amended ("CERCLA").

"Environmental Law" – any Legal Requirement that requires or relates to:

(a)      advising appropriate authorities, employees, and the public of intended or actual releases of pollutants or hazardous substances or materials, violations of discharge limits, or other prohibitions and of the commencements of activities, such as resource extraction or construction, that could have significant impact on the Environment;

(b)      preventing or reducing to acceptable levels the release of pollutants or hazardous substances or materials into the Environment;

(c)      reducing the quantities, preventing the release, or minimizing the hazardous characteristics of wastes that are generated;

(d)      assuring that products are designed, formulated, packaged, and used so that they do not present unreasonable risks to human health or the Environment when used or disposed of;

(e)      protecting resources, species, or ecological amenities;

(f)      reducing to acceptable levels the risks inherent in the transportation of hazardous substances, pollutants, oil, or other potentially harmful substances;

(g)      cleaning up pollutants that have been released, preventing the threat of release, or paying the costs of such clean up or prevention; or

(h)      making responsible parties pay private parties, or groups of them, for damages done to their health or the Environment, or permitting self-appointed representatives of the public interest to recover for injuries done to public assets.

"ERISA" – the Employee Retirement Income Security Act of 1974 or any successor law, and regulations and rules issued pursuant to that Act or any successor law.

"ERISA Affiliate" means, with respect to the Company, any other person that, together with the Company, would be treated as a single employer under IRC Section 414.

"Excluded Liabilities" – as defined in Section 10.2(c).

"Facilities" – any real property, leaseholds, or other interests currently owned or operated by the Company and any buildings, plants, structures, or equipment (including motor vehicles, tank cars, and rolling stock) currently owned or operated by the Company.

"Franchise" – each agreement set forth on Exhibit 1.1 and each amendment or successor or renewal agreement thereto.

"Franchisee" – each counterparty to a Franchise Agreement.

"Franchise Revenue" – all revenue received by the Company from each Franchise with respect to each location covered thereby pursuant to the terms thereof on the date of this Agreement or thereafter including, but not limited to, all fees and royalties except contributions to advertising funds. In the event that a Franchise is terminated or expires and the Company commences to operate a restaurant that was previously operated by a Franchisee under a Franchise, all revenue received from such location will be included in the term "Franchise Revenue."

"GAAP" – generally accepted United States accounting principles, applied on a basis consistent with the basis on which the Balance Sheet and the other financial statements referred to in Section 3.4(b) were prepared.

"Governmental Authorization" – any approval, consent, license, permit, waiver, or other authorization issued, granted, given, or otherwise made available by or under the authority of any Governmental Body or pursuant to any Legal Requirement.

"Governmental Body" – any:

(a) nation, state, county, city, town, village, district, or other jurisdiction of any nature;

(b) federal, state, local, municipal, foreign, or other government;

(c) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal);

(d) multi-national organization or body; or

(e) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature.

"Hazardous Activity" – the distribution, generation, handling, importing, management, manufacturing, processing, production, refinement, Release, storage, transfer, transportation, treatment, or use (including any withdrawal or other use of groundwater) of Hazardous Materials in, on, under, about, or from the Facilities or any part thereof into the Environment, and any other act, business, operation, or thing that materially increases the danger, or risk of danger, or poses an unreasonable risk of harm to persons or property on or off the Facilities, or that may affect the value of the Facilities or the Company.

"Hazardous Materials" – any waste or other substance that is listed, defined, designated, or classified as, or otherwise determined to be, hazardous, radioactive, or toxic or a pollutant or a contaminant under or pursuant to any Environmental Law, including any admixture or solution thereof, and specifically including petroleum and all derivatives thereof or synthetic substitutes therefor and asbestos or asbestos-containing materials.

"Indemnified Persons" – as defined in Section 10.2.

"Intellectual Property Assets" – as defined in Section 3.22.

"Interim Balance Sheet" – as defined in Section 3.4.

"Initial Consideration" – as defined in Section 2.4(b)(i).

"IRC" – the Internal Revenue Code of 1986 or any successor law, and regulations issued by the IRS pursuant to the Internal Revenue Code or any successor law.

"IRS" – the United States Internal Revenue Service or any successor agency, and, to the extent relevant, the United States Department of the Treasury.

"Knowledge" – an individual will be deemed to have "Knowledge" of a particular fact or other matter if:

> (a)     such individual is actually aware of such fact or other matter; or

> (b)     a prudent individual could be reasonably expected to discover or otherwise become aware of such fact or other matter in the course of conducting a reasonably comprehensive investigation concerning the existence of such fact or other matter.

A Person (other than an individual) will be deemed to have "Knowledge" of a particular fact or other matter if any individual who is serving, or who has at any time served, as an officer of such Person (or in any similar capacity) has, or at any time had, Knowledge of such fact or other matter. When reference is made to "Seller's Knowledge" or "the Knowledge of the Seller" that means the Knowledge held by Boyd Hoback, Ryan Zink and/or Scott LeFever.

"Legal Requirement" – any federal, state, local, municipal, foreign, international, multinational, or other administrative order, constitution, law, ordinance, principle of common law, regulation, statute, or treaty.

"Material Adverse Change" or "Material Adverse Effect" or "material" or "materially" (whether or not presented with initial capital letters) means any change, event, circumstance or development, individually or when taken together with all other such similar or related changes, events, circumstances or developments, that: (i) could reasonably be expected to have a material adverse effect on the assets, liabilities, rights, obligations, financial condition or operations of the Company; or (ii) prevents or delays the ability of Buyer to consummate the transactions contemplated by this Agreement or any of the ancillary documents or agreements to be delivered in connection herewith.

"Noncompetition Agreement" – as defined in Section 2.4(a)(iii).

"Occupational Safety and Health Law" – any Legal Requirement designed to provide safe and healthful working conditions and to reduce occupational safety and health hazards, and any program, whether governmental or private (including those promulgated or sponsored by industry associations and insurance companies), designed to provide safe and healthful working conditions.

"Order" – any award, decision, injunction, judgment, order, ruling, subpoena, or verdict entered, issued, made, or rendered by any court, administrative agency, or other Governmental Body or by any arbitrator.

"Ordinary Course of Business" – an action taken by a Person will be deemed to have been taken in the "Ordinary Course of Business" only if:

(a)     such action is consistent with the past practices of such Person and is taken in the ordinary course of the normal day-to-day operations of such Person;

(b)     such action is not required to be authorized by the board of directors of such Person (or by any Person or group of Persons exercising similar authority) [and is not required to be specifically authorized by the parent company (if any) of such Person]; and

(c)     such action is similar in nature and magnitude to actions customarily taken, without any authorization by the board of directors (or by any Person or group of Persons exercising similar authority), in the ordinary course of the normal day-to-day operations of other Persons that are in the same line of business as such Person.

"Organizational Documents" – (a) the articles or certificate of incorporation and the bylaws of a corporation; (b) the partnership agreement and any statement of partnership of a general partnership; (c) the limited partnership agreement and the certificate of limited partnership of a limited partnership; (d) any charter or similar document adopted or filed in connection with the creation, formation, or organization of a Person; and (e) any amendment to any of the foregoing.

"Person" – any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, labor union, or other entity or Governmental Body.

"Proceeding" – any action, arbitration, audit, hearing, investigation, litigation, or suit (whether civil, criminal, administrative, investigative, or informal) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Body or arbitrator.

"Related Person" – with respect to a particular individual:

(a)     each other member of such individual's Family;

(b)     any Person that is directly or indirectly controlled by such individual or one or more members of such individual's Family;

(c)     any Person in which such individual or members of such individual's Family hold (individually or in the aggregate) a Material Interest; and

(d)     any Person with respect to which such individual or one or more members of such individual's Family serves as a director, officer, partner, executor, or trustee (or in a similar capacity).

With respect to a specified Person other than an individual:

(a)     any Person that directly or indirectly controls, is directly or indirectly controlled by, or is directly or indirectly under common control with such specified Person;

(b)     any Person that holds a Material Interest in such specified Person;

(c)     each Person that serves as a director, officer, partner, executor, or trustee of such specified Person (or in a similar capacity);

(d)     any Person in which such specified Person holds a Material Interest;

(e)     any Person with respect to which such specified Person serves as a general partner or a trustee (or in a similar capacity); and

(f)     any Related Person of any individual described in clause (b) or (c).

For purposes of this definition: (a) the "Family" of an individual includes: (i) the individual; (ii) the individual's spouse; (iii) any other natural person who is related to the individual or the individual's spouse within the second degree; and (iv) any other natural person who resides with such individual; and (b) "Material Interest" means direct or indirect beneficial ownership (as defined in Rule 13d-3 under the Securities Exchange Act of 1934) of voting securities or other voting interests representing at least 5% of the outstanding voting power of a Person or equity securities or other equity interests representing at least 5% of the outstanding equity securities or equity interests in a Person.

"Release" – any material spilling, leaking, emitting, discharging, depositing, escaping, leaching, dumping, or other releasing into the Environment, whether intentional or unintentional.

"Representative" – with respect to a particular Person, any director, officer, employee, agent, consultant, advisor, or other representative of such Person, including legal counsel, accountants, and financial advisors.

"Securities Act" – the Securities Act of 1933 or any successor law, and regulations and rules issued pursuant to that Act or any successor law.

"Seller" – as defined in the first paragraph of this Agreement.

"Seller's Releases" – as defined in Section 2.4.

"Shares" – as defined in the Recitals of this Agreement.

"Subsidiary" – with respect to any Person (the "Owner"), any corporation or other Person of which securities or other interests having the power to elect a majority of that corporation's or other Person's board of directors or similar governing body, or otherwise having the power to direct the business and policies of that corporation or other Person (other than securities or other interests having such power only upon the happening of a contingency that has not occurred) are held by the Owner or one or more of its Subsidiaries; when used without reference to a particular Person, "Subsidiary" means a Subsidiary of the Company including but not limited to Fast Restaurants Co-Development LLLP, a Colorado limited liability limited partnership.

"Target Working Capital" – shall mean $0.00.

"Tax" – any tax (including any income tax, capital gains tax, value-added tax, sales tax, property tax, gift tax, or estate tax), levy, assessment, tariff, duty (including any customs duty), deficiency, or other fee, and any related charge or amount (including any fine, penalty, interest, or addition to tax), imposed, assessed, or collected by or under the authority of any Governmental Body or payable pursuant to any tax-sharing agreement or any other Contract relating to the sharing or payment of any such tax, levy, assessment, tariff, duty, deficiency, or fee.

"Tax Return" – any return (including any information return), report, statement, schedule, notice, form, or other document or information filed with or submitted to, or required to be filed with or submitted to, any Governmental Body in connection with the determination, assessment, collection, or payment of any Tax or in connection with the administration, implementation, or enforcement of or compliance with any Legal Requirement relating to any Tax.

"Threat of Release" – a substantial likelihood of a Release that may require action in order to prevent or mitigate damage to the Environment that may result from such Release.

"Threatened" – a claim, Proceeding, dispute, action, or other matter will be deemed to have been "Threatened" if any demand or statement has been made (orally or in writing) or any notice has been given (orally or in writing), or if any other event has occurred or any other circumstances exist, that would lead a prudent Person to conclude that such a claim, Proceeding, dispute, action, or other matter is likely to be asserted, commenced, taken, or otherwise pursued in the future.

## ARTICLE 2
## Sale and Transfer of Shares; Closing

Section 2.1.    **Shares**.    Subject to the terms and conditions of this Agreement, at the Closing, Seller will sell and transfer the Shares to Buyer, and Buyer will purchase the Shares from Seller.

Section 2.2.    **Purchase Price**.    The purchase price (the "Purchase Price") for the Shares will be $9,750,000 (plus the Adjustment Amount).

Section 2.3.    **Closing**.    The purchase and sale (the "Closing") provided for in this Agreement will take place at the offices of Buyer's counsel at 76 Saint Paul Street, 7th Floor, Burlington, Vermont, at 10:00 a.m. (local time) on September 25, 2019 with an effective time of 11:59 PM on September 24, 2019 or at such other time and place as the parties may agree. Subject to the provisions of Section 9, failure to consummate the purchase and sale provided for in this Agreement on the date and time and at the place determined pursuant to this Section 2.3 will not result in the termination of this Agreement and will not relieve any party of any obligation under this Agreement.

Section 2.4.    **Closing Obligations**.    At the Closing:

(a)    Seller will deliver to Buyer:

(i)    certificates representing the Shares, duly endorsed (or accompanied by duly executed stock powers), for transfer to Buyer;

(ii)    releases in the form of Exhibit 2.4(a)(ii) executed by Seller (collectively, "Seller's Releases");

(iii)    a noncompetition agreement in the form of Exhibit 2.4(a)(iii), executed by Seller, (the "Noncompetition Agreement"); and

(iv)    a certificate executed by Seller representing and warranting to Buyer that each of Seller's representations and warranties in this Agreement was accurate in all respects as of the date of this Agreement and is accurate in all respects as of the Closing Date as if made on the Closing Date (giving full effect to any

supplements to the Disclosure Letter that were delivered by Seller to Buyer prior to the Closing Date in accordance with Section 5.5);

(v)     all required approvals (including with respect to permits) as reasonably determined by Buyer;

(vi)    release of any liens on Company's property to the reasonable satisfaction of Buyer including written proof that the Company is no longer a party to any loan agreement of the Seller; and

(vii)   documentation reasonably satisfactory to Buyer of all Consents listed in Section 3.2 of the Disclosure Letter; and

(b)     Buyer will deliver to Seller:

(i)     $8,000,000.00 by cash, wire transfer or ACH to accounts specified by Seller (the "Initial Consideration");

(ii)    a promissory note payable to Seller with full recourse to the Company and to Buyer in the original, gross principal amount of $600,000.00 with interest accruing at five percent (5%) per annum and with fully-amortizing principal and interest payments payable in monthly installments in the minimum amount equal to the greater of $7,595.95 or the full amount of Franchise Revenue received by the Company or Buyer during each month over an eight (8) year term in the form of Exhibit 2.4(b)(ii) (the "$600,000 Purchase Note");

(iii)   a limited recourse promissory note payable to Seller in the original, gross principal amount of $1,150,000 (plus or minus the Adjustment amount) with interest accruing at five percent (5%) per annum and with principal and interest payments paid from Franchise Revenue in monthly installments, to commence only after full repayment of the $600,000 Purchase Note, in the form of Exhibit 2.4(b)(iii) (the "$1,150,000 Purchase Note") with interest accruing from and after the Closing Date and with a maturity date on the eighth (8th) anniversary of the Closing Date, provided, however, that Seller may elect to extend such term on a year to year basis in the event that the $1,150,000 Purchase Note has not been fully paid by such eighth (8th) anniversary for however many years may be necessary for the full payment of the $1,150,000 Purchase Note from Franchise Revenue, or Seller may on or after such eighth (8th) anniversary date elect to exercise its rights under the Collateral Assignment in full satisfaction of any obligations of Buyer under the $1,150,000 Purchase Note; and

(iv)    a Collateral Assignment of Franchise Revenue payable to the Company to secure the obligations of the $600,000 Purchase Note and the $1,150,000 Purchase Note in a form of Exhibit 2.4(b)(iv) (the "Collateral Assignment"). The Collateral Assignment shall establish a first lien security interest on the Franchise Revenue for the benefit of Seller. All Franchise Revenue shall be deposited into a special account for which account there will be a deposit account control agreement;

(v)     a certificate executed by Buyer representing and warranting to Seller that each of Buyer's representations and warranties in this Agreement was accurate in all

respects as of the date of this Agreement and is accurate in all respects as of the Closing Date as if made on the Closing Date

(c)    The parties agree that a Section 338(h)(10) election will be made, and agree to allocate the Purchase Price for tax purposes as provided in Section 5.10.

Section 2.5.    **Working Capital Reconciliation**.

(a)    **Estimated Net Working Capital**. Between the fifth (5th) and the third (3rd) day prior to Closing Date, Seller shall cause to be prepared and delivered to Buyer an estimated consolidated balance sheet of the Company as of the Closing Date, which balance sheet will be prepared in accordance with GAAP (the "Estimated Closing Date Balance Sheet"). Seller shall also cause to be prepared and delivered to Buyer a worksheet showing: a good faith estimate of the Net Working Capital as of the Closing Date (the "Estimated Net Working Capital").

(b)    **Pre-Closing Adjustment**. The Purchase Price and the Initial Consideration shall be adjusted by the following amount (the "Adjustment Amount") determined as follows prior to the Closing:

    (i)    If the Estimated Net Working Capital exceeds the Target Net Working Capital, the Purchase Price and the Initial Consideration shall be increased by an amount equal to the amount by which the Estimated Net Working Capital exceeds the Target Net Working Capital. If the Estimated Net Working Capital is less than the Target Net Working Capital, the principal amount of the $1,150,000 Purchase Note shall be decreased by an amount equal to the amount by which the Target Net Working Capital exceeds the Estimated Net Working Capital and if that amount exceeds $1,150,000.00, then the Initial Consideration shall be reduced on a dollar for dollar basis to the extent of any remaining shortfall between the Target Net Working Capital and the Estimated Net Working Capital.

(c)    **Final Closing Date Balance Sheet**.

    (i)    As soon as practicable following the Closing, but in no event more than sixty (60) days after the Closing Date, Buyer shall in good faith prepare a consolidated balance sheet for the Company as of the Closing Date, which balance sheet will be prepared in the same manner as the Estimated Closing Date Balance Sheet (the "Final Closing Date Balance Sheet"), together with a worksheet showing: the difference, if any, between the Net Working Capital as of the Closing Date shown on the Final Closing Date Balance Sheet (the "Actual Net Working Capital") and the Estimated Net Working Capital. From and after delivery of the Final Closing Date Balance Sheet, Buyer shall provide Seller and its authorized representatives with reasonable access during normal business hours to the facilities, books and records, personnel and accountants of the Company, in each case, to the extent reasonably necessary for Seller to review Buyer's preparation of the Final Closing Date Balance Sheet.

    (ii)    For thirty (30) days following its receipt of the Final Closing Date Balance Sheet, Seller shall have the right to object thereto. Any such objection made by Seller shall be accompanied by materials showing in reasonable detail Seller's support for her position. Buyer and Seller shall seek to resolve any differences in their

respective positions with respect to the Final Closing Date Balance Sheet. If Buyer and Seller are unable to agree on the Final Closing Date Balance Sheet within thirty (30) days of Buyer's receipt of Seller's written objections, then BKD, LLP or such other independent accounting firm of recognized regional standing in the United States as may be mutually selected by Buyer and Seller (the "Accountant") shall resolve any remaining disagreements. Seller and Buyer shall execute any agreement reasonably required by the Accountant for its engagement to serve in the capacity contemplated by this Agreement. The Accountant shall be charged with determining as promptly as practicable, but in any event within thirty (30) days after the date on which such dispute is referred to the Accountant, whether the Actual Net Working Capital and the Final Closing Date Balance Sheet were prepared in accordance with this Agreement and (only with respect to the disagreements as to the items set forth in the notice of disagreement and submitted to the Accountant and any other items affected by the resolution of those disputed items) whether and to what extent, if any, the Actual Net Working Capital and the Final Closing Date Balance Sheet require adjustment. The Accountant shall allocate its costs and expenses between Buyer and Seller based upon the percentage of the contested amount submitted to the Accountant that is ultimately awarded to Buyer on the one hand or Seller on the other hand, such that Buyer, bears a percentage of such costs and expenses equal to the percentage of the contested amount awarded to Seller and Seller bears a percentage of such costs and expenses equal to the percentage of the contested amount awarded to Buyer. If there is no timely objection as provided above, the Final Closing Date Balance Sheet as determined by Buyer shall be binding and final for purposes of this Agreement. If there is a timely objection as provided above, the determination of the Accountant shall be binding and final for purposes of this Agreement.

(d) **Post-Closing Adjustment Procedures**. Promptly following the final determination of the Final Closing Date Balance Sheet, but in no event more than ninety (90) days after the Closing Date:

    (i)    If the Actual Net Working Capital is greater than the Estimated Net Working Capital, then Buyer shall pay to Seller an amount in cash equal to the difference between: (A) the Actual Net Working Capital; and (B) the Estimated Net Working Capital; and

    (ii)    If the Actual Net Working Capital is less than the Estimated Net Working Capital, then Buyer shall recover any shortfall through a dollar for dollar reduction in the principal amount of the $1,150,000 Purchase Note equal to the difference between: (A) the Actual Working Capital; and (B) the Estimated Net Working Capital. If, after such adjustment to the $1,150,000 Purchase Note, there remains any shortfall between the Actual Net Working Capital and the Estimated Net Working Capital (the "Net Working Capital Shortfall"), then Seller will pay Buyer the Net Working Capital Shortfall in cash or by wire transfer within fifteen (15) days. If payment of the Net Working Capital Shortfall is not made in accordance with the preceding sentence, then Seller will pay Buyer the amount that is one and a half times the Net Working Capital Shortfall plus interest at the rate of one percent (1%) per month plus reasonable attorney's fees and costs of collection until the Net Working Capital Shortfall and fees and costs are paid in full. Amounts set forth in this Section 2.5(d) shall be

paid, in immediately available funds, to such accounts as Buyer or Seller shall designate in writing to the other party. Any payments made pursuant to this Section 2.5(d) shall, for Tax purposes, be deemed to be an adjustment to the Purchase Price payable to Seller.

# ARTICLE 3
## Representations and Warranties of Seller

Seller represents and warrants to Buyer as follows:

Section 3.1.    **Organization and Good Standing**.

(a)    The Company is a corporation duly organized, validly existing, and in good standing under the laws of its jurisdiction of incorporation, with full corporate power and authority to conduct its business as it is now being conducted, to own or use the properties and assets that it purports to own or use, and to perform all its obligations under Applicable Contracts. The Company is duly qualified to do business as a foreign corporation and is in good standing under the laws of each state or other jurisdiction in which either the ownership or use of the properties owned or used by it, or the nature of the activities conducted by it, requires such qualification.

(b)    Seller has delivered to Buyer copies of the Organizational Documents of the Company, as currently in effect.

Section 3.2.    **Authority; No Conflict**.

(a)    This Agreement constitutes the legal, valid, and binding obligation of Seller, enforceable against Seller in accordance with its terms. Upon the execution and delivery by Seller of the Seller's Releases and the Noncompetition Agreement (collectively, the "Seller's Closing Documents"), the Seller's Closing Documents will constitute the legal, valid, and binding obligations of Seller, enforceable against Seller in accordance with their respective terms. Seller has the absolute and unrestricted right, power, authority, and capacity to execute and deliver this Agreement and the Seller's Closing Documents and to perform their obligations under this Agreement and the Seller's Closing Documents.

(b)    Except as set forth in Part 3.2 of the Disclosure Letter, neither the execution and delivery of this Agreement nor the consummation or performance of any of the Contemplated Transactions will, directly or indirectly (with or without notice or lapse of time):

(i)    contravene, conflict with, or result in a violation of: (A) any provision of the Organizational Documents of the Company; or (B) any resolution adopted by the board of directors or the stockholders of the Company;

(ii)    contravene, conflict with, or result in a violation of, or give any Governmental Body or other Person the right to challenge any of the Contemplated Transactions or to exercise any remedy or obtain any relief under, any Legal Requirement or any Order to which the Company or Seller, or any of the assets owned or used by the Company, may be subject;

(iii)    contravene, conflict with, or result in a violation of any of the terms or requirements of, or give any Governmental Body the right to revoke, withdraw,

suspend, cancel, terminate, or modify, any Governmental Authorization that is held by the Company or that otherwise relates to the business of, or any of the assets owned or used by, the Company;

(iv)     cause the Company to become subject to, or to become liable for the payment of, any Tax;

(v)      cause any of the assets owned by the Company to be reassessed or revalued by any taxing authority or other Governmental Body other than for federal and state income tax purposes as a result of the Section 338(h)(10) election described in Section 2.4(c) of this Agreement.

(vi)     contravene, conflict with, or result in a violation or breach of any provision of, or give any Person the right to declare a default or exercise any remedy under, or to accelerate the maturity or performance of, or to cancel, terminate, or modify, any Applicable Contract; or

(vii)    except as set forth herein, result in the imposition or creation of any Encumbrance upon or with respect to any of the assets owned or used by the Company.

Neither Seller nor the Company is or will be required to give any notice to or obtain any Consent from any Person in connection with the execution and delivery of this Agreement or the consummation or performance of any of the Contemplated Transactions.

(c)      Seller is acquiring the $600,000 Purchase Note and the $1,150,000 Purchase Note for its own account and not with a view to their distribution within the meaning of Section 2(11) of the Securities Act. Seller is an "accredited investor" as such term is defined in Rule 501(a) under the Securities Act.

Section 3.3.     **Capitalization and Subsidiaries**.

(a)      The authorized equity securities of the Company consist of 10,000,000 shares of common stock, par value $0.01 per share, of which 1,000,000 shares are issued and outstanding and constitute the Shares. Seller is and will be on the Closing Date the record and beneficial owner and holder of the Shares, free and clear of all Encumbrances. No legend or other reference to any purported Encumbrance appears upon any certificate representing equity securities of the Company except a legend required by the Securities Act. All of the outstanding equity securities of the Company have been duly authorized and validly issued and are fully paid and nonassessable. There are no Contracts relating to the issuance, sale, or transfer of any equity securities or other securities of the Company. None of the outstanding equity securities or other securities of the Company was issued in violation of the Securities Act or any other Legal Requirement.

(b)      Part 3.3(b) of the Disclosure Letter lists for each Subsidiary its authorized equity securities or other interests, the number and type of equity securities or other interests issued and outstanding, and the identity of each owner (of record and beneficially) of such equity securities or other interests and number of shares or other interests held by each holder. Except as described in Part 3.3(b) of the Disclosure Letter, all outstanding

equity securities or other interests of each Subsidiary are owned of record and beneficially by the Company, free and clear of all Encumbrances.

(c)     The Company does not own or does not have any Contract to acquire, any equity securities or other securities of any Person or any direct or indirect equity or ownership interest in any other business.

Section 3.4.     **Financial Statements**.     Seller has delivered to Buyer: balance sheets of the Company as of the last Tuesday of September in each of the years 2016, 2017 and 2018 as well as the balance sheet of the Company as at _____ __, 2019 (the "Interim Balance Sheet") and the related statements of income and changes in stockholders' equity for each of such time periods, including in each case the notes thereto. Such financial statements and notes fairly present the financial condition and the results of operations and changes in stockholders' equity of the Company as at the respective dates of and for the periods referred to in such financial statements, all in accordance with GAAP; the financial statements referred to in this Section 3.4 reflect the consistent application of such accounting principles throughout the periods involved, except as disclosed in the notes to such financial statements. No financial statements of any Person other than the Company are required by GAAP to be included in the consolidated financial statements of the Company.

Section 3.5.     **Books and Records**.     The books of account and other records of the Company, all of which have been made available to Buyer, are complete and correct in all material respects and have been maintained in accordance with sound business practices and the requirements of Section 13(b)(2) of the Securities Exchange Act of 1934, as amended (regardless of whether or not the Company is subject to that Section), including the maintenance of an adequate system of internal controls. Seller represents and warrants that (i) the Board of Directors of the Seller has acted as the Board of Directors of the Company, (ii) the Board of Directors or the Seller as the sole shareholder of the Company has approved all actions of the Company which required such approval. At the Closing, all of those books and records will be in the possession of the Company.

Section 3.6.     **Title to Properties; Encumbrances**.     Part 3.6 of the Disclosure Letter contains a complete and accurate list of all real property, leaseholds, or other interests therein owned by the Company. Seller has delivered or made available to Buyer copies of the deeds and other instruments (as recorded) by which the Company acquired such real property and interests, and copies of all title insurance policies, opinions, abstracts, and surveys in the possession of Seller or the Company and relating to such property or interests. The Company owns (with good and marketable title in the case of real property, subject only to the matters permitted by the following sentence) all the properties and assets (whether real, personal, or mixed and whether tangible or intangible) that they purport to own, including all of the properties and assets reflected in the Balance Sheet and the Interim Balance Sheet (except for assets held under capitalized leases disclosed or not required to be disclosed in Part 3.6 of the Disclosure Letter and personal property sold since the date of the Balance Sheet and the Interim Balance Sheet, as the case may be, in the Ordinary Course of Business), and all of the properties and assets purchased or otherwise acquired by the Company since the date of the Balance Sheet (except for personal property acquired and sold since the date of the Balance Sheet in the Ordinary Course of Business and consistent with past practice), which subsequently purchased or acquired properties and assets (other than inventory and short-term investments) are listed in Part 3.6 of the Disclosure Letter. All material properties and assets reflected in the Balance Sheet and the Interim Balance Sheet are free and clear of all Encumbrances and are not, in the case of real property, subject to any rights of way, building use restrictions, exceptions, variances, reservations, or limitations of any nature except, with respect to all such properties and assets: (a) mortgages or security interests shown on the Balance Sheet or the Interim Balance Sheet as securing specified liabilities or obligations, with respect to which no default (or event that, with notice or lapse of time or both, would constitute a default) exists; (b) mortgages or security interests incurred in connection

with the purchase of property or assets after the date of the Interim Balance Sheet (such mortgages and security interests being limited to the property or assets so acquired), with respect to which no default (or event that, with notice or lapse of time or both, would constitute a default) exists; (c) liens for current taxes not yet due; and (d) with respect to real property: (i) minor imperfections of title, if any, none of which is substantial in amount, materially detracts from the value or impairs the use of the property subject thereto, or impairs the operations of the Company; and (ii) zoning laws and other land use restrictions that do not materially impair the present or anticipated use of the property subject thereto. All buildings, plants, and structures owned by the Company lie wholly within the boundaries of the real property owned by the Company and do not encroach upon the property of, or otherwise conflict with the property rights of, any other Person.

Section 3.7.  **Condition and Sufficiency of Assets**.  The buildings, plants, structures, and equipment of the Company are structurally sound, are in good operating condition and repair, and are adequate for the uses to which they are being put, and none of such buildings, plants, structures, or equipment is in need of maintenance or repairs except for ordinary, routine maintenance and repairs that are not material in nature or cost. The building, plants, structures, equipment and other assets of the Company are sufficient for the continued conduct of the Company's businesses after the Closing in substantially the same manner as conducted prior to the Closing.

Section 3.8.  **Accounts Receivable**.  All accounts receivable of the Company that are reflected on the Balance Sheet or the Interim Balance Sheet or on the accounting records of the Company as of the Closing Date (collectively, the "Accounts Receivable") represent or will represent valid obligations arising from sales actually made or services actually performed in the Ordinary Course of Business. Unless paid prior to the Closing Date, the Accounts Receivable are or will be as of the Closing Date current and collectible net of the respective reserves shown on the Balance Sheet or the Interim Balance Sheet or on the accounting records of the Company as of the Closing Date (which reserves are adequate and calculated consistent with past practice and, in the case of the reserve as of the Closing Date, will not represent a greater percentage of the Accounts Receivable as of the Closing Date than the reserve reflected in the Interim Balance Sheet represented of the Accounts Receivable reflected therein and will not represent a material adverse change in the composition of such Accounts Receivable in terms of aging or collectability). Subject to such reserves, each of the Accounts Receivable either has been or will be collected in full, without any set-off, within ninety days after the day on which it first becomes due and payable. There is no contest, claim, or right of set-off, other than returns in the Ordinary Course of Business, under any Contract with any obligor of an Accounts Receivable relating to the amount or validity of such Accounts Receivable. Part 3.8 of the Disclosure Letter contains a complete and accurate list of all Accounts Receivable as of the date of the Interim Balance Sheet, which list sets forth the aging of such Accounts Receivable.

Section 3.9.  **Inventory**.  All inventory of the Company, whether or not reflected in the Balance Sheet or the Interim Balance Sheet, consists of a quality and quantity usable and salable in the Ordinary Course of Business, except for obsolete items and items of below-standard quality, all of which have been written off or written down to net realizable value in the Balance Sheet or the Interim Balance Sheet or on the accounting records of the Company as of the Closing Date, as the case may be. All inventories not written off have been priced at the lower of cost or market on a first in, first out basis. The quantities of each material item of inventory (whether raw materials, work-in-process, or finished goods) are not excessive, but are reasonable in the present circumstances of the Company.

Section 3.10.  **No Undisclosed Liabilities**.  Except as set forth in Part 3.10 of the Disclosure Letter, the Company has no liabilities or obligations of any nature (whether known or unknown and whether absolute, accrued, contingent, or otherwise) except for liabilities or obligations reflected or

reserved against in the Balance Sheet or the Interim Balance Sheet and current liabilities incurred in the Ordinary Course of Business since the respective dates thereof.

Section 3.11. **Taxes**.

(a)    The Company, on a consolidated basis with Seller, has filed or caused to be filed (on a timely basis since January 1, 2015, all Tax Returns that are or were required to be filed by or with respect to any of them, either separately or as a member of a group of corporations, pursuant to applicable Legal Requirements. Seller has delivered or made available to Buyer copies of, and Part 3.11 of the Disclosure Letter contains a complete and accurate list of, all such Tax Returns relating to income or franchise taxes filed since January 1, 2015. The Company has paid, or made provision for the payment of, all Taxes that have or may have become due pursuant to those Tax Returns or otherwise, or pursuant to any assessment received by Seller or the Company, except such Taxes, if any, as are listed in Part 3.11 of the Disclosure Letter and are being contested in good faith and as to which adequate reserves (determined in accordance with GAAP) have been provided in the Balance Sheet and the Interim Balance Sheet.

(b)    The United States federal and state income Tax Returns of the Company subject to such Taxes have been audited by the IRS or relevant state tax authorities or are closed by the applicable statute of limitations for all taxable years through January 1, 2015. Part 3.11 of the Disclosure Letter contains a complete and accurate list of all audits of all such Tax Returns, including a reasonably detailed description of the nature and outcome of each audit. All deficiencies proposed as a result of such audits have been paid, reserved against, settled, or, as described in Part 3.11 of the Disclosure Letter, are being contested in good faith by appropriate proceedings. Part 3.11 of the Disclosure Letter describes all adjustments to the United States federal income Tax Returns filed by the Company for all taxable years since January 1, 2015, and the resulting deficiencies proposed by the IRS. Except as described in Part 3.11 of the Disclosure Letter, neither Seller nor the Company has given or been requested to give waivers or extensions (or is or would be subject to a waiver or extension given by any other Person) of any statute of limitations relating to the payment of Taxes of the Company or for which the Company may be liable.

(c)    The charges, accruals, and reserves with respect to Taxes on the respective books of the Company are adequate (determined in accordance with GAAP) and are at least equal to that Company's liability for Taxes. There exists no proposed tax assessment against the Company except as disclosed in the Balance Sheet or in Part 3.11 of the Disclosure Letter. All Taxes that the Company is or was required by Legal Requirements to withhold or collect have been duly withheld or collected and, to the extent required, have been paid to the proper Governmental Body or other Person.

(d)    All Tax Returns filed by (or that include on a consolidated basis) the Company are true, correct, and complete in all material respects. There is no tax sharing agreement that will require any payment by the Company after the date of this Agreement. The Company has not been, nor within the five-year period preceding the Closing Date, an "S" corporation.

Section 3.12. **No Material Adverse Change**. Since the date of the Interim Balance Sheet, there has not been any material adverse change in the business, operations, properties, prospects, assets, or condition of the Company, and no event has occurred or circumstance exists, other than unfavorable weather, that may result in such a material adverse change other than changes that may result from changes in the economy of the states in which the Company conducts its business.

Section 3.13.  **Employee Benefits**.

(a)     "Benefit Plan" means each "employee benefit plan" within the meaning of Section 3(3) of ERISA, whether or not written and whether or not subject to ERISA, and each supplemental retirement, compensation, employment, consulting, profit-sharing, deferred compensation, incentive, bonus, equity, change in control, retention, severance, salary continuation, and other similar agreement, plan, policy, program, practice, or arrangement which is or has been maintained, sponsored, contributed to, or required to be contributed to by the Company or its affiliates for the benefit of any current or former employee, officer, director, retiree, independent contractor or consultant of the Company or any spouse or dependent of such individual, or under which the Company or any of its ERISA Affiliates has or may have any liability or obligation, or with respect to which Buyer or any of its ERISA Affiliates would reasonably be expected to have any liability or obligation, contingent or otherwise, as set forth on Exhibit 3.13(a).  The Company has provided with respect to each Benefit Plan: (i) all documents that set forth its terms, or a written description if such Benefit Plan is not otherwise in writing (ii) in the case of any Benefit Plan that is intended to be qualified under Section 401(a) of the Code, a copy of the most recent determination, opinion or advisory letter from the Internal Revenue Service and any legal opinions issued thereafter with respect to such Benefit Plan's continued qualification; (iii) any written contracts and arrangements related to such Benefit Plan, including trust agreements or other funding arrangements, and insurance policies, certificates, and contracts; (iv) the most recent Form 5500 with respect to each Benefit Plan; (v) all employee handbooks relating to such Benefit Plan; and (vi) any material notices, audits, inquiries, or other correspondence from, or filings with, any Governmental Body relating to the Benefit Plan in the past three (3) years.

(b)     The Company and its affiliates have performed all of their material obligations with respect to the Benefit Plans including as to the terms of the Benefit Plans and the laws and regulations applicable to the Benefit Plans.  Nothing has occurred with respect to any Benefit Plan that has subjected or could reasonably be expected to subject the Company or, with respect to any period on or after the Closing Date, Buyer or any of its affiliates, to a civil action, penalty, surcharge, or Tax under applicable Legal Requirements.  Benefits accrued under any unfunded Benefit Plan have been paid, accrued, or adequately reserved for to the extent required by GAAP.  No transaction prohibited by ERISA Section 406 and no "prohibited transaction" under IRC Section 4975(c) have occurred with respect to any Benefit Plan.

(c)     Neither the Company nor any ERISA Affiliate of the Company has ever established, maintained, or contributed to or otherwise participated in, or had an obligation to maintain, contribute to, or otherwise participate in (i) a benefit plan subject to Title IV of ERISA, (ii) a multi-employer plan as defined in ERISA Section 3(37)(A); or (iii) a voluntary employees' beneficiary association under IRC Section 501(c)(9).

(d)     All Benefit Plans are sponsored by Seller and not the Company.  All benefits are made available to employees of the Company to the same extent as they are available to the employees of the Seller.  From and after the Closing, pursuant to their terms, the Benefit Plans will not cover and be available to the employees of the Company to the same extent and with the same terms and effects as would have applied to the employees of the Company prior to the date of the Closing if all of the employees of the Company ceased to be employed by the Company on that date.

(e)     Except to the extent required under ERISA Section 601 et seq. and IRC Section 4980B and paid at the sole expense of the participant, the Company does not provide health or welfare benefits for any retired or former employee nor is obligated to provide health or welfare benefits to any active employee following such employee's retirement or other termination of service.

(f)     The consummation of the Contemplated Transactions will not result in the payment, vesting, or acceleration of any benefit to any of the Company's employees. No payment that is owed or may become due to any director, officer, employee, or agent of the Company will be non-deductible to the Company or subject to tax under IRC Section 280G or Section 4999; nor will the Company be required to "gross up" or otherwise compensate any such person because of the imposition of any excise tax on a payment to such person.

(g)     With respect to each benefit plan established by the Company following the Closing for the benefit of any of its employees who were employees of the Company prior to the Closing (collectively, the "Buyer Plans"), for purposes of determining under the Buyer Plans the eligibility to participate, vesting and employment service with the Company employment service with the Company prior to the Closing shall be treated as employment under the Buyer Plans to the extent required by applicable Legal Requirement.

Section 3.14.    **Compliance With Legal Requirements; Governmental Authorizations**.

(a)     Except as set forth in Part 3.14 of the Disclosure Letter:

    (i)     the Company is, and at all times since its organization has been, in full compliance with each Legal Requirement that is or was applicable to it or to the conduct or operation of its business or the ownership or use of any of its assets;

    (ii)    no event has occurred or circumstance exists that (with or without notice or lapse of time): (A) may constitute or result in a material violation by the Company of, or a failure on the part of the Company to comply with, any Legal Requirement; or (B) may give rise to any obligation on the part of the Company to undertake, or to bear all or any portion of the cost of, any remedial action of any nature; and

    (iii)   the Company has not received, any notice or other communication (whether oral or written) from any Governmental Body or any other Person regarding: (A) any actual, alleged, possible, or potential violation of, or failure to comply with, any Legal Requirement; or (B) any actual, alleged, possible, or potential obligation on the part of the Company to undertake, or to bear all or any portion of the cost of, any remedial action of any nature.

(b)     Part 3.14 of the Disclosure Letter contains a complete and accurate list of each Governmental Authorization that is held by the Company or that otherwise relates to the business of, or to any of the assets owned or used by, the Company. Each Governmental Authorization listed or required to be listed in Part 3.14 of the Disclosure Letter is valid and in full force and effect. Except as set forth in Part 3.14 of the Disclosure Letter:

(i)     the Company is, and at all times has been, in material compliance with all of the terms and requirements of each Governmental Authorization identified or required to be identified in Part 3.14 of the Disclosure Letter;

(ii)    no event has occurred or circumstance exists that may (with or without notice or lapse of time): (A) constitute or result directly or indirectly in a <u>material</u> violation of or a failure to comply with any term or requirement of any Governmental Authorization listed or required to be listed in Part 3.14 of the Disclosure Letter; or (B) result directly or indirectly in the revocation, withdrawal, suspension, cancellation, or termination of, or any modification to, any Governmental Authorization listed or required to be listed in Part 3.14 of the Disclosure Letter;

(iii)   the Company has not received, at any time, any notice or other communication (whether oral or written) from any Governmental Body or any other Person regarding: (A) any actual, alleged, possible, or potential material violation of or failure to comply with any term or requirement of any Governmental Authorization; or (B) any actual, proposed, possible, or potential revocation, withdrawal, suspension, cancellation, termination of, or modification to any Governmental Authorization; and

(iv)   all applications required to have been filed for the renewal of the Governmental Authorizations listed or required to be listed in Part 3.14 of the Disclosure Letter have been duly filed on a timely basis with the appropriate Governmental Bodies, and all other filings required to have been made with respect to such Governmental Authorizations have been duly made on a timely basis with the appropriate Governmental Bodies.

The Governmental Authorizations listed in Part 3.14 of the Disclosure Letter collectively constitute all of the Governmental Authorizations necessary to permit the Company to lawfully conduct and operate their businesses in the manner they currently conduct and operate such businesses and to permit the Company to own and use its assets in the manner in which it currently owns and uses such assets.

Section 3.15.   **Legal Proceedings; Orders**.

(a)    Except as set forth in Part 3.15 of the Disclosure Letter, there is no pending Proceeding:

(i)    that has been commenced by or against the Company or that otherwise relates to or may affect the business of, or any of the assets owned or used by, the Company; or

(ii)    that challenges, or that may have the effect of preventing, delaying, making illegal, or otherwise interfering with, any of the Contemplated Transactions.

To the Knowledge of Seller and the Company: (1) no such Proceeding has been Threatened; and (2) no event has occurred or circumstance exists that may give rise to or serve as a basis for the commencement of any such Proceeding. Seller has delivered to Buyer copies of all pleadings, correspondence, and other documents relating to each Proceeding listed in Part 3.15 of the Disclosure Letter. The Proceedings listed in Part 3.15 of the Disclosure Letter will not have a material adverse effect on the business, operations, assets, condition, or prospects of the Company.

(b)     Except as set forth in Part 3.15 of the Disclosure Letter:

   (i)     there is no Order to which any of the Company, or any of the assets owned or used by the Company, is subject;

   (ii)    Seller is not subject to any Order that relates to the business of, or any of the assets owned or used by, the Company; and

   (iii)   no officer, director, agent, or employee of the Company is subject to any Order that prohibits such officer, director, agent, or employee from engaging in or continuing any conduct, activity, or practice relating to the business of the Company.

(c)     Except as set forth in Part 3.15 of the Disclosure Letter:

   (i)     the Company is, and at all times has been, in full compliance with all of the terms and requirements of each Order to which it, or any of the assets owned or used by it, is or has been subject;

   (ii)    no event has occurred or circumstance exists that may constitute or result in (with or without notice or lapse of time) a violation of or failure to comply with any term or requirement of any Order to which the Company, or any of the assets owned or used by the Company, is subject; and

   (iii)   the Company has not received any notice or other communication (whether oral or written) from any Governmental Body or any other Person regarding any actual, alleged, possible, or potential violation of, or failure to comply with, any term or requirement of any Order to which the Company, or any of the assets owned or used by the Company, is or has been subject.

Section 3.16.    **Absence of Certain Changes and Events**.  Except as set forth in Part 3.16 of the Disclosure Letter, since the date of the Interim Balance Sheet, the Company has conducted its businesses only in the Ordinary Course of Business and there has not been any:

(a)     change in the Company's authorized or issued capital stock; grant of any stock option or right to purchase shares of capital stock of the Company; issuance of any security convertible into such capital stock; grant of any registration rights; purchase, redemption, retirement, or other acquisition by the Company of any shares of any such capital stock; or declaration or payment of any dividend or other distribution or payment in respect of shares of capital stock;

(b)     amendment to the Organizational Documents of the Company;

(c)     payment or increase by the Company of any bonuses, salaries, or other compensation to any stockholder, director, officer, or (except in the Ordinary Course of Business) employee or entry into any employment, severance, or similar Contract with any director, officer, or employee;

(d)     Except in the Ordinary Course of Business, adoption of, or increase in the payments to or benefits under, any profit sharing, bonus, deferred compensation, savings, insurance,

pension, retirement, or other employee benefit plan for or with any employees of the Company;

(e)   damage to or destruction or loss of any asset or property of the Company, whether or not covered by insurance, materially and adversely affecting the properties, assets, business, financial condition, or prospects of the Company, taken as a whole;

(f)   entry into, termination of, or receipt of notice of termination of: (i) any license, distributorship, dealer, sales representative, joint venture, credit, or similar agreement; or (ii) any Contract or transaction involving a total remaining commitment by or to the Company of at least $50,000.00;

(g)   sale (other than sales of inventory in the Ordinary Course of Business), lease, or other disposition of any asset or property of the Company or mortgage, pledge, or imposition of any lien or other encumbrance on any material asset or property of the Company, including the sale, lease, or other disposition of any of the Intellectual Property Assets;

(h)   cancellation or waiver of any claims or rights with a value to the Company in excess of $10,000.00;

(i)   material change in the accounting methods used by the Company; or

(j)   agreement, whether oral or written, by the Company to do any of the foregoing.

Section 3.17.   **Contracts; No Defaults**.

(a)   Part 3.17(a) of the Disclosure Letter contains a complete and accurate list, and Seller has delivered to Buyer true and complete copies, of:

(i)   each Applicable Contract that involves performance of services or delivery of goods or materials by the Company of an amount or value in excess of $10,000.00;

(ii)   each Applicable Contract that involves performance of services or delivery of goods or materials to the Company of an amount or value in excess of $10,000.00;

(iii)   each Applicable Contract that was not entered into in the Ordinary Course of Business and that involves expenditures or receipts of the Company in excess of $10,000.00;

(iv)   each lease, rental or occupancy agreement, license, installment and conditional sale agreement, and other Applicable Contract affecting the ownership of, leasing of, title to, use of, or any leasehold or other interest in, any real or personal property (except personal property leases and installment and conditional sales agreements having a value per item or aggregate payments of less than $5,000.00 and with terms of less than one year);

(v)   each agreement which relates to or stemming from a Franchise as well as a listing of the receipts by month from each Franchise for the six (6) month period ending

on the last day of the last month prior to the month in which the Closing Date occurs;

(vi) each licensing agreement or other Applicable Contract with respect to patents, trademarks, copyrights, or other intellectual property, including agreements with current or former employees, consultants, or contractors regarding the appropriation or the non-disclosure of any of the Intellectual Property Assets;

(vii) each collective bargaining agreement and other Applicable Contract to or with any labor union or other employee representative of a group of employees;

(viii) each joint venture, partnership, and other Applicable Contract (however named) involving a sharing of profits, losses, costs, or liabilities by the Company with any other Person;

(ix) each Applicable Contract containing covenants that in any way purport to restrict the business activity of the Company or any Affiliate of the Company or limit the freedom of the Company or any Affiliate of the Company to engage in any line of business or to compete with any Person;

(x) each Applicable Contract providing for payments to or by any Person based on sales, purchases, or profits, other than direct payments for goods;

(xi) each power of attorney that is currently effective and outstanding;

(xii) each Applicable Contract entered into other than in the Ordinary Course of Business that contains or provides for an express undertaking by the Company to be responsible for consequential damages;

(xiii) each Applicable Contract for capital expenditures in excess of $10,000.00;

(xiv) each written warranty, guaranty, and or other similar undertaking with respect to contractual performance extended by the Company other than in the Ordinary Course of Business; and

(xv) each amendment, supplement, and modification (whether oral or written) in respect of any of the foregoing.

Part 3.17(a) of the Disclosure Letter sets forth reasonably complete details concerning such Contracts, including the parties to the Contracts, the amount of the remaining commitment of the Company under the Contracts, and the Company's office where details relating to the Contracts are located.

(b) Except as set forth in Part 3.17(b) of the Disclosure Letter:

(i) Seller (and no Related Person of Seller) does not have or may not acquire any rights under, and Seller does not have or may not become subject to any obligation or liability under, any Contract that relates to the business of, or any of the assets owned or used by, the Company; and

(ii)    no officer, director, agent, employee, consultant, or contractor of the Company is bound by any Contract that purports to limit the ability of such officer, director, agent, employee, consultant, or contractor to: (A) engage in or continue any conduct, activity, or practice relating to the business of the Company; or (B) assign to the Company or to any other Person any rights to any invention, improvement, or discovery.

(c)    Except as set forth in Part 3.17(c) of the Disclosure Letter, each Contract identified or required to be identified in Part 3.17(a) of the Disclosure Letter is in full force and effect and is valid and enforceable in accordance with its terms.

(d)    Except as set forth in Part 3.17(d) of the Disclosure Letter:

(i)    the Company is, and at all times has been, in material compliance with all applicable terms and requirements of each Contract under which such Company has or had any obligation or liability or by which such Company or any of the assets owned or used by such Company is or was bound;

(ii)    each other Person that has or had any obligation or liability under any Contract under which the Company has or had any rights is, and at all times has been, in material compliance with all applicable terms and requirements of such Contract;

(iii)    to the Knowledge of the Company no event has occurred or circumstance exists that (with or without notice or lapse of time) may contravene, conflict with, or result in a violation or breach of, or give the Company or other Person the right to declare a default or exercise any remedy under, or to accelerate the maturity or performance of, or to cancel, terminate, or modify, any Applicable Contract; and

(iv)    the Company has not given to or received from any other Person, at any time since January 1, 2018, any notice or other communication (whether oral or written) regarding any actual, alleged, possible, or potential violation or breach of, or default under, any Contract.

(e)    There are no renegotiations of, attempts to renegotiate, or outstanding rights to renegotiate any material amounts paid or payable to the Company under current or completed Contracts with any Person and no such Person has made written demand for such renegotiation.

(f)    The Contracts relating to the sale, design, manufacture, or provision of products or services by the Company have been entered into in the Ordinary Course of Business and have been entered into without the commission of any act alone or in concert with any other Person, or any consideration having been paid or promised, that is or would be in violation of any Legal Requirement.

Section 3.18.   **Insurance**.

(a)    Seller has delivered to Buyer:

(i)    true and complete copies of all policies of insurance to which the Company is a party or under which the Company, or any director of the Company, is or has

been covered at any time within the five (5) years preceding the date of this Agreement;

(ii)    true and complete copies of all pending applications for policies of insurance; and

(iii)    any statement by the auditor of the Company's financial statements with regard to the adequacy of such entity's coverage or of the reserves for claims.

(b)    Part 3.18(b) of the Disclosure Letter describes:

(i)    any self-insurance arrangement by or affecting the Company, including any reserves established thereunder;

(ii)    any contract or arrangement, other than a policy of insurance, for the transfer or sharing of any risk by the Company; and

(iii)    all obligations of the Company to third parties with respect to insurance (including such obligations under leases and service agreements) and identifies the policy under which such coverage is provided.

(c)    Part 3.18(c) of the Disclosure Letter sets forth, by year, for the current policy year and each of the five (5) preceding policy years:

(i)    a summary of the loss experience under each policy;

(ii)    a statement describing each claim under an insurance policy for an amount in excess of $10,000.00, which sets forth:

(A)    the name of the claimant;

(B)    a description of the policy by insurer, type of insurance, and period of coverage; and

(C)    the amount and a brief description of the claim; and

(iii)    a statement describing the loss experience for all claims that were self-insured, including the number and aggregate cost of such claims.

(d)    Except as set forth on Part 3.18(d) of the Disclosure Letter:

(i)    All policies to which the Company is a party or that provide coverage to the Company, or any director or officer of the Company:

(A)    are valid, outstanding, and enforceable;

(B)    are issued by an insurer that is financially sound and reputable;

(C)    taken together, provide adequate insurance coverage for the assets and the operations of the Company for all risks normally insured against by a Person carrying on the same business or businesses as the Company;

<div style="margin-left: 2em;">

(D)    are sufficient for compliance with all Legal Requirements and Contracts to which the Company is a party or by which any of them is bound;

(E)    will continue in full force and effect for the term thereof following the consummation of the Contemplated Transactions; and

(F)    do not provide for any retrospective premium adjustment or other experienced-based liability on the part of the Company.

(ii)    Neither Seller nor the Company has received: (A) any refusal of coverage or any notice that a defense will be afforded with reservation of rights; or (B) any notice of cancellation or any other indication that any insurance policy is no longer in full force or effect or will not be renewed or that the issuer of any policy is not willing or able to perform its obligations thereunder.

(iii)    The Company has paid all premiums due, and has otherwise performed all of its obligations, under each policy to which the Company is a party or that provides coverage to the Company or director thereof in all material respects.

(iv)    The Company has given notice to the insurer of all claims that may be insured thereby.

</div>

Section 3.19.   **Environmental Matters**.  Except as set forth in part 3.19 of the Disclosure Letter:

(a)    The Company is, and at all times has been, in material compliance with, and to its Knowledge has not been and is not in violation of or liable under, any Environmental Law. To its Knowledge, the Company has no basis to expect, nor has any other Person for whose conduct it is or may be held to be responsible received, any actual or Threatened order, notice, or other communication from: (i) any Governmental Body or private citizen acting in the public interest; or (ii) the current or prior owner or operator of any Facilities, of any actual or potential violation or failure to comply with any Environmental Law, or of any actual or Threatened obligation to undertake or bear the cost of any Environmental, Health, and Safety Liabilities with respect to any of the Facilities or any other properties or assets (whether real, personal, or mixed) in which the Company has had an interest, or with respect to any property or Facility at or to which Hazardous Materials were generated, manufactured, refined, transferred, imported, used, or processed by the Company, or any other Person for whose conduct it is or may be held responsible, or from which Hazardous Materials have been transported, treated, stored, handled, transferred, disposed, recycled, or received.

(b)    There are no pending or, to the Knowledge of Seller and the Company, Threatened claims, Encumbrances, or other restrictions of any nature, resulting from any Environmental, Health, and Safety Liabilities or arising under or pursuant to any Environmental Law, with respect to or affecting any of the Facilities or any other properties and assets (whether real, personal, or mixed) in which the Company has or had an interest.

(c)    Neither Seller nor the Company has Knowledge of, any basis to expect, nor has it or any other Person for whose conduct it is or may be held responsible, received, any citation, directive, inquiry, notice, Order, summons, warning, or other communication that relates

to Hazardous Activity, Hazardous Materials, or any alleged, actual, or potential violation or failure to comply with any Environmental Law, or of any alleged, actual, or potential obligation to undertake or bear the cost of any Environmental, Health, and Safety Liabilities with respect to any of the Facilities or any other properties or assets (whether real, personal, or mixed) in which the Company had an interest, or with respect to any property or facility to which Hazardous Materials generated, manufactured, refined, transferred, imported, used, or processed by the Company, or any other Person for whose conduct they are or may be held responsible, have been transported, treated, stored, handled, transferred, disposed, recycled, or received.

(d)     The Company to its Knowledge does not, nor any other Person for whose conduct it is or may be held responsible, have any Environmental, Health, and Safety Liabilities with respect to the Facilities or, to the Knowledge of the Company, with respect to any other properties and assets (whether real, personal, or mixed) in which the Company (or any predecessor), has or had an interest, or at any property geologically or hydrologically adjoining the Facilities or any such other property or assets.

(e)     To the Knowledge of the Seller and the Company there are no Hazardous Materials present on or in the Environment at the Facilities or at any geologically or hydrologically adjoining property, including any Hazardous Materials contained in barrels, above or underground storage tanks, landfills, land deposits, dumps, equipment (whether moveable or fixed) or other containers, either temporary or permanent, and deposited or located in land, water, sumps, or any other part of the Facilities or such adjoining property, or incorporated into any structure therein or thereon. Neither to the Knowledge of Seller and the Company, nor any other Person for whose conduct it is or may be held responsible, nor to the Knowledge of Seller and the Company, any other Person, has permitted or conducted, or is aware of, any Hazardous Activity conducted with respect to the Facilities or any other properties or assets (whether real, personal, or mixed) in which the Company has or had an interest except in full compliance with all applicable Environmental Laws.

(f)     There has been no Release or, to the Knowledge of Seller and the Company, Threat of Release, of any Hazardous Materials at or from the Facilities or at any other locations where any Hazardous Materials were generated, manufactured, refined, transferred, produced, imported, used, or processed from or by the Facilities, or from or by any other properties and assets (whether real, personal, or mixed) in which the Company has or had an interest, or to the Knowledge of the Company any geologically or hydrologically adjoining property, whether by the Company, or any other Person.

(g)     Seller has delivered to Buyer true and complete copies and results of any reports, studies, analyses, tests, or monitoring possessed or initiated by Seller or the Company pertaining to Hazardous Materials or Hazardous Activities in, on, or under the Facilities, or concerning compliance by the Company, or any other Person for whose conduct it is or may be held responsible, with Environmental Laws.

Section 3.20.   **Employees**.

(a)     Part 3.20 of the Disclosure Letter contains a complete and accurate list of the following information for each employee or director of the Company, including each employee on leave of absence or layoff status: name; job title; current compensation paid or payable and any change in compensation since January 1, 2019; vacation accrued; and service credited for purposes of vesting and eligibility to participate under the Company's

pension, retirement, profit-sharing, thrift-savings, deferred compensation, stock bonus, stock option, cash bonus, employee stock ownership (including investment credit or payroll stock ownership), severance pay, insurance, medical, welfare, or vacation plan, other Benefit Plan, or any other employee benefit plan.

(b)  No employee or director of the Company is a party to, or is otherwise bound by, any agreement or arrangement, including any confidentiality, noncompetition, or proprietary rights agreement, between such employee or director and any other Person ("Proprietary Rights Agreement") that in any way adversely affects or will affect (i) the performance of his duties as an employee or director of the Company; or (ii) the ability of the Company to conduct its business, including any Proprietary Rights Agreement with Seller or the Company by any such employee or director. To Seller's Knowledge, no director, officer, or other key employee of the Company intends to terminate his employment with the Company.

(c)  There are no retired employees or directors of the Company, or any of their dependents, receiving benefits or as to whom the Company is obligated to provide benefits in the future.

(d)  The Employment Agreement by and between the Seller and Scott G. LeFever, dated September 27, 2016, has been terminated and is no longer of any force or effect.

Section 3.21.  **Labor Relations; Compliance**.  The Company has not been or is a party to any collective bargaining or other labor Contract.  There has not been, there is not presently pending or existing, and to Seller's Knowledge there is not Threatened: (a) any strike, slowdown, picketing, work stoppage, or employee grievance process; (b) any Proceeding against or affecting the Company relating to the alleged violation of any Legal Requirement pertaining to labor relations or employment matters, including any charge or complaint filed by an employee or union with the National Labor Relations Board, the Equal Employment Opportunity Commission, or any comparable Governmental Body, organizational activity, or other labor or employment dispute against or affecting any of the Company or its premises; or (c) any application for certification of a collective bargaining agent.  No event has occurred or circumstance exists that could provide the basis for any work stoppage or other labor dispute.  There is no lockout of any employees by the Company, and no such action is contemplated by the Company. The Company has complied in all respects with all Legal Requirements relating to employment, equal employment opportunity, nondiscrimination, immigration, wages, hours, benefits, collective bargaining, the payment of social security and similar taxes, occupational safety and health, and plant closing.  The Company is not liable for the payment of any compensation, damages, taxes, fines, penalties, or other amounts, however designated, for failure to comply with any of the foregoing Legal Requirements.

Section 3.22.  **Intellectual Property**.

(a)  **Intellectual Property Assets**.  The term "Intellectual Property Assets" includes:

(i)   the name Good Times Drive Thru, all fictional business names, trading names, registered and unregistered trademarks, service marks, and applications (collectively, "Marks");

(ii)  any patents, patent applications, and inventions and discoveries that may be patentable (collectively, "Patents");

(iii) any copyrights in both published works and unpublished works (collectively, "Copyrights");

(iv) any rights in mask works (collectively, "Rights in Mask Works"); and

(v) all know-how, trade secrets, confidential information, customer lists, software, technical information, data, process technology, plans, drawings, and blue prints (collectively, "Trade Secrets"); owned, used, or licensed by the Company as licensee or licensor.

(b) **Agreements**. Part 3.22(b) of the Disclosure Letter contains a complete and accurate list and summary description, including any royalties paid or received by the Company, of all Contracts relating to the Intellectual Property Assets to which the Company is a party or by which the Company is bound, except for any license implied by the sale of a product and perpetual, paid-up licenses for commonly available software programs with a value of less than $1,000.00 under which the Company is the licensee. There are no outstanding and, to Seller's Knowledge, no Threatened disputes or disagreements with respect to any such agreement.

(c) **Know-How Necessary for the Business**.

(i) The Intellectual Property Assets are all those necessary for the operation of the Company's businesses as it is currently conducted and the Company is the owner of all right, title, and interest in and to each of the Intellectual Property Assets, free and clear of all liens, security interests, charges, encumbrances, equities, and other adverse claims, and has the right to use without payment to a third party all of the Intellectual Property Assets.

(ii) Except as set forth in Part 3.22(c) of the Disclosure Letter, no current or former employee of the Company has entered into any Contract that restricts or limits in any way the scope or type of work in which the employee may be engaged or requires the employee to transfer, assign, or disclose information concerning his work to anyone other than the Company.

(d) **Patents**.

(i) Part 3.22(d) of the Disclosure Letter contains a complete and accurate list and summary description of any Patents. The Company is the owner of all right, title, and interest in and to any Patents, free and clear of all liens, security interests, charges, encumbrances, entities, and other adverse claims.

(ii) All of any issued Patents are currently in compliance with formal legal requirements (including payment of filing, examination, and maintenance fees and proofs of working or use), are valid and enforceable, and are not subject to any maintenance fees or taxes or actions falling due within ninety days after the Closing Date.

(iii) No Patent has been or is now involved in any interference, reissue, reexamination, or opposition proceeding. To Seller's Knowledge, there is no potentially interfering patent or patent application of any third party.

(iv)     No Patent is infringed or, to Seller's Knowledge, has been challenged or threatened in any way. None of the products manufactured and sold, nor any process or know-how used, by the Company infringes or is alleged to infringe any patent or other proprietary right of any other Person.

(v)     Any products made, used, or sold under the Patents have been marked with the proper patent notice.

(e)     **Trademarks**.

(i)     Part 3.22(e) of Disclosure Letter contains a complete and accurate list and summary description of all Marks. The Company is the owner of all right, title, and interest in and to each of the Marks, free and clear of all liens, security interests, charges, encumbrances, equities, and other adverse claims.

(ii)     All Marks that have been registered with the United States Patent and Trademark Office and are currently in compliance with all formal legal requirements (including the timely post-registration filing of affidavits of use and incontestability and renewal applications), are valid and enforceable, and are not subject to any maintenance fees or taxes or actions falling due within ninety days after the Closing Date.

(iii)     No Mark has been or is now involved in any opposition, invalidation, or cancellation and, to Seller's Knowledge, no such action is Threatened with the respect to any of the Marks.

(iv)     To Seller's Knowledge, there is no potentially interfering trademark or trademark application of any third party.

(v)     No Mark is infringed or, to Seller' Knowledge, has been challenged or threatened in any way. None of the Marks used by the Company infringes or is alleged to infringe any trade name, trademark, or service mark of any third party.

(vi)     All products and materials containing a Mark bear the proper federal registration notice where permitted by law.

(f)     **Copyrights**.

(i)     Part 3.22(f) of the Disclosure Letter contains a complete and accurate list and summary description of any Copyrights. The Company is the owner of all right, title, and interest in and to any Copyrights, free and clear of all liens, security interests, charges, encumbrances, equities, and other adverse claims.

(ii)     All of the Copyrights have been registered and are currently in compliance with formal legal requirements, are valid and enforceable, and are not subject to any maintenance fees or taxes or actions falling due within ninety days after the date of Closing.

(iii)     No Copyright is infringed or, to Seller's Knowledge, has been challenged or threatened in any way. None of the subject matter of any of the Copyrights

infringes or is alleged to infringe any copyright of any third party or is a derivative work based on the work of a third party.

    (iv)    All works encompassed by the Copyrights have been marked with the proper copyright notice.

    (g)    **Trade Secrets**.

    (i)    With respect to any Trade Secret, the documentation relating to such Trade Secret is current, accurate, and sufficient in detail and content to identify and explain it and to allow its full and proper use without reliance on the Knowledge or memory of any individual.

    (ii)    The Company has taken all reasonable precautions to protect the secrecy, confidentiality, and value of its Trade Secrets.

    (iii)    The Company has good title and an absolute (but not necessarily exclusive) right to use the Trade Secrets. The Trade Secrets are not part of the public knowledge or literature, and, to Seller's Knowledge, have not been used, divulged, or appropriated either for the benefit of any Person (other than the Company) or to the detriment of the Company. No Trade Secret is subject to any adverse claim or has been challenged or threatened in any way.

Section 3.23.    **Certain Payments**.    Neither the Company nor any director, officer, agent, or employee of the Company, or to Seller's Knowledge any other Person associated with or acting for or on behalf of the Company, has directly or indirectly: (a) made any contribution, gift, bribe, rebate, payoff, influence payment, kickback, or other payment to any Person, private or public, regardless of form, whether in money, property, or services: (i) to obtain favorable treatment in securing business; (ii) to pay for favorable treatment for business secured; (iii) to obtain special concessions or for special concessions already obtained, for or in respect of the Company or any Affiliate of the Company; or (iv) in violation of any Legal Requirement; (b) established or maintained any fund or asset that has not been recorded in the books and records of the Company.

Section 3.24.    **Disclosure**.

    (a)    No representation or warranty of Seller in this Agreement and no statement in the Disclosure Letter omits to state a material fact necessary to make the statements herein or therein, in light of the circumstances in which they were made, not misleading.

    (b)    No notice given pursuant to Section 5.5 will contain any untrue statement or omit to state a material fact necessary to make the statements therein or in this Agreement, in light of the circumstances in which they were made, not misleading.

    (c)    There is no fact known to Seller that has specific application to Seller or the Company (other than general economic or industry conditions) and that materially adversely affects or, as far as Seller can reasonably foresee, materially threatens, the assets, business, prospects, financial condition, or results of operations of the Company that has not been set forth in this Agreement or the Disclosure Letter.

Section 3.25.    **Relationships with Related Persons**.    Neither Seller nor any Related Person of Seller or of the Company has, or since the first day of the next to last completed fiscal year of the

Company has had, any interest in any property (whether real, personal, or mixed and whether tangible or intangible), used in or pertaining to the Company's businesses. Neither Seller nor any Related Person of Seller nor of the Company is, or since the first day of the next to last completed fiscal year of the Company has owned (of record or as a beneficial owner) an equity interest or any other financial or profit interest in, a Person that has: (i) had business dealings or a material financial interest in any transaction with the Company other than business dealings or transactions conducted in the Ordinary Course of Business with the Company at substantially prevailing market prices and on substantially prevailing market terms; or (ii) engaged in competition with the Company with respect to any line of the products or services of the Company (a "Competing Business") in any market presently served by the Company. Except as set forth in Part 3.25 of the Disclosure Letter, neither Seller nor any Related Person of Seller or of the Company is a party to any Contract with, or has any claim or right against, the Company.

Section 3.26.  **Relationships with Franchisees**.  To the Knowledge of Seller, the Company's relations with its Franchisees are good and no Franchisee has threatened in writing to Seller or the Company to terminate its Franchise Agreement.  None of the individuals listed in the definition of Knowledge set forth above have actual knowledge of specific facts as to any Franchisee likely to cause that Franchisee to terminate its Franchise Agreement with the Company within the twelve (12) month period after the Closing Date.

Section 3.27.  **Brokers or Finders**.  Except as set forth in the Disclosure Letter, Seller and its agents have incurred no obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment in connection with this Agreement.

Section 3.28.  **Lease and Subleases**.  Exhibit 3.28(i) sets forth the status of the leased properties of the Company.  Exhibit 3.28 (ii) sets forth the status of the subleases to which the Company is a party.

Section 3.29.  **Repair and Maintenance Process**.  Seller has transferred all assets and liabilities of the so-called Repair and Maintenance Process and its employees to the Company.  Part 3.29 of the Disclosure Letter contains a complete and accurate list of the assets and liabilities of the Repair and Maintenance Process as well as the following information for each employee of the Repair and Maintenance Process, including each employee on leave of absence or layoff status: name; job title; current compensation paid or payable and any change in compensation since January 1, 2019; vacation accrued; and service credited for purposes of vesting and eligibility to participate under the Company's pension, retirement, profit-sharing, thrift-savings, deferred compensation, stock bonus, stock option, cash bonus, employee stock ownership (including investment credit or payroll stock ownership), severance pay, insurance, medical, welfare, or vacation plan, or any other Benefit Plan.

**ARTICLE 4**
**Representations and Warranties of Buyer**

Buyer represents and warrants to Seller as follows:

Section 4.1.  **Organization and Good Standing**.  Buyer is a corporation duly organized, validly existing, and in good standing under the laws of its jurisdiction of incorporation.

Section 4.2.  **Authority; No Conflict**.

(a)     This Agreement constitutes the legal, valid, and binding obligation of Buyer, enforceable against Buyer in accordance with its terms. Upon the execution and delivery by Buyer of the $600,000 Purchase Note and the $1,150,000 Purchase Note (collectively, the "Buyer's Closing Documents"), the Buyer's Closing Documents will constitute the legal,

valid, and binding obligations of Buyer, enforceable against Buyer in accordance with their respective terms. Buyer has the absolute and unrestricted right, power, and authority to execute and deliver this Agreement and the Buyer's Closing Documents and to perform its obligations under this Agreement and the Buyer's Closing Documents.

(b) Neither the execution and delivery of this Agreement by Buyer nor the consummation or performance of any of the Contemplated Transactions by Buyer will give any Person the right to prevent, delay, or otherwise interfere with any of the Contemplated Transactions pursuant to:

(i) any provision of Buyer's Organizational Documents;

(ii) any resolution adopted by the board of directors or the stockholders of Buyer;

(iii) any Legal Requirement or Order to which Buyer may be subject; or

(iv) any Contract to which Buyer is a party or by which Buyer may be bound.

Buyer is not and will not be required to obtain any Consent from any Person in connection with the execution and delivery of this Agreement or the consummation or performance of any of the Contemplated Transactions.

Section 4.3.   **Investment Intent**.  Buyer is acquiring the Shares for its own account and not with a view to their distribution within the meaning of Section 2(11) of the Securities Act.

Section 4.4.   **Certain Proceedings**.  There is no pending Proceeding that has been commenced against Buyer and that challenges, or may have the effect of preventing, delaying, making illegal, or otherwise interfering with, any of the Contemplated Transactions.  To Buyer's Knowledge, no such Proceeding has been Threatened.

Section 4.5.   **Brokers or Finders**.  Buyer and its officers and agents have incurred no obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment in connection with this Agreement and will indemnify and hold Seller harmless from any such payment alleged to be due by or through Buyer as a result of the action of Buyer or its officers or agents.

## ARTICLE 5
## Covenants of Seller

Section 5.1.   **Access and Investigation**.  Between the date of this Agreement and the Closing Date, Seller will, and will cause the Company and its Representatives to: (a) afford Buyer and its Representatives and prospective lenders and their Representatives (collectively, "Buyer's Advisors") full and free access to the Company's personnel, properties (including subsurface testing), contracts, books and records, and other documents and data; (b) furnish Buyer and Buyer's Advisors with copies of all such contracts, books and records, and other existing documents and data as Buyer may reasonably request; and (c) furnish Buyer and Buyer's Advisors with such additional financial, operating, and other data and information as Buyer may reasonably request.

Section 5.2.   **Operation of the Business of the Company**.  Between the date of this Agreement and the Closing Date, Seller will, and will cause the Company to:

(a) conduct the business of the Company only in the Ordinary Course of Business;

(b) use its Best Efforts to preserve intact the current business organization of the Company, keep available the services of the current officers, its principal employees, and agents of the Company, and utilize its Best Efforts to maintain the relations and good will with suppliers, customers, landlords, creditors, its principal employees, agents, and others having business relationships with the Company;

(c) confer with Buyer concerning operational matters of a material nature; and

(d) otherwise report periodically to Buyer concerning the status of the business, operations, and finances of the Company.

Section 5.3. **Negative Covenant**. Except as otherwise expressly permitted by this Agreement, between the date of this Agreement and the Closing Date, Seller will not, and will cause the Company not to, without the prior consent of Buyer, take any affirmative action, or fail to take any reasonable action within their or its control, as a result of which any of the changes or events listed in Section 3.16 is likely to occur.

Section 5.4. **Required Approvals**. As promptly as practicable after the date of this Agreement, Seller will, and will cause the Company to, make all filings required by Legal Requirements to be made by them in order to consummate the Contemplated Transactions. Between the date of this Agreement and the Closing Date, Seller will, and will cause the Company to cooperate with Buyer with respect to all filings that Buyer elects to make or is required by Legal Requirements to make in connection with the Contemplated Transactions.

Section 5.5. **Notification**. Between the date of this Agreement and the Closing Date, Seller will promptly notify Buyer in writing if Seller or the Company becomes aware of any fact or condition that causes or constitutes a Breach of the Seller's representations and warranties as of the date of this Agreement, or if Seller or the Company becomes aware of the occurrence after the date of this Agreement of any fact or condition that would (except as expressly contemplated by this Agreement) cause or constitute a Breach of any such representation or warranty had such representation or warranty been made as of the time of occurrence or discovery of such fact or condition. Should any such fact or condition require any change in the Disclosure Letter if the Disclosure Letter were dated the date of the occurrence or discovery of any such fact or condition, Seller will promptly deliver to Buyer a supplement to the Disclosure Letter specifying such change. During the same period, Seller will promptly notify Buyer of the occurrence of any Breach of any covenant of Seller in this Section 5 or of the occurrence of any event that may make the satisfaction of the conditions in Section 7 impossible or unlikely.

Section 5.6. **Payment of Indebtedness by Related Persons**. Except as expressly provided in this Agreement, Seller will cause all indebtedness owed to the Company by Seller or any Related Person of Seller to be paid in full prior to Closing.

Section 5.7. **No Negotiation**. Until such time, if any, as this Agreement is terminated pursuant to Section 9, Seller will not, and will cause the Company and each of their Representatives not to, directly or indirectly solicit, initiate, or encourage any inquiries or proposals from, discuss or negotiate with, provide any non-public information to any Person (other than Buyer) relating to any transaction involving the sale of the business or assets (other than in the Ordinary Course of Business) of the Company, or any of the capital stock of the Company, or any merger, consolidation, business combination, or similar transaction involving the Company.

Section 5.8. **Best Efforts**. Between the date of this Agreement and the Closing Date, Seller will use its Best Efforts to cause the conditions in Sections 7 and 8 to be satisfied.

Section 5.9. **Tax Elections**. Buyer shall elect to treat the Contemplated Transactions pursuant to Section 338(h)(10) of the Internal Revenue Code. Buyer and Seller each agree to make the elections prescribed in that Section and to sign the prescribed forms relating thereto at Closing.

Section 5.10. **Purchase Price Allocation**. A Section 338(h)(10) election shall be made, and Seller and Buyer agree that the Purchase Price and the Liabilities of the Company (plus other relevant items) shall be allocated among the assets of the Company for all purposes (including Tax and financial accounting) as shown on the allocation schedule (the "Allocation Schedule"). A draft of the Allocation Schedule shall be prepared by Buyer and delivered to Seller within ten (10) days prior to the Closing Date for its approval. If Seller notifies Buyer in writing that Seller objects to one or more items reflected in the Allocation Schedule, Seller and Buyer shall negotiate in good faith to resolve such dispute; provided, however, that if Seller and Buyer are unable to resolve any dispute with respect to the Allocation Schedule prior to the Closing Date, such dispute shall be resolved by the Accountant. The fees and expenses of the Accountant shall be borne equally by Seller and Buyer. Buyer, the Company and Seller shall file all Tax Returns (including amended returns and claims for refund) and information reports in a manner consistent with the Allocation Schedule.

Section 5.11. **Tax Clearance**. The Seller shall submit a Form DR 0096 to the State of Colorado Department of Revenue and shall have obtained and delivered to Buyer a Tax Status Letter from the State of Colorado Department of Revenue detailing the status of the Company's state sales, city sales, RTD/SCFD sales, consumer use and state withholding tax and certificates of no tax due from all home-rule jurisdictions in which the Company does business (collectively, the "Clearance Letters"). The parties agree that a requirement of the State of Colorado Department of Revenue that a portion of the purchase price be held in escrow shall not excuse any party from the obligation to close the transactions which are the subject of this Agreement and furthermore, Buyer and Seller agree that the aggregate amount of any liability reported in all Clearance Letters shall be included in as a liability the Estimated Closing Date Balance Sheet.

Section 5.12. **Unclaimed Property**. Prior to the Closing Date, the Company will remit to the State of Colorado any property that is characterized under any Legal Requirement as "unclaimed property" or, in the alternative, shall ensure that the Estimated Closing Date Balance Sheet reflects such funds as a liability of the Company.

## ARTICLE 6
### Covenants of Buyer

Section 6.1. **Approvals of Governmental Bodies**. As promptly as practicable after the date of this Agreement, Buyer will, and will cause each of its Related Persons to, make all filings required by Legal Requirements to be made by them to consummate the Contemplated Transactions. Between the date of this Agreement and the Closing Date, Buyer will, and will cause each Related Person to, (i) cooperate with Seller with respect to all filings that Seller is required by Legal Requirements to make in connection with the Contemplated Transactions, and (ii) cooperate with Seller in obtaining all consents identified in Part 3.2 of the Disclosure Letter; provided that this Agreement will not require Buyer to dispose of or make any change in any portion of its business or to incur any other burden to obtain a Governmental Authorization.

Section 6.2.   **Best Efforts**.   Except as set forth in the proviso to Section 6.1, between the date of this Agreement and the Closing Date, Buyer will use its Best Efforts to cause the conditions in Sections 7 and 8 to be satisfied.

Section 6.3.   **Efforts for Franchises**.   From and after the Closing and until the $600,000 Purchase Note and the $1,150,000 Purchase Note are paid in full, Buyer shall utilize its Best Efforts to cause the Company to comply with the Franchises and to extend the term of any Franchise as to which the Franchisee is not in default prior to such extension.

Section 6.4.   **Payment of Purchase Notes**.   Buyer covenants that it shall, and shall cause the Company to, dedicate one hundred percent (100%) of the Franchise Revenue actually received after the Closing Date to pay the principal and interest due under the $600,000 Purchase Note and to pay the principal and interest due under the $1,150,000 Purchase Note.

Section 6.5.   **Lease Guarantees**.   Buyer covenants that it shall not, and shall cause the Company not to, amend or otherwise alter any lease agreement listed on <u>Exhibit 10.4</u> which amendment or alteration has the effect of prolonging or broadening any guarantee or other obligation of Seller with respect to such lease agreement.

<div align="center">

**ARTICLE 7**
**Conditions Precedent to Buyer's Obligation to Close**

</div>

Buyer's obligation to purchase the Shares and to take the other actions required to be taken by Buyer at the Closing is subject to the satisfaction, at or prior to the Closing, of each of the following conditions (any of which may be waived by Buyer, in whole or in part):

Section 7.1.   **Accuracy of Representations**.

(a)   All of Seller's representations and warranties in this Agreement (considered collectively), and each of these representations and warranties (considered individually), must have been accurate in all material respects as of the date of this Agreement, and must be accurate in all material respects as of the Closing Date as if made on the Closing Date, without giving effect to any supplement to the Disclosure Letter.

(b)   Each of Seller's representations and warranties in Sections 3.1, 3.3, 3.4, 3.12 and 3.24 must have been accurate in all respects as of the date of this Agreement, and must be accurate in all respects as of the Closing Date as if made on the Closing Date, without giving effect to any supplement to the Disclosure Letter.

Section 7.2.   **Seller's Performance**.

(a)   All of the covenants and obligations that Seller is required to perform or to comply with pursuant to this Agreement at or prior to the Closing (considered collectively), and each of these covenants and obligations (considered individually), must have been duly performed and complied with in all material respects.

(b)   Each document required to be delivered pursuant to Section 2.4 must have been delivered, and each of the other covenants and obligations in Sections 5.4 and 5.8 must have been performed and complied with in all respects.

Section 7.3. **Bring Down Certificate**. Buyer will have received a certificate executed by Seller confirming (a) the accuracy of its representations and warranties as of the date of this Agreement and as of the Closing Date in accordance with Section 7.1 and (b) the performance of and compliance with its covenants and obligations to be performed or complied with at or prior to Closing in accordance with Section 7.2.

Section 7.4. **Consents**. Each of the Consents identified in Part 3.2 of the Disclosure Letter must have been obtained and must be in full force and effect.

Section 7.5. **Additional Documents**. Each of the following documents must have been delivered to Buyer:

(a)     an opinion of Snell & Wilmer L.L.P., dated the Closing Date, in the form of Exhibit 7.4(a);

(b)     such other documents as Buyer may reasonably request for the purpose of: (i) enabling its counsel to provide the opinion referred to in Section 8.4(a); (ii) evidencing the accuracy of any of Seller's representations and warranties; (iii) evidencing the performance by Seller of, or the compliance by Seller with, any covenant or obligation required to be performed or complied with by Seller; (iv) evidencing the satisfaction of any condition referred to in this Section 7; or (v) otherwise facilitating the consummation or performance of any of the Contemplated Transactions.

Section 7.6. **No Proceedings**. Since the date of this Agreement, there must not have been commenced or Threatened against Buyer, or against any Person affiliated with Buyer, any Proceeding: (a) involving any challenge to, or seeking damages or other relief in connection with, any of the Contemplated Transactions; or (b) that may have the effect of preventing, delaying, making illegal, or otherwise interfering with any of the Contemplated Transactions.

Section 7.7. **No Claim Regarding Stock Ownership or Sale Proceeds**. There must not have been made or Threatened by any Person any claim asserting that such Person: (a) is the holder or the beneficial owner of, or has the right to acquire or to obtain beneficial ownership of, any stock of, or any other voting, equity, or ownership interest in, the Company; or (b) is entitled to all or any portion of the Purchase Price payable for the Shares.

Section 7.8. **No Prohibition**. Neither the consummation nor the performance of any of the Contemplated Transactions will, directly or indirectly (with or without notice or lapse of time), materially contravene, or conflict with, or result in a material violation of, or cause Buyer or any Person affiliated with Buyer to suffer any material adverse consequence under, (a) any applicable Legal Requirement or Order; or (b) any Legal Requirement or Order that has been published, introduced, or otherwise proposed by or before any Governmental Body.

Section 7.9. **Repair and Maintenance**. Prior to the Closing, the Company shall have entered into a services agreement with Seller for the Company to provide repair and maintenance services to Bad Daddy's Burger Bar restaurants in the form attached as Exhibit 7.8.

Section 7.10. **Store 172 Lease**. Prior to the Closing, Seller shall have caused the Company to assign the lease for Store 172 located at 14405 East Arapahoe Road, Centennial, Colorado (the "Store 172 Lease") to Seller, or to one of Seller's Subsidiaries other than the Company.

Section 7.11.  **No Material Adverse Change**.  Since the date of this Agreement, Seller will not have suffered any Material Adverse Change and no event will have occurred, and no circumstance will exist, that could result in a Material Adverse Change.

## ARTICLE 8
### Conditions Precedent to Seller's Obligation to Close

Seller's obligation to sell the Shares and to take the other actions required to be taken by Seller at the Closing is subject to the satisfaction, at or prior to the Closing, of each of the following conditions (any of which may be waived by Seller, in whole or in part):

Section 8.1.  **Accuracy of Representations**.  All of Buyer's representations and warranties in this Agreement (considered collectively), and each of these representations and warranties (considered individually), must have been accurate in all material respects as of the date of this Agreement and must be accurate in all material respects as of the Closing Date as if made on the Closing Date.

Section 8.2.  **Buyer's Performance**.

(a)     All of the covenants and obligations that Buyer is required to perform or to comply with pursuant to this Agreement at or prior to the Closing (considered collectively), and each of these covenants and obligations (considered individually), must have been performed and complied with in all material respects.

(b)     Buyer must have delivered each of the documents required to be delivered by Buyer pursuant to Section 2.4 and must have made the cash payments required to be made by Buyer pursuant to Sections 2.4(b)(i) and 2.4(b)(iii).

Section 8.3.  **Consents**.  Each of the Consents identified in Part 3.2 of the Disclosure Letter must have been obtained and must be in full force and effect.

Section 8.4.  **Additional Documents**.  Buyer must have caused the following documents to be delivered to Seller:

(a)     an opinion of Gravel & Shea PC, dated the Closing Date, in the form of Exhibit 8.4(a); and

(b)     such other documents as Seller may reasonably request for the purpose of (i) enabling their counsel to provide the opinion referred to in Section 7.4(a), (ii) evidencing the accuracy of any representation or warranty of Buyer, (iii) evidencing the performance by Buyer of, or the compliance by Buyer with, any covenant or obligation required to be performed or complied with by Buyer, (ii) evidencing the satisfaction of any condition referred to in this Section 8, or (v) otherwise facilitating the consummation of any of the Contemplated Transactions.

Section 8.5.  **No Injunction**.  There must not be in effect any Legal Requirement or any injunction or other Order that (a) prohibits the sale of the Shares by Seller to Buyer; and (b) has been adopted or issued, or has otherwise become effective, since the date of this Agreement.

## ARTICLE 9
## Termination

Section 9.1. **Termination Events**. This Agreement may, by notice given prior to or at the Closing, be terminated:

(a)    by either Buyer or Seller if a material Breach of any provision of this Agreement has been committed by the other party and such Breach has not been waived or cured within ten (10) business days after receiving written notice of such Breach;

(b)    (i) by Buyer if any of the conditions in Section 7 has not been satisfied as of the Closing Date or if satisfaction of such a condition is or becomes impossible (other than through the failure of Buyer to comply with its obligations under this Agreement) and Buyer has not waived such condition on or before the Closing Date; or (ii) by Seller, if any of the conditions in Section 8 has not been satisfied of the Closing Date or if satisfaction of such a condition is or becomes impossible (other than through the failure of Seller to comply with their obligations under this Agreement) and Seller has not waived such condition on or before the Closing Date;

(c)    by mutual consent of Buyer and Seller; or

(d)    by either Buyer or Seller if the Closing has not occurred, other than through the failure of any party seeking to terminate this Agreement to comply fully with its obligations under this Agreement, on or before September 15, 2019, or such later date as the parties may agree upon.

Section 9.2. **Effect of Termination**. Each party's right of termination under Section 9.1 is in addition to any other rights it may have under this Agreement or otherwise, and the exercise of a right of termination will not be an election of remedies. If this Agreement is terminated pursuant to Section 9.1, all further obligations of the parties under this Agreement will terminate, except that the obligations in Section 11.1 will survive; provided, however, that if this Agreement is terminated by a party because of the Breach of the Agreement by the other party or because one or more of the conditions to the terminating party's obligations under this Agreement is not satisfied as a result of the other party's failure to comply with its obligations under this Agreement, the terminating party's right to pursue all legal remedies will survive such termination unimpaired.

## ARTICLE 10
## Indemnification; Remedies

Section 10.1. **Survival; Right to Indemnification not Affected by Knowledge**. All representations, warranties, covenants, and obligations in this Agreement, the Disclosure Letter, the supplements to the Disclosure Letter, the certificate delivered pursuant to Section 2.4(a)(iv), and any other certificate or document delivered pursuant to this Agreement will survive the Closing. The right to indemnification, payment of Damages or other remedy based on such representations, warranties, covenants, and obligations will not be affected by any investigation conducted with respect to, or any Knowledge acquired (or capable of being acquired) at any time, whether before or after the execution and delivery of this Agreement or the Closing Date, with respect to the accuracy or inaccuracy of or compliance with, any such representation, warranty, covenant, or obligation. The waiver of any condition based on the accuracy of any representation or warranty, or on the performance of or compliance with any covenant or obligation, will not affect the right to indemnification, payment of Damages, or other remedy based on such representations, warranties, covenants, and obligations.

Section 10.2. **Indemnification and Payment of Damages by Seller**. Seller will indemnify and hold harmless Buyer, the Company, and their respective Representatives, stockholders, controlling persons, and affiliates (collectively, the "Indemnified Persons") for, and will pay to the Indemnified Persons the amount of, any loss, liability, claim, damage (including incidental and consequential damages), expense (including costs of investigation and defense and reasonable attorneys' fees) or diminution of value, whether or not involving a third-party claim (collectively, "Damages"), arising, directly or indirectly, from or in connection with:

(a)    any Breach of any representation or warranty made by Seller in this Agreement, including in the Disclosure Letter or any other certificate or document delivered by Seller pursuant to this Agreement, other than any such Breach that is expressly identified in the certificate delivered pursuant to Section 2.4(a)(iv) as having caused the condition specified in Section 7.1 not to be satisfied;

(b)    any Breach by Seller of any covenant or obligation of Seller in this Agreement not cured within ten (10) business days after receiving written notice of such Breach;

(c)    liabilities of any nature related to the Company's activities prior to the Closing Date not specifically reflected in any working capital adjustment to the Purchase Price (collectively, the "Excluded Liabilities");

(d)    any matter disclosed in the Disclosure Letter;

(e)    any claim based on the fraud or intentional misrepresentation of Seller;

(f)    any claim by any Person for brokerage or finder's fees or commissions or similar payments based upon any agreement or understanding alleged to have been made by any such Person with either Seller or the Company (or any Person acting on their behalf) in connection with any of the Contemplated Transactions; and

(g)    any claim by any Person arising from or in connection with the Store 172 Lease.

The remedies provided in this Section 10.2 will not be exclusive of or limit any other remedies that may be available to Buyer or the other Indemnified Persons.

Section 10.3. **Indemnification and Payment of Damages by Seller – Environmental Matters**. In addition to the provisions of Section 10.2, Seller will indemnify and hold harmless Buyer, the Company, and the other Indemnified Persons for, and will pay to Buyer, the Company, and the other Indemnified Persons the amount of, any Damages (including costs of cleanup, containment, or other remediation) arising, directly or indirectly, from or in connection with:

(a)    any Environmental, Health, and Safety Liabilities arising out of or relating to: (i): (A) the ownership, operation, or condition at any time on or prior to the Closing Date of the Facilities or any other properties and assets (whether real, personal, or mixed and whether tangible or intangible) in which the Company has or had an interest; or (B) any Hazardous Materials or other contaminants that were present on the Facilities or such other properties and assets at any time on or prior to the Closing Date; or (ii): (A) any Hazardous Materials or other contaminants, wherever located, that were, or were allegedly, generated, transported, stored, treated, Released, or otherwise handled by the Company or by any other Person for whose conduct it is or may be held responsible at any time on or prior to the Closing Date; or (B) any Hazardous Activities that were, or

were allegedly, conducted by the Company or by any other Person for whose conduct it is or may be held responsible; or

(b)     any bodily injury (including illness, disability, and death, and regardless of when any such bodily injury occurred, was incurred, or manifested itself), personal injury, property damage (including trespass, nuisance, wrongful eviction, and deprivation of the use of real property), or other damage of or to any Person, including any employee or former employee of the Company or any other Person for whose conduct it is or may be held responsible, in any way arising from or allegedly arising from any Hazardous Activity conducted or allegedly conducted with respect to the Facilities or the operation of the Company prior to the Closing Date, or from Hazardous Material that was (i) present or suspected to be present on or before the Closing Date on or at the Facilities (or present or suspected to be present on any other property, if such Hazardous Material emanated or allegedly emanated from any of the Facilities and was present or suspected to be present on any of the Facilities on or prior to the Closing Date) or (ii) Released or allegedly Released by the Company or any other Person for whose conduct it is or may be held responsible, at any time on or prior to the Closing Date.

Buyer will be entitled to control any Cleanup, any related Proceeding, and, except as provided in the following sentence, any other Proceeding with respect to which indemnity may be sought under this Section 10.3. The procedure described in Section 10.9 will apply to any claim solely for monetary damages relating to a matter covered by this Section 10.3.

Section 10.4.   **Indemnification and Payment of Damages by Buyer**.   Buyer will indemnify and hold harmless Seller, and will pay to Seller the amount of any Damages arising, directly or indirectly, from or in connection with: (a) any Breach of any representation or warranty made by Buyer in this Agreement or in any certificate delivered by Buyer pursuant to this Agreement; (b) any Breach by Buyer of any covenant or obligation of Buyer in this Agreement not cured within ten (10) business days after receiving written notice of such Breach; (c) any claim by any Person for brokerage or finder's fees or commissions or similar payments based upon any agreement or understanding alleged to have been made by such Person with Buyer (or any Person acting on its behalf) in connection with any of the Contemplated Transactions; or (d) in connection with any liability arising from or in connection with the Contracts listed on Exhibit 10.4.

Section 10.5.   **Time Limitations**.   If the Closing occurs, Seller will have no liability (for indemnification or otherwise) with respect to any representation or warranty, or covenant or obligation to be performed and complied with prior to the Closing Date, other than those in Sections 3.1, 3.2, 3.3, 3.6., 3.7 and 3.26 (collectively, the "Fundamental Representations"), unless on or before the date that is eighteen (18) months after the Effective Date Buyer notifies Seller of a claim specifying the factual basis of that claim in reasonable detail to the extent then known by Buyer; a claim with respect to Section 3.11 (the "SOL Representation") may be made any time until thirty (30) days after the expiration of applicable statute of limitations, but in any event no less than five (5) years after the Closing Date; and a claim with respect to Sections 3.1, 3.2, 3.3, 3.6., 3.10 or 3.26, or a claim for indemnification or reimbursement not based upon any representation or warranty or any covenant or obligation to be performed and complied with prior to the Closing Date, may be made at any time. If the Closing occurs, Buyer will have no liability (for indemnification or otherwise) with respect to any representation or warranty, or covenant or obligation to be performed and complied with prior to the Closing Date, unless on or before the date that is eighteen (18) months after the Effective Date Seller notifies Buyer of a claim specifying the factual basis of that claim in reasonable detail to the extent then known by Seller.

Section 10.6. **Limitations on Amount – Seller**. Seller will have no liability (for indemnification or otherwise) with respect to any matter described in clause (a), clause (b) or clause (d) of Section 10.2 until the total of all Damages with respect to such matter exceeds $5,000 (the "Mini-Basket Claims") or the aggregate amount of all eligible claims including the Mini-Basket Claims exceeds $100,000 (the "Basket"), after which the Seller will be responsible for all eligible claims including claims within the Basket; or which claims are not in the aggregate in excess of $1,500,000 (the "Cap"). However, this Section 10.6 will not apply to: (i) any Breach of any of Seller's representations and warranties of which Seller had actual and direct knowledge at any time prior to the date on which such representation and warranty is made; (ii) any intentional Breach by Seller of any covenant or obligation; (iii) any Breach of a Fundamental Representation or the SOL Representation; or (iv) any claims arising under or in connection with Section 10.2(c). Buyer's ability to seek indemnity under this Article will not be affected by any investigation, inquiry, knowledge, or examination (and the Buyer will not be required to represent that it does not have knowledge or reason to believe that any representation or warranty is untrue, or incomplete). Materiality and material adverse effect or consequence (but not Knowledge) qualifiers will be disregarded for the purposes of determining whether there was a Breach and the amount of Damages. Damages will be calculated after application of any received insurance proceeds actually received during the year of the loss (net of costs of recovery and the present value of any associated increase in premiums). Lost profits, diminution of value, losses based on valuation metrics or other multipliers, or similar damages may be recovered by the Indemnified Persons, however punitive damages may only be recovered by an Indemnified Person if owed to a third party.

Section 10.7. **Limitations on Amount – Buyer**. Buyer will have no liability (for indemnification or otherwise) with respect to the matters described in clause (a), (b) or (d) of Section 10.4 until the total of all Damages with respect to such matters exceeds $100,000, after which the Buyer will be responsible for all eligible claims; or which claims are not in the aggregate in excess of $1,500,000. However, this Section 10.7 will not apply to any Breach of any of Buyer's representations and warranties of which Buyer had actual and direct Knowledge at any time prior to the date on which such representation and warranty is made or any intentional Breach by Buyer of any covenant or obligation, and Buyer will be liable for all Damages with respect to such Breaches.

Section 10.8. **Right of Set-Off**. Upon notice to Seller specifying in reasonable detail the basis for such set-off, Buyer may set off any amount to which it may be entitled under this Section 10 against amounts otherwise payable under the $600,000 Purchase Note, in the first instance until the $600,000 Purchase Note is paid in full, and then the $1,150,000 Purchase Note until the $1,150,000 Purchase Note is paid in full. The exercise of such right of set-off by Buyer in good faith, whether or not ultimately determined to be justified, will not constitute an event of default under the $600,000 Purchase Note or the $1,150,000 Purchase Note or any instrument securing the $600,000 Purchase Note or the $1,150,000 Purchase Note.

Section 10.9. **Procedure for Indemnification – Third Party Claims**.

(a)     Promptly after receipt by an indemnified party under Section 10.2, 10.4, or (to the extent provided in the last sentence of Section 10.3) Section 10.3 of notice of the commencement of any Proceeding against it, such indemnified party will, if a claim is to be made against an indemnifying party under such Section, give notice to the indemnifying party of the commencement of such claim, but the failure to notify the indemnifying party will not relieve the indemnifying party of any liability that it may have to any indemnified party, except to the extent that the indemnifying party demonstrates that the defense of such action is prejudiced by the indemnifying party's failure to give such notice.

(b)     If any Proceeding referred to in Section 10.9(a) is brought against an indemnified party and it gives notice to the indemnifying party of the commencement of such Proceeding, the indemnifying party will, unless the claim involves Taxes, be entitled to participate in such Proceeding and, to the extent that it wishes (unless (i) the indemnifying party is also a party to such Proceeding and the indemnified party determines in good faith that joint representation would be inappropriate, or (ii) the indemnifying party fails to provide reasonable assurance to the indemnified party of its financial capacity to defend such Proceeding and provide indemnification with respect to such Proceeding), to assume the defense of such Proceeding with counsel satisfactory to the indemnified party and, after notice from the indemnifying party to the indemnified party of its election to assume the defense of such Proceeding, the indemnifying party will not, as long as it diligently conducts such defense, be liable to the indemnified party under this Section 10 for any fees of other counsel or any other expenses with respect to the defense of such Proceeding, in each case subsequently incurred by the indemnified party in connection with the defense of such Proceeding, other than reasonable costs of investigation. If the indemnifying party assumes the defense of a Proceeding, (i) it will be conclusively established for purposes of this Agreement that the claims made in that Proceeding are within the scope of and subject to indemnification; (ii) no compromise or settlement of such claims may be effected by the indemnifying party without the indemnified party's consent unless: (A) there is no finding or admission of any violation of Legal Requirements or any violation of the rights of any Person and no effect on any other claims that may be made against the indemnified party; and (B) the sole relief provided is monetary damages that are paid in full by the indemnifying party; and (iii) the indemnified party will have no liability with respect to any compromise or settlement of such claims effected without its consent. If notice is given to an indemnifying party of the commencement of any Proceeding and the indemnifying party does not, within ten days after the indemnified party's notice is given, give notice to the indemnified party of its election to assume the defense of such Proceeding, the indemnifying party will be bound by any determination made in such Proceeding or any compromise or settlement effected by the indemnified party.

(c)     Notwithstanding the foregoing, if an indemnified party determines in good faith that there is a reasonable probability that a Proceeding may adversely affect it or its affiliates other than as a result of monetary damages for which it would be entitled to indemnification under this Agreement, the indemnified party may, by notice to the indemnifying party, assume the exclusive right to defend, compromise, or settle such Proceeding, but the indemnifying party will not be bound by any determination of a Proceeding so defended or any compromise or settlement effected without its consent (which may not be unreasonably withheld).

(d)     Seller hereby consents to the non-exclusive jurisdiction of any court in which a Proceeding is brought against any Indemnified Person for purposes of any claim that an Indemnified Person may have under this Agreement with respect to such Proceeding or the matters alleged therein, and agree that process may be served on Seller with respect to such a claim anywhere in the world.

Section 10.10.  **Procedure for Indemnification – Other Claims**.  A claim for indemnification for any matter not involving a third-party claim may be asserted by notice to the party from whom indemnification is sought.

# ARTICLE 11
## General Provisions

Section 11.1. **Expenses**. Except as otherwise expressly provided in this Agreement, each party to this Agreement will bear its respective expenses incurred in connection with the preparation, execution, and performance of this Agreement and the Contemplated Transactions, including all fees and expenses of agents, representatives, counsel, and accountants. Seller will cause the Company not to incur any out-of-pocket expenses in connection with this Agreement. In the event of termination of this Agreement, the obligation of each party to pay its own expenses will be subject to any rights of such party arising from a breach of this Agreement by another party.

Section 11.2. **Public Announcements**. Any public announcement or similar publicity with respect to this Agreement or the Contemplated Transactions will be issued, if at all, at such time and in such manner as Buyer determines. Unless consented to by Buyer in advance or required by Legal Requirements as determined by legal counsel for Seller, prior to the Closing Seller shall, and shall cause the Company to, keep this Agreement strictly confidential and may not make any disclosure of this Agreement to any Person. Seller and Buyer will consult with each other concerning the means by which the Company's employees, customers, and suppliers and others having dealings with the Company will be informed of the Contemplated Transactions, and Buyer will have the right to be present for any such communication.

Section 11.3. **Confidentiality**. Except as set forth in Section 11.2, between the date of this Agreement and the Closing Date, Buyer and Seller will maintain in confidence, and will cause the directors, officers, employees, agents, and advisors of Buyer and the Company to maintain in confidence, any written, oral, or other information obtained in confidence from another party or the Company in connection with this Agreement or the Contemplated Transactions, unless: (a) such information is already known to such party or to others not bound by a duty of confidentiality or such information becomes publicly available through no fault of such party; (b) the use of such information is necessary or appropriate in making any filing or obtaining any consent or approval required for the consummation of the Contemplated Transactions; or (c) the furnishing or use of such information is required by or necessary or appropriate in connection with legal proceedings.

If the Contemplated Transactions are not consummated, each party will return or destroy as much of such written information as the other party may reasonably request.

Section 11.4. **Notices**. All notices, consents, waivers, and other communications under this Agreement must be in writing and will be deemed to have been duly given when: (a) delivered by hand (with written confirmation of receipt); (b) sent by telecopier (with written confirmation of receipt), provided that a copy is mailed by registered mail, return receipt requested; or (c) when received by the addressee, if sent by a nationally recognized overnight delivery service (receipt requested), in each case to the appropriate addresses and telecopier numbers set forth below (or to such other addresses and telecopier numbers as a party may designate by notice to the other parties):

Seller:          Good Times Restaurants, Inc.
                 141 Union Boulevard
                 Suite 400
                 Lakewood, CO  80228

with copy to:    Roger C. Cohen, Esq.
                 Snell & Wilmer L.L.P.
                 1200 Seventeenth Street, Suite 1900

Denver, CO 80202

Buyer:            GT Acquisition Group, Inc.
                   Attn: Mr. Todd M. Enright
                   c/o White Winston Select Asset Funds, LLC
                   265 Franklin Street, Suite 1702
                   Boston, MA 02110-3144

with copy to:   Gravel & Shea PC
                   Attn: Peter S. Erly, Esq.
                   76 Saint Paul Street, 7th Floor
                   P.O. Box 369
                   Burlington, VT 05402

Section 11.5.  **Jurisdiction; Service of Process**.  Any action or proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement shall be brought against any of the parties in the courts of the State of Delaware, or, if it has or can acquire jurisdiction, in the United States District Courts in the State of Delaware, and each of the parties consents to the jurisdiction of such courts (and of the appropriate appellate courts) in any such action or proceeding and waives any objection to venue laid therein. Process in any action or proceeding referred to in the preceding sentence may be served on any party anywhere in the world.

Section 11.6.  **Further Assurances**.  The parties agree: (a) to furnish upon request to each other such further information; (b) to execute and deliver to each other such other documents; and (c) to do such other acts and things, all as the other party may reasonably request for the purpose of carrying out the intent of this Agreement and the documents referred to in this Agreement.

Section 11.7.  **Waiver**.  The rights and remedies of the parties to this Agreement are cumulative and not alternative. Neither the failure nor any delay by any party in exercising any right, power, or privilege under this Agreement or the documents referred to in this Agreement will operate as a waiver of such right, power, or privilege, and no single or partial exercise of any such right, power, or privilege will preclude any other or further exercise of such right, power, or privilege or the exercise of any other right, power, or privilege. To the maximum extent permitted by applicable law: (a) no claim or right arising out of this Agreement or the documents referred to in this Agreement can be discharged by one party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other party; (b) no waiver that may be given by a party will be applicable except in the specific instance for which it is given; and (c) no notice to or demand on one party will be deemed to be a waiver of any obligation of such party or of the right of the party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the documents referred to in this Agreement.

Section 11.8.  **Entire Agreement and Modification**.  This Agreement supersedes all prior agreements between the parties with respect to its subject matter (including the Amended and Restated Letter of Intent between Buyer and Seller dated April 29, 2019, as amended May 24, 2019) and constitutes (along with the documents referred to in this Agreement) a complete and exclusive statement of the terms of the agreement between the parties with respect to its subject matter. This Agreement may not be amended except by a written agreement executed by the party to be charged with the amendment.

Section 11.9.  **Disclosure Letter**.

(a) The disclosures in the Disclosure Letter, and those in any Supplement thereto, must relate only to the representations and warranties in the Section of the Agreement to which they expressly relate and not to any other representation or warranty in this Agreement.

(b) In the event of any inconsistency between the statements in the body of this Agreement and those in the Disclosure Letter (other than an exception expressly set forth as such in the Disclosure Letter with respect to a specifically identified representation or warranty), the statements in the body of this Agreement will control.

Section 11.10. **Assignments, Successors and No Third-Party Rights**. Neither party may assign any of its rights under this Agreement without the prior consent of the other parties, which will not be unreasonably withheld, except that Buyer may assign any of its rights under this Agreement to any Subsidiary of Buyer. Subject to the preceding sentence, this Agreement will apply to, be binding in all respects upon, and inure to the benefit of the successors and permitted assigns of the parties. Nothing expressed or referred to in this Agreement will be construed to give any Person other than the parties to this Agreement any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement. This Agreement and all of its provisions and conditions are for the sole and exclusive benefit of the parties to this Agreement and their successors and assigns.

Section 11.11. **Severability**. If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect. Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

Section 11.12. **Section Headings, Construction**. The headings of Sections in this Agreement are provided for convenience only and will not affect its construction or interpretation. All references to "Section" or "Sections" refer to the corresponding Section or Sections of this Agreement. All words used in this Agreement will be construed to be of such gender or number as the circumstances require. Unless otherwise expressly provided, the word "including" does not limit the preceding words or terms.

Section 11.13. **Time of the Essence**. With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

Section 11.14. **Governing Law**. This Agreement will be governed by the laws of the State of Delaware without regard to conflicts of laws principles.

Section 11.15. **Counterparts**. This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

Section 11.16. **Effective Date**. This Agreement shall become effective as of the date of execution by the last party to execute this Agreement (the "Effective Date").

*[Signatures on following page]*

IN WITNESS WHEREOF, the parties, as evidenced by the signatures of their Duly Authorized Agents, do hereby execute this Stock Purchase Agreement as of the ____ day of August, 2019.

GT ACQUISITION GROUP, INC.

By:_____
    Duly Authorized Agent

GOOD TIMES RESTAURANTS, INC.

By:_____
    Duly Authorized Agent

# LIST OF EXHIBITS

Exhibit 1.1 – Franchises

Exhibit 2.4(a)(ii) – Seller Releases

Exhibit 2.4(a)(iii) – Noncompetition Agreement

Exhibit 2.4(b)(ii) – $600,000 Purchase Note

Exhibit 2.4(b)(iii) – $1,150,000 Purchase Note

Exhibit 2.4(b)(iv) – Collateral Assignment

Exhibit 3.13(a) – Benefit Plans

Exhibit 3.28(i) – Status of Leases

Exhibit 3.28 (ii) – Status of Subleases

Exhibit 7.4(a) – Opinion of Snell & Wilmer

Exhibit 7.8 – Repair and Maintenances Services Agreement

Exhibit 8.4(a) – Opinion of Gravel & Shea

Exhibit 10.4 – Indemnified Contracts

<1407333v14/KAR>

# EXHIBIT B

**White Winston**
**Select Asset Funds**

265 Franklin Street Suite 1702
Boston MA 02110 3144

617 273 5610
whitewinston.com

February 11, 2019

<u>VIA ELECTRONIC MAIL</u>

Boyd Hoback
Good Times Restaurants, Inc.
141 Union Blvd.
Suite 400
Lakewood, CO 80228

Sean Geraty
Geraty Investments
10400 Viking Dr.
Suite 140
Eden Prairie, MN 55344

Re:   <u>Letter of Intent Regarding White Winston Select Asset Funds, LLC Interest in
Purchasing the Capital Stock of Good Times Drive Thru, Inc.</u>

Gentlemen:

Thank you for providing White Winston Select Asset Funds, LLC ("White Winston")
with an opportunity to evaluate the potential purchase of Good Times Drive Thru, Inc. (the "Company").
As a result of our review of the publicly available information regarding the Company, meetings with
management, and follow-up conversations with management, we are pleased to submit the following
proposal regarding the possible acquisition of the Company (the "Acquisition") by a Delaware
corporation to be formed by White Winston Select Asset Funds, LLC (the "Purchaser") from Good Times
Restaurants, Inc. (the "Seller").

1.      **Price.**   The purchase price for the Company will be Ten Million Dollars
($10,000,000.00) consisting of the following consideration: (a) Eight Million Dollars ($8,000,000.00) in
cash;  and (b) Two Million Dollars ($2,000,000.00) by execution and delivery of a limited recourse
promissory note (the "Purchase Note") with interest at five percent (5%) per annum and payable in
monthly installments of Twenty-Five Thousand Three Hundred Nineteen and 84/100 Dollars
($25,319.84) over an eight (8) year term; recourse under the note would be limited to a collateral
assignment of franchise revenue and sublease revenue payable to the Company.

In addition to the forgoing, the purchase price would be subject to a post-closing adjustment
based on working capital at the closing.  Target working capital at closing will be zero.

2.    **Structure**. The Acquisition would be effected through the direct purchase by the Purchaser of all the shares of the issued and outstanding capital stock of the Company or a merger of the Purchaser with and into the Company. We will require additional investigation and discussions with our advisers before we can confirm the terms of the final acquisition structure.

In connection with the Acquisition, the Seller would issue and sell to White Winston or an affiliate a general obligation convertible bond in the initial principal amount of Two Million Dollars ($2,000,000.00) with interest at five percent (5%) per annum and payable in equal semi-annual installments of principal and interest over an eight (8) year term (the "Convertible Bond"). Payment for the Convertible Bond would be made in cash at closing of the purchase of the Company. Payment and performance of the Convertible Bond would be secured by a first priority security pledge of the Purchase Note and the underlying collateral assignment of franchise revenue and sublease revenue payable to the Seller. Upon any default, the unpaid balance (or a portion thereof) of the Convertible Bond would be convertible at the election of the holder into freely tradable registered shares of common stock of the Seller at a per share price equal to eighty-five percent (85%) of the price of the Seller's shares determined with reference to the average of the closing bid and ask prices for the shares on the securities exchange on which the predominant portion of such shares is traded during the thirty (30) consecutive trading days ending on the day before a conversion election is made.

3.    **Financing**. White Winston and its affiliates have committed to provide the Purchaser with the financing necessary to undertake the Transaction. The terms and conditions of such financing are subject to standard terms and conditions, due diligence, and other investment matters as otherwise offered to other White Winston portfolio companies under its standard commercial financing documents.

4.    **The Definitive Agreement**. The Acquisition would be effected in accordance with the terms of a definitive purchase or merger agreement (the "Definitive Agreement"). The Definitive Agreement would be prepared and finalized in accordance with the following schedule: (i) initial draft of the Definitive Agreement prepared by our counsel within 20 days of the date of execution of this letter (the "LOI Date"); (ii) proposed final schedules to the Definitive Agreement delivered within 45 days of the LOI Date; (iii) execution of the Definitive Agreement within 60 days of the LOI Date but not earlier than 15 days after the delivery of proposed final schedules; and (iv) closing under the Definitive Agreement within 20 days after execution of the Definitive Agreement. The Definitive Agreement will contain certain conditions to Purchaser's obligation to consummate the Acquisition, including but not limited to satisfactory completion of due diligence as described below, procurement of satisfactory financing for the Acquisition and the receipt by Purchaser of the proceeds thereof. The Definitive Agreement will reflect the Summary of Key Terms attached as Exhibit I.

5.    **Due Diligence; Timing**. Our proposal is subject to the satisfactory completion of our business, accounting, tax, environmental and legal due diligence. Upon your acceptance of this proposal, we are prepared to commit all necessary resources to expeditiously complete our due diligence. Assuming the full cooperation of all necessary personnel of the Company, we are confident that due diligence can be completed quickly. We would of course conduct our review in a manner that minimizes disruption to the Company. The negotiation of the Definitive Agreement can take place concurrently with the completion of our due diligence.

6.    **Access**. Upon reasonable notice, we and our representatives shall be afforded full and complete access during normal business hours or such other hours as are reasonable under the

circumstances to the books, record, documents and facilities of the business of the Company, and on the same conditions the officers, employees, attorneys, agents, and independent accountants of the Company will be made available to discuss the business, financial condition and prospects of the business.

7. **Exclusive Dealings**. By signing this letter, the Seller agrees that it will deal exclusively with White Winston in connection with the sale of the Company, and until the expiration of 90 days from the date of acceptance of this letter by the Company and for so long thereafter as we and the Company are negotiating such sale, neither the Seller, the Company nor any of its affiliates or subsidiaries, nor any of their respective officers, employees, representatives or agents, will, directly or indirectly, without our consent, solicit, encourage or initiate any offer or proposal from, or engage in any discussions or negotiations with, or enter into an agreement with, or provide any information to, any corporation, partnership, person or other entity or group, other than the Purchaser and its affiliates, employees, representatives and agents, concerning any transaction involving the sale of any portion of the Company, its capital stock or its business. If the Seller or the Company receives any proposal in respect of any such transaction, it will immediately communicate to the Purchaser the terms of such proposal.

8. **Legal Effect**. This letter is not binding upon any person and has no legal effect whatsoever; provided, however, that paragraphs 7, 8, 9 and 10 hereof and this paragraph 9 shall constitute a binding agreement of the parties hereto. Neither this letter nor any party's execution thereof shall constitute an obligation or commitment of any party to enter into the Definitive Agreement or give any party any rights or claims against another in the event any party for any reason terminates negotiations to effect the Acquisition, other than in respect of claimed breaches of paragraphs 7, 8, 9 and 10 hereof. All obligations or commitments to proceed with the Acquisition shall be contained only in the Definitive Agreement. The Company represents and warrants that it (or its agents or representatives), as the case may be, has not entered into any agreement or had any discussions with any third party regarding the sale or other disposition of the Company, its capital stock or its assets which could result in the Purchaser or its affiliates (collectively, the "Buyer Group") having any liability to such third party as a result of entering into this letter or pursuing the transactions contemplated hereby. The Company agrees to indemnify, defend and save and hold the Buyer Group (and their respective officers, directors, partners and agents) harmless from any claims or liabilities resulting from any breach of the foregoing representation and warranty, including any legal or other expenses incurred in connection with the defense of any such claims or liabilities against any member of the Buyer Group (or their respective officers, directors, partners or agents). This letter shall be governed by and construed in accordance with the laws of the State of Delaware (excluding the provisions of such laws regarding conflicts of law) and may not be amended or modified except by an agreement in writing signed by the Purchaser and the Company and specifically referring to this letter.

9. **Confidentiality**. This proposal letter is being delivered to you with the understanding that this letter and its contents (including the purchase price referred to) will remain strictly confidential, except as set forth below, and that neither the existence of this letter nor its contents nor the identity of the Buyer Group will be directly or indirectly discussed with or disclosed to any other prospective purchaser of all or a substantial part of the stock or the assets of the Company.

10. **Public Announcement**. None of the parties shall make any public statement, announcement or disclosure concerning this letter or the proposed transaction without the consent of the other parties hereto, except as may be required by applicable law, as determined by your counsel in light of your public ownership, after consultation with the other parties hereto.

11. **Termination**. This letter must be accepted prior to 5 p.m. (Eastern time) on Tuesday, February 13, 2019, unless we have previously agreed in writing to an extension, and failing such acceptance this letter will terminate.

Any questions regarding this proposal can be directed to Todd M. Enright (phone 850-570-4793.

If this proposal is acceptable to you and you wish to proceed with the Acquisition on the terms set forth herein, please sign and return to the undersigned one copy of this letter.

Very truly yours,

WHITE WINSTON SELECT ASSET FUNDS, LLC

By: _____
    Name: Todd M. Enright
    Title: Manager

ACCEPTED AND AGREED TO:

GOOD TIMES RESTAURANTS, INC.

By _____
   Name: Ryan M. Zink
   Title: Chief Financial Officer and Treasurer

## Exhibit 1: Summary of Certain Key Terms

*This summary of certain key terms is for discussion purposes only and does not represent a commitment or agreement by any person. It is not intended to define or describe all of the terms and conditions of the Transaction.*

**Purchase Price:** At closing, the Purchaser will pay the purchase price for the Company as described in the Letter of Intent to which this Summary of Certain Key Terms is attached. From the purchase price an amount of $1,000,000 will be paid into an escrow account with a qualified independent escrow agent to be agreed upon by the Seller and the Purchaser to secure any liabilities or obligations the Seller may have to Purchaser under the indemnity provisions described below and to secure payment of any working capital adjustment in Purchaser's favor. Within 90 days after closing, there will be a final working capital true-up based on the amounts at closing, with the amount previously paid to the Seller adjusted based on the amount by which actual working capital at closing is greater than or less than the agreed upon target working capital of zero. The Purchaser may recover any working capital shortfall directly from the Seller, or from the escrow account, provided that if the Purchaser satisfies the shortfall from the escrow account, the Seller will be obligated to replenish that amount.

**Representations and Warranties:** The Seller will make mutually agreeable representations and warranties customary for transactions of this type and size. These representations and warranties will be comprehensive, with appropriate Material Adverse Effect, materiality and ordinary course of business qualifications and/or knowledge qualifiers.

**Definition of Knowledge:** As applicable and subject to confirmatory diligence, knowledge will be defined as the knowledge after appropriate inquiry of the management team and certain others to be identified after diligence.

**Indemnity:** All representations and warranties and pre-closing covenants will survive for 18 months, except that: (i) representations and warranties with respect to Organization and Qualification; Authority, Power and Enforceability; No Conflicts, Capitalization, Title to and Sufficiency of Assets, Indebtedness and Guarantees, and No Brokers (collectively, the "Fundamental Reps") will survive indefinitely; and (ii) representations with respect to Taxes will survive until 30 days after the expiration of applicable statutes of limitations, but in any event no less than five years (the "SOL Reps"). Post-closing covenants will survive in accordance with their terms.

The Seller will indemnify the Purchaser for: (i) the Seller's breaches of representations and warranties; (ii) the Seller's breaches of covenants; (iii) liabilities of any nature related to the Company's activities prior to the Closing not specifically reflected in any working capital adjustment to the Purchase Price ("Excluded Liabilities") and (iv) fraud or intentional misrepresentation.

Purchaser will not be entitled to indemnity for any breach of representation or warranty, other than the Fundamental Reps and the SOL Reps: (i) until the

aggregate of all damages arising from a claim or related claims exceeds $5,000 (the "Mini-Basket Claims"), or the aggregate amount of all eligible claims including the Mini-Basket Claims exceeds $100,000 (the "Basket"), after which the Seller will be responsible for all eligible claims including claims within the Basket; or (ii) in excess of $1,500,000 (the "Cap"). For the avoidance of doubt, the Basket and Cap will not apply to indemnity claims arising out of breaches of Fundamental or SOL Reps, breaches of covenants, Excluded Liabilities or fraud or intentional misrepresentation.

The Purchaser's ability to seek indemnity will not be affected by any investigation, inquiry, knowledge, or examination by the party seeking indemnification (and the Purchaser will not be required to represent that it does not have knowledge or reason to believe that any representation or warranty is untrue, or incomplete). Materiality and MAE (but not knowledge) qualifiers will be disregarded for the purposes of determining whether there was a breach and the amount of indemnifiable losses.

Indemnified losses will be calculated after application of any received insurance proceeds actually received during the year of the loss (net of costs of recovery and the present value of any associated increase in premiums). Lost profits, consequential damages, diminution of value, losses based on valuation metrics or other multipliers, or similar damages may be recovered by the indemnified party. Punitive damages, however, may only be recovered by an indemnified party if owed to a third party.

Subject to open claims, the amount held in escrow will be released in 1/3 amounts on dates that are 6 months, 12 months and 18 months after the closing.

| **Closing Deliveries:** | The closing will be conditioned on receipt of the following closing deliveries, among others: |

- Transfer of the stock of the Company or consummation of a merger of the Company with a subsidiary of the Purchaser
- All regulatory approvals (including with respect to permits)
- Delivery of customary closing certificates
- Receipt of pay-off letters and lien releases as to any pre-closing indebtedness
- Receipt of third party consents
- Receipt of scheduled ancillary transaction agreements
- Receipt of financing (including receipt of related documents, insurance, etc.) on terms and conditions acceptable to Purchaser

**Governing Law and Jurisdiction:** Delaware, with litigation in the state or federal courts located in Delaware.

EFiled: Sep 24 2019 05:11PM EDT
Transaction ID 64238574
Case No. 2019-0771-

# EXHIBIT C

**From:** Boyd Hoback [bhoback@gtrestaurants.com]
**Sent:** Monday, April 08, 2019 11:17 AM
**To:** T.M. Enright
**Subject:** RE: DD Letter

Todd;
I'll take responsibility for the working capital issue for not quantifying & clarifying that up front with my team. What we anticipated to be a $10m transaction is now $9m which makes it a much more difficult decision for our board. For clarification, we're not asking you to eat $750,000 as we're taking the total hit for that in the transaction value with full allocation to the Buyer. It's simply allocated to the note(s) vs the cash, which makes the $1m reduction in value from our original expectations a bit more palatable. You will immediately recoup that $750,000 in working capital within the first 4 weeks.

Let me know how to proceed. I'm at the Restaurant Leadership Conference in Phoenix but can talk this afternoon prior to 4:00 ET. My cell is 720-363-5863. Thanks.
Boyd

**From:** T.M. Enright <tenright@whitewinston.com>
**Sent:** Monday, April 8, 2019 9:36 AM
**To:** Boyd Hoback <bhoback@gtrestaurants.com>
**Subject:** Re: DD Letter

Boyd, thanks for your e-mail and quick turn around. For the purpose of our discussions, I have taken all the other parties off this e-mail, as I would like to have a conversion with you ahead of addressing with the group. As a general matter, I think we can get through the bulk of these issues (with some clarification) without to much consideration. We understand this deal has to work for everyone and we can be flexible to make things work for you if you have to manage board expectations. That being said, we have one issue that is going to be a problem, and frankly, one that is not sitting well with me: the Working Capital Adjustment argument.

While I am happy to discuss the benefit of the WC adjustment to the buyer, or what each party "thought" about WC when agreeing to a stock sale vs. an asset sale, however, what I can't ignore is what is written in the LOI on the bottom on the first page: "In addition, to the forgoing, the purchase price would be subject to a post-closing adjustment based on working capital at the closing. Target working capital at closing will be zero."

There is no question in my mind that the parties know what working capital at zero means and I am surprised this is even an issue for discussion at this point. Now if you need some help shoehorning this deal in a way that addresses the timing on the calculation/payment of working capital that is one thing; I will work with you to make that happen. But to ask us to eat $750,000 on something that is so clearly defined in the LOI (and was a material deal-point) is quite another. I'm a fair guy and will work to address optics regarding the deal, but let's call a spade-a-spade; this 11th hour WC grab is about net cash at closing not about what the parties "thought" vis-a-vis working capital and purchase price.

I'm in the office this afternoon and ready to speak when you can are available. Thanks again and let me know when you ave a moment to address so we can get our lawyers working on the SPA and start the DD process back-up again. Thanks again Boyd.

**T.M. Enright, Partner**

White Winston
Select Asset Funds

850.570.4793 (Direct Dial)
617.830.2200 (Administrative)

tenright@whitewinston.com

On Apr 7, 2019, at 10:55 AM, Boyd Hoback <bhoback@gtrestaurants.com> wrote:

Todd;
After our call on Thursday, I think we're down to two substantive issues that at the end of the day are somewhat intertwined as they simply affect the purchase value of the transaction.

1. The biggest issue is with the Working Capital calculation. It becomes an approximate $750,000 permanent, interest free funding vehicle in the Buyer's favor in that it will stay in perpetuity or until the business is sold or liquidated and is an additional cost to the transaction for us. We had entered into this process intending for any potential sale of the business to be a stock sale but treated for tax purposes as an asset sale. We did not intend to absorb the $750,000.

2. The other issue relates to subleases on stores 105 and 152 and any adjustment to the purchase price. We are continuing to work on a couple of different options for the sublease of store 105 and are completing the sublease of store 152 to Dutch Bros Coffee. We had already reduced the purchase price by $150,000 due to the lack of a sublease premium. Our expectation is that Buyer will take these stores as of the date of Closing.

The net result of a price reduction for the working capital deficit and any additional adjustment based on store 105 takes our Purchase Value to below $9,000,000. Our board won't be willing to move forward at that price given other alternatives. We need a minimum cash amount of $8,000,000 and total gross transaction value of $9,000,000. We have reduced the note payable to $1,850,000, and propose further reducing the note value to $1,750,000 and by the amount of the Estimated Working Capital deficit as contemplated in the Pre-Closing Adjustment in the SPA. This would leave us at $9,000,000 in transaction value which we can move forward with.

We are ok with your proposal on the bifurcation of the Note Payable into two separate full recourse and limited recourse notes, so long as the note is reduced by the Working Capital Deficit. However, substantively there is very little if any risk to the Buyer on the full recourse note in that it will be fully paid in a little over two years based on the current royalty stream. We had agreed to limited recourse in concept in the LOI so we are willing to live with the risk on the second note so long as we have the specific covenants binding on Buyer and Drive Thru related to their franchisor obligations and the lockbox arrangement we discussed, with Seller having a first lien position on that collateral, including a DACA on the account and UCC 1 filing on that collateral.

The other outstanding item is the draft of the escrow agreement and provision for a holdback.  In that we have agreed to a $600,000 full recourse note, any adjustments arising from our indemnifications should be an adjustment to that note rather than any further holdback in cash.  We should review a draft of that agreement as soon as possible.

Please let me know how you'd like to move forward.   Thanks.
Boyd

EFiled: Sep 24 2019 05:11PM EDT
Transaction ID 64238574
Case No. 2019-0771-

# EXHIBIT D

**White Winston**
Select Asset Funds

285 Franklin Street, Suite 1702
Boston, MA 02110-3144

617-274-9610
whitewinston.com

April 29, 2019

VIA ELECTRONIC MAIL

Boyd Hoback
Good Times Restaurants, Inc.
141 Union Blvd.
Suite 400
Lakewood, CO 80228

Sean Geraty
Geraty Investments
10400 Viking Dr.
Suite 140
Eden Prairie, MN 55344

Re:     Amended and Restated Letter of Intent Regarding White Winston Select Asset Funds,
        LLC Interest in Purchasing the Capital Stock of Good Times Drive Thru, Inc.

Gentlemen:

In light of our discussions that have resulted in material changes to the terms of the agreement described in the Letter of Intent dated February 11, 2019 (the "Letter of Intent" ) between White Winston Select Asset Funds, LLC ("White Winston") and Good Times Restaurants, Inc. ("Seller") regarding Good Times Drive Thru, Inc. (the "Company"), we present this Amended and Restated Letter of Intent ("Amended LOI") that completely supersedes and replaces the Letter of Intent, the result being that the Letter of Intent is void.

As a result of our review of the publicly available information regarding the Company, meetings with management, and follow-up conversations with management, we are pleased to submit the following amended and restated proposal regarding the possible acquisition of the Company (the "Acquisition") by a Delaware corporation to be formed by White Winston (the "Purchaser") from the Seller.

1.     Price. The purchase price for the Company will be Nine Million Seven Hundred Fifty Thousand Dollars ($9,750,000.00) consisting of the following consideration: (a) Eight Million Dollars ($8,000,000.00) in cash; (b) Six Hundred Thousand Dollars ($600,000.00) by execution and delivery of a promissory note with full recourse to the Purchaser and the Company (the "$600,000 Purchase Note") with interest at five percent (5%) per annum and payable in monthly installments of not less than Seven Thousand Five Hundred Ninety-five and 95/100 Dollars ($7,595.95) over an eight

4829-0344-6420.2

(8) year term; although recourse under the $600,000 Purchase Note will not be limited, it will primarily be paid by franchise revenue payable to the Company or the Purchaser from franchisees of the Company determined as of the date of closing of the Acquisition (the "Franchise Revenue"), and the Company and the Purchaser will covenant to dedicate 100% of the Franchise Revenue to pay the $600,000 Purchase Note, even if the Franchise Revenue exceeds the minimum payments due in an effort to pay off the $600,000 Purchase Note prior to its maturity; and (c) One Million One Hundred Fifty Thousand Dollars ($1,150,000.00) by execution and delivery of a limited recourse promissory note (the "$1,150,000 Purchase Note") with interest at five percent (5%) per annum and payable in monthly installments to commence only after full repayment of the $600,000 Note; recourse under the $1,150,000 Purchase Note will be limited to a collateral assignment of the Franchise Revenue. Interest will accrue on the $1,150,000 Purchase Note from and after the closing of the Acquisition and the $1,150,000 Purchase Note will have a maturity date on the eighth anniversary of the closing of the Acquisition, provided that the Seller may elect to extend such term on a year to year basis in the event that the $1,150,000 Purchase Note has not been paid by such anniversary for however many years may be necessary for the payment of the $1,150,000 Purchase Note from the Franchise Revenue, or the Seller may on or after such anniversary elect to exercise its rights under the collateral assignment of Franchise Revenue in full satisfaction of any obligations of the Purchaser and the Company under the Purchase Note.

The collateral assignment will obligate the Purchaser and the Company to make good faith commercially reasonable efforts to maximize the Franchise Revenue while either or both of the $600,000 Purchase Note and $1,150,000 Purchase Note are outstanding. The collateral assignment shall establish a first lien security interest on the Franchise Revenue for the benefit of the Seller. All Franchise Revenue shall be deposited into a special account for which account there will be a deposit account control agreement. Such deposits shall be made directly by the franchisee by ACH or if by check through the use of a lockbox at the financial institution holding such account.

In addition to the forgoing, the purchase price will be subject to a post-closing adjustment based on working capital at the closing. Target working capital at closing will be zero and if the working capital is less than zero, then the amount of the $1,150,000 Purchase Note will be reduced dollar for dollar to reflect such deficit.

2.     Structure. The Acquisition would be effected through the direct purchase by the Purchaser of all the shares of the issued and outstanding capital stock of the Company or a merger of the

Purchaser with and into the Company. We will require additional investigation and discussions with our advisers before we can confirm the terms of the final acquisition structure.

Prior to the closing on the Acquisition, Seller and the Company will take the following actions:

a.      Transfer all assets and liabilities of the so-called Repair and Maintenance Process and its employees (the "R&M") to the Company and have the Company enter into a commercially reasonable services agreement with Seller for the Company to provide repair and maintenance services to Bad Daddy's Burger Bar for a period of no less than one year at rates and terms agreeable to Seller, the Company and Purchaser.

b.      Assign the lease for Store 172 (the "Store 172 Lease") from the Company to Seller. In connection with such assignment, Seller will indemnify the Company and Purchaser after closing for any losses arising in connection with such lease.

3.      Financing. White Winston and its affiliates have committed to provide the Purchaser with the financing necessary to undertake the Transaction. The terms and conditions of such financing are subject to standard terms and conditions, due diligence, and other investment matters as otherwise offered to other White Winston portfolio companies under its standard commercial financing documents.

4.      Schedule. The desired schedule for completing the Acquisition should be as follows:

- This Letter of Intent should be executed on or before April 24, 2019;
- The draft of the definitive purchase agreement (the "Definitive Agreement") should be revised by the Seller on or before May 3, 2019 to reflect this Letter of Intent;
- The Purchaser should provide comments on the revised Definitive Agreement on or before May 10, 2019;
- The Seller should complete the disclosure schedules on or before May 17, 2019;
- The Purchaser should complete its due diligence on or before May 24, 2019;
- The parties should agree on any due diligence or disclosure schedules issues on or before May 31, 2019;

- Any agreed revisions to the Definitive Agreement necessary for the above agreement should be made on or before June 14, 2019;
- The Definitive Agreement should be executed on or before June 25, 2019;
- The closing of the Acquisition should occur on June 26, 2019.

5.     Due Diligence. Our proposal is subject to the satisfactory completion of our business, accounting, tax, environmental and legal due diligence. Upon your acceptance of this proposal, we are prepared to continue to commit all necessary resources to expeditiously complete our due diligence. Assuming the full cooperation of all necessary personnel of the Company, we are confident that due diligence can be completed quickly and undertake to have it completed on or before May 10, 2019. We would of course conduct our review in a manner that minimizes disruption to the Company. The negotiation of the Definitive Agreement can take place concurrently with the completion of our due diligence.

6.     Access. Upon reasonable notice, we and our representatives shall be afforded full and complete access during normal business hours or such other hours as are reasonable under the circumstances to the books, records, documents and facilities of the business of the Company, and on the same conditions the officers, employees, attorneys, agents, and independent accountants of the Company will be made available to discuss the business, financial condition and prospects of the business.

7.     Exclusive Dealings. By signing this letter, the Seller agrees that it will deal exclusively with White Winston in connection with the sale of the Company, and until June 25, 2019 and for so long thereafter as we and the Company are negotiating such sale, neither the Seller, the Company nor any of its affiliates or subsidiaries, nor any of their respective officers, employees, representatives or agents, will, directly or indirectly, without our consent, solicit, encourage or initiate any offer or proposal from, or engage in any discussions or negotiations with, or enter into an agreement with, or provide any information to, any corporation, partnership, person or other entity or group, other than the Purchaser and its affiliates, employees, representatives and agents, concerning any transaction involving the sale of any portion of the Company, its capital stock or its business. If the Seller or the Company receives any proposal in respect of any such transaction, it will immediately communicate to the Purchaser the terms of such proposal.

8.     Legal Effect. This letter is not binding upon any person and has no legal effect whatsoever; provided, however, that paragraphs 7, 8, 9, 10 and 11 hereof shall constitute a binding

agreement of the parties hereto. Neither this letter nor any party's execution thereof shall constitute an obligation or commitment of any party to enter into the Definitive Agreement or give any party any rights or claims against another in the event any party for any reason terminates negotiations to effect the Acquisition, other than in respect of claimed breaches of paragraphs 7, 8, 9, 10 and 11 hereof. All obligations or commitments to proceed with the Acquisition shall be contained only in the Definitive Agreement. The Company represents and warrants that it (or its agents or representatives), as the case may be, has not entered into any agreement or had any discussions with any third party regarding the sale or other disposition of the Company, its capital stock or its assets which could result in the Purchaser or its affiliates (collectively, the "Buyer Group") having any liability to such third party as a result of entering into this letter or pursuing the transactions contemplated hereby. The Company agrees to indemnify, defend and save and hold the Buyer Group (and their respective officers, directors, partners and agents) harmless from any claims or liabilities resulting from any breach of the foregoing representation and warranty, including any legal or other expenses incurred in connection with the defense of any such claims or liabilities against any member of the Buyer Group (or their respective officers, directors, partners or agents). This letter shall be governed by and construed in accordance with the laws of the State of Delaware (excluding the provisions of such laws regarding conflicts of law) and may not be amended or modified except by an agreement in writing signed by the Purchaser and the Seller and specifically referring to this letter.

9. <u>Confidentiality.</u> This proposal letter is being delivered to you with the understanding that this letter and its contents (including the purchase price referred to) will remain strictly confidential, except as set forth below, and that neither the existence of this letter nor its contents nor the identity of the Buyer Group will be directly or indirectly discussed with or disclosed to any other prospective purchaser of all or a substantial part of the stock or the assets of the Company.

10. <u>Public Announcement.</u> None of the parties shall make any public statement, announcement or disclosure concerning this letter or the proposed transaction without the consent of the other parties hereto, except as may be required by applicable law, as determined by your counsel in light of your public ownership, after consultation with the other parties hereto.

11. <u>Termination.</u> This letter must be accepted prior to 5 p.m. (Eastern time) on Tuesday, April 24, 2019, unless we have previously agreed in writing to an extension, and failing such acceptance this letter will terminate.

Any questions regarding this proposal can be directed to Todd M. Enright (phone 850 570-4793).

If this proposal is acceptable to you and you wish to proceed with the Acquisition on the terms set forth herein, please sign and return to the undersigned one copy of this letter.

Very truly yours,

WHITE WINSTON SELECT ASSET FUNDS, LLC

By:
    Name:  Todd M. Enright
    Title:  Manager

ACCEPTED AND AGREED TO:

GOOD TIMES RESTAURANTS, INC.

By:
    Name:  Boyd E. Hoback
    Title:  Pres, CEO

GOOD TIMES DRIVE THRU, INC.

By:
    Name:  Boyd E. Hoback
    Title:  Pres, CEO

# Exhibit 1: Summary of Certain Key Terms

*This summary of certain key terms is for discussion purposes only and does not represent a commitment or agreement by any person. It is not intended to define or describe all of the terms and conditions of the Transaction.*

**Purchase Price:** At closing, the Purchaser will pay the purchase price for the Company as described in the Amended LOI to which this Summary of Certain Key Terms is attached. Within 90 days after closing, there will be a final working capital true-up based on the amounts at closing, with the amount previously paid to the Seller adjusted based on the amount by which actual working capital at closing is greater than or less than the agreed upon target working capital of zero. The Purchaser will recover any working capital shortfall through a dollar for dollar reduction in the principal amount of the $1,150,000 Purchase Note.

**Representations and Warranties:** The Seller will make mutually agreeable representations and warranties customary for transactions of this type and size. These representations and warranties will be comprehensive, with appropriate Material Adverse Effect, materiality and ordinary course of business qualifications and/or knowledge qualifiers.

**Definition of Knowledge:** As applicable and subject to confirmatory diligence, knowledge will be defined as the knowledge after appropriate inquiry of the management team and certain others to be identified after diligence.

**Indemnity:** All representations and warranties and pre-closing covenants will survive for 18 months, except that: (i) representations and warranties with respect to Organization and Qualification; Authority, Power and Enforceability; No Conflicts, Capitalization, Title to and Sufficiency of Assets, Indebtedness and Guarantees, and No Brokers (collectively, the "Fundamental Reps") will survive indefinitely; and (ii) representations with respect to Taxes will survive until 30 days after the expiration of applicable statutes of limitations, but in any event no less than five years (the "SOL Reps"). Post-closing covenants will survive in accordance with their terms.

The Seller will indemnify the Purchaser for: (i) the Seller's breaches of representations and warranties; (ii) the Seller's breaches of covenants; (iii) liabilities of any nature related to the Company's activities prior to the Closing not specifically reflected in any working capital adjustment to the Purchase Price ("Excluded Liabilities"); (iv) fraud or intentional misrepresentation; and (v) any claim arising from or in connection with the Store 172 Lease.

Purchaser will not be entitled to indemnity for any breach of representation or warranty, other than the Fundamental Reps and the SOL Reps: (i) until the aggregate of all damages arising from a claim or related claims exceeds $5,000 (the "Mini-Basket Claims"), or the aggregate amount of all eligible claims including the Mini-Basket Claims exceeds $100,000 (the "Basket"), after

which the Seller will be responsible for all eligible claims including claims within the Basket; or (ii) in excess of $1,500,000 (the "Cap"). For the avoidance of doubt, the Basket and Cap will not apply to indemnity claims arising out of breaches of Fundamental or SOL Reps, breaches of covenants, Excluded Liabilities or fraud or intentional misrepresentation.

The Purchaser's ability to seek indemnity will not be affected by any investigation, inquiry, knowledge, or examination by the party seeking indemnification (and the Purchaser will not be required to represent that it does not have knowledge or reason to believe that any representation or warranty is untrue, or incomplete). Materiality and MAE (but not knowledge) qualifiers will be disregarded for the purposes of determining whether there was a breach and the amount of indemnifiable losses.

Indemnified losses will be calculated after application of any received insurance proceeds actually received during the year of the loss (net of costs of recovery and the present value of any associated increase in premiums). Lost profits, consequential damages, diminution of value, losses based on valuation metrics or other multipliers, or similar damages may be recovered by the indemnified party. Punitive damages, however, may only be recovered by an indemnified party if owed to a third party.

Indemnified losses suffered by Purchaser will be set-off first against amounts owing under the $600,000 Purchase Note until it is paid in full and then to any amounts owing under the $1,150,000 Purchase Note.

**Closing Deliveries:**   The closing will be conditioned on receipt of the following closing deliveries, among others:

- Transfer of the stock of the Company or consummation of a merger of the Company with a subsidiary of the Purchaser
- All regulatory approvals (including with respect to permits)
- Delivery of customary closing certificates
- Receipt of pay-off letters and lien releases as to any pre-closing indebtedness
- Receipt of third party consents
- Receipt of scheduled ancillary transaction agreements
- Receipt of financing (including receipt of related documents, insurance, etc.) on terms and conditions acceptable to Purchaser
- Evidence of assignment of the Store 172 Lease
- Evidence of the transfer of R&M as described herein

**Governing Law and Jurisdiction:**   Delaware, with litigation in the state or federal courts located in Delaware.

<1421031r2/KAR>

EFiled: Sep 24 2019 05:11PM EDT
Transaction ID 64238574
Case No. 2019-0771-

# EXHIBIT E

**White Winston**
**Select Asset Funds**

265 Franklin Street, Suite 1702
Boston, MA 02110-3144

617-274-5610
.whitewinston.com

May 24, 2019

**E-MAIL**

Mr. Boyd Hoback
Good Times Restaurants, Inc.
141 Union Blvd., Suite 400
Lakewood, CO  80228

Mr. Sean Geraty
Geraty Investments
10400 Viking Drive, Suite 140
Eden Prairie, MN  55344

> Re: Letter of Intent between White Winston Select Asset Funds, LLC (the "Buyer")
> and Good Times Restaurants, Inc. (the "Seller")

Gentlemen:

This letter will modify the existing Amended and Restated Letter of Intent between the Buyer and the Seller dated April 29, 2019 (the "Letter of Intent"). Unless otherwise defined herein, capitalized terms have the meanings given to them in the Letter of Intent. The Buyer and the Seller have agreed to modify the schedule described in paragraph 4 of the Letter of Intent as follows:

- The Seller should complete the disclosure schedules on or before May 31, 2019;

- The Buyer should complete its due diligence on or before June 10, 2019;

- The parties should agree on any due diligence or disclosure schedule issues on or before June 17, 2019;

- The Definitive Agreement should be executed on or before June 25, 2019; and

- The closing of the Acquisition should occur on or before a date not later than thirty (30) days after the date of execution of the Definitive Agreement, as agreed upon by the Buyer and the Seller.

Except as modified as set forth above, the terms of the Letter of Intent shall remain in effect.

If the proposed modifications to the Letter of Intent described above is acceptable to you, please sign and return one copy of this letter to the undersigned.

Very truly yours,

WHITE WINSTON SELECT ASSET FUNDS, LLC

By: _____

Accepted and Agreed to:

GOOD TIMES RESTAURANTS, INC.

By: _____
     Name:  Boyd E. Hoback
     Title:  President and CEO

GOOD TIMES DRIVE THRU, INC.

By: _____
     Name:  Boyd E. Hoback
     Title:  President and CEO

<1434977v1/PSE>

EFiled: Sep 24 2019 05:11PM EDT
Transaction ID 64238574
Case No. 2019-0771-

# EXHIBIT F

**From:** Boyd Hoback [bhoback@gtrestaurants.com]
**Sent:** Wednesday, June 26, 2019 2:00 PM
**To:** T.M. Enright
**CC:** Ryan M. Zink
**Subject:** SPA

Todd;

There are two issues that we're hung up on internally right now that look like they will delay the signing of the SPA, but shouldn't affect the closing date.

Our bank is having significant heartburn over the lease guarantees by Good Times Restaurants Inc. on the 8 leases (4 of which go away in 9 months) with an indemnity from a new entity that has no credit or significant equity capitalization. There's no incentive for the landlords to let us off the guarantees due to the new buyer's thin capitalization & one of those landlords is one of two that have a change of control approval provision in the lease (which won't be an issue with our guarantee still in place). Our suggestion to resolve that is to have, in addition to an indemnity, a subrogation agreement with GT Acquisition Co. to be able to step into the shoes of the Tenant & operate the stores for our own account as Good Times if we have to perform on any lease guaranty. You as lender would need to be a party to that agreement so that our subrogation rights supersede any collateral rights you have (or any other lender so long as our guarantee is in place).

The second issue in terms of timing is getting the lease issue on store 111 worked out. Our franchisee has agreed to extend his franchise agreement if we get the lease extension worked out, but the landlord is still pushing for a termination right in the lease extension with the payment of far less than the business value (9 month notice & $100,000).

We can push the signing of the SPA until those two issues are resolved & hopefully not be forced to announce the deal until we sign. Worst case is it leaks & we file an 8k with the deal & those two conditions.

Let me know your thoughts on the lease guarantees. Thanks.
Boyd



**Boyd Hoback**
President, CEO
(303) 384-1411 *office*
bhoback@gtrestaurants.com

**good times restaurants, inc.**
Bad Daddy's Burger Bar
Good Times | All Natural Burgers | Frozen Custard
141 Union Blvd #400
Lakewood, CO 80228
http://goodtimesburgers.com/
http://baddaddysburgerbar.com/

# EXHIBIT G

**From:** Boyd Hoback [bhoback@gtrestaurants.com]
**Sent:** Wednesday, July 24, 2019 8:58 AM
**To:** T.M. Enright
**CC:** Ryan M. Zink
**Subject:** GTDT

Todd;

Have you come to a conclusion with your group on how we can handle the lease guarantees?   In thinking about it more, our proposal is as follows:

- We will cover issues related to the guarantees on all 7 stores except store 103 with our bank, putting up additional cash collateral.   We will require a one year letter of credit or cash bond for one year's rent on store 103.
- We will modify existing leases so that GTIM will be released as a guarantor if the lease is modified or extended by Landlord & GTDT beyond the existing base term and option periods (GTDT cannot negotiate lease extensions whereby our guarantee continues).

A consistent issue with every landlord is that they do not know the new buyer nor their financial condition, have had bad or mixed experiences with financial buyers of other tenants and want to keep GTIM on as a guarantor.  No amount of cash deposit has swayed them.   If you want to come & meet face to face, we can certainly do so.

Let us know what other issues are outstanding on the SPA.   We'd like to execute the SPA with a condition on lease guarantee documentation prior to closing.

One issue of concern is that our counsel heard from yours that they were waiting to see if the deal is moving forward or not.  Are there other issues on your side?

Thanks.

Boyd





**Boyd Hoback**
President, CEO
(303) 384-1411 *office*
bhoback@gtrestaurants.com

**good times restaurants, inc.**
Bad Daddy's Burger Bar
Good Times | All Natural Burgers | Frozen Custard
141 Union Blvd #400
Lakewood, CO  80228
http://goodtimesburgers.com/
http://baddaddysburgerbar.com/

EFiled: Sep 24 2019 05:11PM EDT
Transaction ID 64238574
Case No. 2019-0771-

# EXHIBIT H

Todd;
Any update?  We had hoped to get the SPA signed this week & are concerned there are other issues that
we're unaware of.   Is it only the lease guaranty issue?
Boyd



**Boyd Hoback**
President, CEO
(303) 384-1411 *office*
bhoback@gtrestaurants.com

**good times restaurants, inc.**
Bad Daddy's Burger Bar
Good Times | All Natural Burgers | Frozen Custard
141 Union Blvd #400
Lakewood, CO  80228
http://goodtimesburgers.com/
http://baddaddysburgerbar.com/

EFiled: Sep 24 2019 05:11PM EDT
Transaction ID 64238574
Case No. 2019-0771-

# EXHIBIT I

**From:** Ryan M. Zink [rzink@gtrestaurants.com]
**Sent:** Friday, July 26, 2019 1:40 PM
**To:** T.M. Enright ; Boyd Hoback; Drew Gressett
**Subject:** RE: Good Times - Stock Purchase Agreement

Todd-

I'll review the new draft and comments below from Keith.

As it relates to guarantor issues, I believe us to be in general agreement in the understanding below. Seller will address the guarantor issues with our lender for all leases other than #103. For the purpose of clarifying the L/C or cash bond for #103, the L/C is required to be in-place for so long as we remain a guarantor to the lease, and in an amount equal to one year of rent payments for the *then current* lease year.

I discussed this with our credit officer a short while ago and he confirmed his individual approval. Given that we have agreement on this, he will present this solution officially to their credit committee Thursday morning but does not see any issue and indicated we should be in a place to execute the SPA mid-morning Thursday (8/1). He confirmed their counsel's ability to draft consents and amendments to our credit agreement for execution by our August 20 targeted closing date.

Let me know if you have any questions.

Best regards,

Ryan



**Ryan M. Zink**
Chief Financial Officer
(303) 384-1432 *office*
(316) 304-6476 *mobile*
rzink@gtrestaurants.com

**good times restaurants, inc.**
Bad Daddy's Burger Bar
Good Times | All Natural Burgers | Frozen Custard
141 Union Blvd #400
Lakewood, CO 80228
http://goodtimesburgers.com/
http://baddaddysburgerbar.com/

---

**From:** T.M. Enright <tenright@whitewinston.com>
**Sent:** Friday, July 26, 2019 10:30 AM
**To:** Boyd Hoback <bhoback@gtrestaurants.com>; Ryan M. Zink <rzink@gtrestaurants.com>; Drew Gressett <drew@hatcreekburgers.com>
**Subject:** Fwd: Good Times - Stock Purchase Agreement

Boyd and Ryan, please see below. To be clear, on the lease guaranty, we understand that you will be addressing all the issues with respect to the leases except for store 103. In regard to that lease, I understand that the parent will remain as a guarantor for that lease during the current term and all option periods (if so exercised-under the current lease).

In addition, we are advised that your lender is requiring that the purchaser post an LC or cash bond equal to one-year rent (for the current lease year) to secure the purchasers' obligations under the lease and indemnification agreement.

Please let us know if this is your understanding. Thanks again.

**T.M. Enright, Partner**



850.570.4793 (Direct Dial)
617.830.2200 (Administrative)
tenright@whitewinston.com


Sent from my iPhone, please excuse the typos.

Begin forwarded message:

> **From:** "Keith A. Roberts" <kroberts@gravelshea.com>
> **Date:** July 26, 2019 at 9:00:57 AM PDT
> **To:** "'Cohen, Roger'" <rcohen@swlaw.com>, "'Lynn, Rachel'" <rlynn@swlaw.com>
> **Cc:** "Peter S. Erly" <perly@gravelshea.com>, Scott Rowland <srowland@gravelshea.com>, "'T.M. Enright '" <tenright@whitewinston.com>
> **Subject: Good Times - Stock Purchase Agreement**
>
> Roger and Rachel,
>
> I understand from our client that the lease guarantee issue is either resolved or close to being so. In light of that, I drafted language in accordance with the below email string which we believe to be the only open issue in the Stock Purchase Agreement. Here is what we propose to be added to the definition of Franchise Revenue to address it:
>
> In the event that a Franchise is terminated or expires and the Company commences to operate a restaurant that was previously operated by a Franchisee under a Franchise, all revenue received from such location will be included in the term "Franchise Revenue." The attached revised draft of the SPA incorporates that language and contains some other minor revisions from the last draft delivered to you on June 25. I include both a

clean and marked version of the document, marked to that last draft delivered. If this new draft is acceptable, I think we can move to execution of the agreement.

To complete the Stock Purchase Agreement though, I think there are three small outstanding issues stemming from the Exhibits and the Disclosure Letter:

1. Scott wrote this morning about two outstanding lease issues in the Disclosure Letter, namely obtaining landlord consents to change in control for leases 103 and 121;

2. You sent some SPA exhibits on July 10 but omitted Exhibit 3.13(a) on benefits, indicating that it would come later. I'm not sure we ever got that; and

3. We need to see a draft of Exhibit 10.4, the list of guaranteed leases that are subject to indemnification if that is how the issue is handled.

Other than those three items, I think all of the outstanding items listed in my email of June 26 have been completed. Please let me know if that is not the case.

Thanks,

**Keith A. Roberts** | *Special Counsel*
**Gravel & Shea PC**
76 St. Paul Street, 7th Floor | P. O. Box 369 | Burlington, VT 05402-0369
802-658-0220 (phone) | 802-658-1456 (fax)
kroberts@gravelshea.com | www.gravelshea.com
Biography | Download vCard

The information contained in this transmission may contain privileged and confidential information. It is intended only for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution or duplication of this communication is strictly prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

**From:** Lynn, Rachel <rlynn@swlaw.com>
**Sent:** Monday, July 15, 2019 10:22 AM
**To:** Keith A. Roberts <kroberts@gravelshea.com>
**Cc:** Cohen, Roger <rcohen@swlaw.com>
**Subject:** RE: Good Times - Stock Purchase Agreement

Keith,

Thank you. That should work if you would like to draft language for us to review.

Thanks,

Rachel M. Lynn
Snell & Wilmer L.L.P.
Tabor Center
1200 Seventeenth Street, Suite 1900
Denver, CO 80202-5854
303.634.2125

Snell & Wilmer

**From:** Keith A. Roberts <kroberts@gravelshea.com>
**Sent:** Monday, July 15, 2019 8:03 AM
**To:** Lynn, Rachel <rlynn@swlaw.com>
**Subject:** RE: Good Times - Stock Purchase Agreement

[EXTERNAL]

Rachel,

I confirmed with our client that the concept you and I discussed is acceptable. We can't accept the "derivations" language though as it is too open-ended for us. What we propose is that we draft language that provides that the revenue from any restaurant that is currently a franchise is included in Franchise Revenue in the event that that restaurant is no longer a franchise as a result of either the acquisition of the franchise entity by the company or buyer or an affiliate or the termination of the Franchise and the continued operation of that restaurant by the company. Let me know if that works.

Thanks,

**Keith A. Roberts** | *Special Counsel*
**Gravel & Shea PC**
76 St. Paul Street, 7th Floor | P. O. Box 369 | Burlington, VT 05402-0369
802-658-0220 (phone) | 802-658-1456 (fax)
kroberts@gravelshea.com | www.gravelshea.com
Biography | Download vCard

The information contained in this transmission may contain privileged and confidential information. It is intended only for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution or duplication of this communication is strictly prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

**From:** Lynn, Rachel <rlynn@swlaw.com>
**Sent:** Thursday, July 11, 2019 12:16 PM
**To:** Keith A. Roberts <kroberts@gravelshea.com>
**Cc:** Cohen, Roger <rcohen@swlaw.com>
**Subject:** RE: Good Times - Stock Purchase Agreement

Keith,

Thank you for your call this morning. Regarding the language in Section 6.3 of the SPA (below), Good Times requests that if any of the stores that are currently franchises goes through a change that causes it to cease to produce franchise royalties (for instance, if Drive Thru purchases a franchise, or converts the franchise to a joint venture or partnership), that the revenues from this location still go toward the Notes.

Perhaps the language "to cause the Franchises or any derivations thereof *involving the same restaurant* to comply with all obligations of the Franchises or such derivations including but not limited the payment of all fees and royalties or comparable amounts" is more clear.

Please let us know your thoughts.

Rachel M. Lynn
Snell & Wilmer L.L.P.
Tabor Center
1200 Seventeenth Street, Suite 1900
Denver, CO 80202-5854
303.634.2125
rlynn@swlaw.com www.swlaw.com

Snell & Wilmer

---

**From:** Lynn, Rachel
**Sent:** Tuesday, July 9, 2019 3:19 PM
**To:** 'Keith A. Roberts' <kroberts@gravelshea.com>
**Cc:** Cohen, Roger <rcohen@swlaw.com>
**Subject:** Good Times - Stock Purchase Agreement

Keith,

Regarding Section 6.3 of the Stock Purchase Agreement, it should obligate the Buyer, and also obligate Company, that until the promissory notes are paid in full to utilize their best efforts "to cause the Franchises or any derivations thereof to comply with all obligations of the Franchises or such derivations including but not limited the payment of all fees and royalties or comparable amounts." If this is acceptable to your client, we can make this change, or you can make it in the SPA. Please let us know if you have any questions.

Thanks,

Rachel M. Lynn
Snell & Wilmer L.L.P.
Tabor Center
1200 Seventeenth Street, Suite 1900
Denver, CO 80202-5854
303.634.2125
rlynn@swlaw.com www.swlaw.com

Snell & Wilmer

EFiled: Sep 24 2019 05:11PM EDT
Transaction ID 64238574
Case No. 2019-0771-

# EXHIBIT J

**From:** "T.M. Enright" <tenright@whitewinston.com>
**Date:** July 26, 2019 at 4:52:39 PM EDT
**To:** "Ryan M. Zink" <rzink@gtrestaurants.com>
**Cc:** Boyd Hoback <bhoback@gtrestaurants.com>, Drew Gressett <drew@hatcreekburgers.com>
**Subject:** Re: Good Times - Stock Purchase Agreement

Thanks Ryan, I was trying to keep the LC static but it appears based on the "then current year" it will require the cash-bond or LC to be increased as rents increased. Not a real issue, just an administrative pain. In the spirt on getting things done, we will agree. Thanks again.

On Jul 26, 2019, at 1:40 PM, Ryan M. Zink <rzink@gtrestaurants.com> wrote:

Todd-

I'll review the new draft and comments below from Keith.

As it relates to guarantor issues, I believe us to be in general agreement in the understanding below.   Seller will address the guarantor issues with our lender for all leases other than #103.  For the purpose of clarifying the L/C or cash bond for #103, the L/C is required to be in-place for so long as we remain a guarantor to the lease, and in an amount equal to one year of rent payments for the *then current* lease year.

I discussed this with our credit officer a short while ago and he confirmed his individual approval.  Given that we have agreement on this, he will present this solution officially to their credit committee Thursday morning but does not see any issue and indicated we should be in a place to execute the SPA mid-morning Thursday (8/1).  He confirmed their counsel's ability to draft consents and amendments to our credit agreement for execution by our August 20 targeted closing date.

Let me know if you have any questions.

Best regards,

Ryan

**Ryan M. Zink**
Chief Financial Officer
(303) 384-1432 *office*
(316) 304-6476 *mobile*
rzink@gtrestaurants.com

**good times restaurants, inc.**
Bad Daddy's Burger Bar
Good Times | All Natural Burgers | Frozen Custard
141 Union Blvd #400
Lakewood, CO  80228
http://goodtimesburgers.com/
http://baddaddysburgerbar.com/

EFiled: Sep 24 2019 05:11PM EDT
Transaction ID 64238574
Case No. 2019-0771-

EXHIBIT K

### Good Times Signs Definitive Agreement to
### Sell Good Times Burgers & Frozen Custard Business

DENVER--(BUSINESS WIRE)--Good Times Restaurants Inc. (Nasdaq: GTIM), operator of Bad Daddy's Burger Bar, a full-service, upscale burger bar concept, and Good Times Burgers & Frozen Custard, a regional drive-through quick-service restaurant chain focused on fresh, high quality, all natural products, today announced that it has signed a definitive agreement for the sale of its Good Times Burgers & Frozen Custard business to an affiliate of White Winston Select Asset Funds, LLC, a Boston-based private equity firm, for an aggregate purchase price of $9,750,000. The purchase price consists of $8,000,000 in cash, $600,000 in the form of a full recourse promissory note and $1,150,000 in the form of a limited recourse promissory note, subject to adjustments for working capital and certain other items.

Commenting on the transaction, Boyd Hoback, President & CEO said "Good Times has a long history in Colorado and while it is bittersweet, we have not grown the Good Times concept of late and this transaction enables us to focus the company around the acceleration of the growth and development of our Bad Daddy's Burger Bar concept, which now represents approximately two thirds of the company's revenues. The purchaser has extensive experience in the restaurant business and plans to continue to invest in and grow the Good Times brand which will be a positive outcome for our employees of Good Times."

This transaction is anticipated to be completed by August 21, 2019, subject to customary closing conditions. The company expects to use the proceeds from the transaction to pay down existing indebtedness as it continues to further develop its Bad Daddy's Burger Bar restaurant concept.

Geraty Investments served as financial advisor to Good Times in connection with the transaction.

**About Good Times Restaurants Inc.**: Good Times Restaurants Inc. (GTIM) owns, operates, franchises and licenses 35 Bad Daddy's Burger Bar restaurants through its wholly-owned subsidiaries. Bad Daddy's Burger Bar is a full service, upscale, "small box" restaurant concept featuring a chef-driven menu of gourmet signature burgers, chopped salads, appetizers and sandwiches with a full bar and a focus on a selection of craft microbrew beers in a high energy atmosphere that appeals to a broad consumer base. Additionally, through its wholly-owned subsidiary, Good Times Restaurants Inc. operates and franchises a regional quick service restaurant chain consisting of 34 Good Times Burgers & Frozen Custard restaurants, located primarily in Colorado.

**Good Times Forward-Looking Statements**: This press release contains forward-looking statements within the meaning of federal securities laws. The words "intend," "may," "believe," "will," "should," "anticipate," "expect," "seek" and similar expressions are intended to identify forward-looking statements. These statements, including those relating to the completion of the transaction and use of proceeds from the transaction, involve known and unknown risks, which may cause the Good Times' actual results to differ materially from results expressed or implied

by the forward-looking statements. These risks include such factors as the satisfaction of the conditions to the completion of the transaction, the timing of the closing of the transaction, the uncertain nature of current restaurant development plans and the ability to implement those plans and integrate new restaurants, delays in developing and opening new restaurants because of weather, local permitting or other reasons, increased competition, cost increases or shortages in raw food products, and other matters discussed under the Risk Factors section of Good Times' Annual Report on Form 10-K for the fiscal year ended September 25, 2018 filed with the Securities and Exchange Commission. Although Good Times may from time to time voluntarily update its forward-looking statements, it disclaims any commitment to do so except as required by securities laws.

**Good Times Restaurants Inc. Contacts:**
Boyd E. Hoback, President and Chief Executive Officer, (303) 384-1411
Ryan Zink, Chief Financial Officer, (303) 384-1432
Christi Pennington, (303) 384-1440

EFiled: Sep 24 2019 05:11PM EDT
Transaction ID 64238574
Case No. 2019-0771-

# EXHIBIT L

**From:** Boyd Hoback [bhoback@gtrestaurants.com]
**Sent:** Tuesday, August 06, 2019 2:10 PM
**To:** T.M. Enright ; Drew Gressett
**Subject:** FW: Collateral Assignment
**Attachments:** CollAssign.pdf; Compare3to4.pdf; Services.pdf; Compare1to2.pdf; Deposit.pdf

Todd, Drew;
Attached are redlined & clean Collateral Assignment & Services Agreements and the DACA, all reviewed with Keith Roberts who is generating the final SPA after a call between counsel this afternoon. We explained to Keith that we can't close after August 31 as it screws up the working capital, so we have pushed the closing to the end of our fiscal year or September 24 since he explained you wouldn't be ready until mid-September anyway.

We are going to do a very "soft" announcement that we are in the process of negotiating a sale of GTDT within our earnings release & then file the SPA with a more definitive press release & 8k once it is signed. Please let me know your thoughts on timing of that. Thanks.
Boyd

---

**From:** Cohen, Roger <rcohen@swlaw.com>
**Sent:** Tuesday, August 06, 2019 2:49 PM
**To:** Boyd Hoback <bhoback@gtrestaurants.com>; Ryan M. Zink <rzink@gtrestaurants.com>
**Cc:** Lynn, Rachel <rlynn@swlaw.com>
**Subject:** FW: Collateral Assignment

See attached.
Roger

**Roger C. Cohen**
Snell & Wilmer L.L.P.
1200 Seventeenth Street, Suite 1900
Denver, CO 80202-5854
303.634.2120 | Fax 303.634.2020
Cell 303.877.0181

rcohen@swlaw.com | www.swlaw.com

---

CONFIDENTIAL COMMUNICATION: E-mails from this firm normally contain confidential and privileged material, and are for the sole use of the intended recipient. Use or distribution by an unintended recipient is prohibited, and may be a violation of law. If you believe that you received this e-mail in error, please do not read this e-mail or any attached items. Please delete the e-mail and all attachments, including any copies thereof, and inform the sender that you have deleted the e-mail, all attachments and any copies thereof. Thank you.

---

**From:** Rhoades, Christina
**Sent:** Tuesday, August 6, 2019 2:48 PM

Christina Rhoades
Legal Administrative Assistant
crhoades@swlaw.com
303.634.2159

EFiled: Sep 24 2019 05:11PM EDT
Transaction ID 64238574
Case No. 2019-0771-

# EXHIBIT M

Thanks Todd.   I think after today's call we should be there.   Let me know if you think otherwise.
Boyd

---

**From:** T.M. Enright <tenright@whitewinston.com>
**Sent:** Tuesday, August 06, 2019 3:13 PM
**To:** Boyd Hoback <bhoback@gtrestaurants.com>
**Cc:** Drew Gressett <drew@hatcreekburgers.com>
**Subject:** Re: FW: Collateral Assignment

Boyd, thank for your follow-up. I think we are of the mind-set that we are ready to sign as soon as we get through any final edits to the SPA you guys have. We will review and attached documents and get with Keith on any open items /issues on the SPA to the plan to sign as soon as the lawyers have addressed any final issues.


**T.M. Enright, Partner**

White Winston
Select Asset Funds

850.570.4793 (Direct Dial)
617.830.2200 (Administrative)

tenright@whitewinston.com


On Aug 6, 2019, at 5:09 PM, Boyd Hoback <bhoback@gtrestaurants.com> wrote:

Todd, Drew;
Attached are redlined & clean Collateral Assignment & Services Agreements and the DACA, all reviewed with Keith Roberts who is generating the final SPA after a call between counsel this afternoon. We explained to Keith that we can't close after August 31 as it screws up the working capital, so we have pushed the closing to the end of our fiscal year or September 24 since he explained you wouldn't be ready until mid-September anyway.


We are going to do a very "soft" announcement that we are in the process of negotiating a sale of GTDT within our earnings release & then file the SPA with a more definitive press release & 8k once it is signed.   Please let me know your thoughts on timing of that.    Thanks.

Boyd

**From:** Cohen, Roger <rcohen@swlaw.com>
**Sent:** Tuesday, August 06, 2019 2:49 PM
**To:** Boyd Hoback <bhoback@gtrestaurants.com>; Ryan M. Zink <rzink@gtrestaurants.com>
**Cc:** Lynn, Rachel <rlynn@swlaw.com>
**Subject:** FW: Collateral Assignment

See attached.
Roger

**Roger C. Cohen**
Snell & Wilmer L.L.P.
1200 Seventeenth Street, Suite 1900
Denver, CO 80202-5854
303.634.2120 | Fax 303.634.2020
Cell 303.877.0181
  rcohen@swlaw.com|www.swlaw.com

CONFIDENTIAL COMMUNICATION: E-mails from this firm normally contain confidential and privileged material, and are for the sole use of the intended recipient. Use or distribution by an unintended recipient is prohibited, and may be a violation of law. If you believe that you received this e-mail in error, please do not read this e-mail or any attached items. Please delete the e-mail and all attachments, including any copies thereof, and inform the sender that you have deleted the e-mail, all attachments and any copies thereof. Thank you.

**From:** Rhoades, Christina
**Sent:** Tuesday, August 6, 2019 2:48 PM
**To:** Cohen, Roger <rcohen@swlaw.com>
**Subject:** Collateral Assignment

Christina Rhoades

Legal Administrative Assistant
crhoades@swlaw.com
303.634.2159

EFiled:  Sep 24 2019 05:11PM EDT
Transaction ID 64238574
Case No. 2019-0771-

# EXHIBIT N

**From:** Keith A. Roberts [mailto:kroberts@gravelshea.com]
**Sent:** Thursday, August 08, 2019 9:40 AM
**To:** 'Cohen, Roger'
**Cc:** Lynn, Rachel
**Subject:** RE: Collateral Assignment

Roger,

Thanks for these comments. All of the proposed changes in all three documents are acceptable to buyer except for the one about no fees charged for travel time in Section 3 of the Services Agreement. As a compromise, we suggest that travel time be charged only one-way, or in the alternative, we could express it as billing the entire travel time at half the stated fee. If that is acceptable, please revise that document accordingly.

On the stock purchase agreement, I attach a clean and marked version (marked to the last draft of July 26) This version makes the changes you or Rachel requested in a series of emails earlier this week and during last week. I have discussed those concepts with our client but they have not seen our proposed language so I must reserve rights to comment on that. As I mentioned, I asked my assistant to go in and format and stylize everything consistently so some of the marked changes reflect that – they are not meant to be substantive. Hopefully this document is at final version and the parties can be in position to execute. Please let me know your feedback on that.

Thanks,

**Keith A. Roberts** | *Special Counsel*
**Gravel & Shea PC**
76 St. Paul Street, 7th Floor | P. O. Box 369 | Burlington, VT 05402-0369
802-658-0220 (phone) | 802-658-1456 (fax)
kroberts@gravelshea.com | www.gravelshea.com
Biography | Download vCard

The information contained in this transmission may contain privileged and confidential information. It is intended only for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution or duplication of this communication is strictly prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

**From:** Cohen, Roger
**Sent:** Tuesday, August 6, 2019 5:15 PM
**To:** Keith A. Roberts ; 'Boyd Hoback (bhoback@gtrestaurants.com)' ; Ryan M. Zink ; Lynn, Rachel
**Subject:** FW: Collateral Assignment

All, haste makes .....
Appologies


Thanks
Roger

**Roger C. Cohen**

Snell & Wilmer L.L.P.
1200 Seventeenth Street, Suite 1900
Denver, CO 80202-5854
303.634.2120 | Fax 303.634.2020
Cell 303.877.0181

rcohen@swlaw.com | www.swlaw.com

CONFIDENTIAL COMMUNICATION: E-mails from this firm normally contain confidential and privileged material, and are for the sole use of the intended recipient. Use or distribution by an unintended recipient is prohibited, and may be a violation of law. If you believe that you received this e-mail in error, please do not read this e-mail or any attached items. Please delete the e-mail and all attachments, including any copies thereof, and inform the sender that you have deleted the e-mail, all attachments and any copies thereof. Thank you.

**From:** Rhoades, Christina
**Sent:** Tuesday, August 6, 2019 2:48 PM
**To:** Cohen, Roger <rcohen@swlaw.com>
**Subject:** Collateral Assignment

Christina Rhoades
Legal Administrative Assistant
crhoades@swlaw.com
303.634.2159

EFiled: Sep 24 2019 05:11PM EDT
Transaction ID 64238574
Case No. 2019-0771-

EXHIBIT O

**From:** "T.M. Enright " <tenright@whitewinston.com>
**Subject: Re: GTDT**
**Date:** August 9, 2019 at 3:42:20 PM EDT
**To:** Boyd Hoback <bhoback@gtrestaurants.com>

I am but I'm working. Happy to speak. I think it sounds like we are ready to sign Monday AM.

**T.M. Enright, Partner**

White Winston
Select Asset Funds

850.570.4793 (Direct Dial)
617.830.2200 (Administrative)
tenright@whitewinston.com

Sent from my iPhone, please excuse the typos.

On Aug 9, 2019, at 3:26 PM, Boyd Hoback <bhoback@gtrestaurants.com> wrote:

Todd;
I understand you're on vacation through next week & I'm on vacation then as well.   Could we schedule a quick call for next Tuesday late morning MT?
Boyd

<table>
<tr><td></td><td><b>Boyd Hoback</b><br>President, CEO<br>(303) 384-1411 <i>office</i><br>bhoback@gtrestaurants.com</td></tr>
<tr><td>&lt;image001.png&gt;</td><td><b>good times restaurants, inc.</b><br>Bad Daddy's Burger Bar</td></tr>
<tr><td>&lt;image002.png&gt;</td><td>Good Times | All Natural Burgers | Frozen Custard<br>141 Union Blvd #400<br>Lakewood, CO  80228<br>http://goodtimesburgers.com/<br>http://baddaddysburgerbar.com/</td></tr>
</table>

**T.M. Enright, Partner**

White Winston
Select Asset Funds

850.570.4793 (Direct Dial)
617.830.2200 (Administrative)

tenright@whitewinston.com

EFiled: Sep 24 2019 05:11PM EDT
Transaction ID 64238574
Case No. 2019-0771-

# EXHIBIT P

Thanks. It's a non issue for me. If you baked drive time into the $110 an hour I'm cool with no drive time split as long as that's the rep your giving us as part of the deal. I'm agnostics either way.

**T.M. Enright, Partner**

White Winston
Select Asset Funds

850.570.4793 (Direct Dial)
617.830.2200 (Administrative)
tenright@whitewinston.com

Sent from my iPhone, please excuse the typos.

On Aug 12, 2019, at 6:12 PM, Ryan M. Zink <rzink@gtrestaurants.com> wrote:

Todd-

Boyd's out today but I think the only remaining item was on the R&M services agreement related to drive time. I was thinking Boyd would reach out to you today to get that covered. I have a call with him early tomorrow so if he doesn't respond today, I'll make sure we get that addressed tomorrow.

-Ryan

<image001.png>

**Ryan M. Zink**
Chief Financial Officer
(303) 384-1432 *office*
(316) 304-6476 *mobile*
rzink@gtrestaurants.com

<image002.png>

**good times restaurants, inc.**
Bad Daddy's Burger Bar
Good Times | All Natural Burgers | Frozen Custard
141 Union Blvd #400
Lakewood, CO 80228
http://goodtimesburgers.com/
http://baddaddysburgerbar.com/

**From:** T.M. Enright <tenright@whitewinston.com>
**Sent:** Monday, August 12, 2019 3:25 PM
**To:** Boyd Hoback <bhoback@gtrestaurants.com>
**Cc:** Drew Gressett <drew@hatcreekburgers.com>; Ryan M. Zink <rzink@gtrestaurants.com>
**Subject:** Re: GTDT

Boyd, just following up on the sPA. Are we good to go?

**T.M. Enright, Partner**

<image003.png>

850.570.4793 (Direct Dial)
617.830.2200 (Administrative)
tenright@whitewinston.com

Sent from my iPhone, please excuse the typos.

On Aug 9, 2019, at 3:26 PM, Boyd Hoback <bhoback@gtrestaurants.com> wrote:

Todd;
I understand you're on vacation through next week & I'm on vacation then as well.  Could we schedule a quick call for next Tuesday late morning MT?
Boyd

**Boyd Hoback**
President, CEO
(303) 384-1411 *office*
bhoback@gtrestaurants.com

<image001.png>

<image002.png>

**good times restaurants, inc.**
Bad Daddy's Burger Bar
Good Times | All Natural Burgers | Frozen Custard
141 Union Blvd #400
Lakewood, CO  80228
http://goodtimesburgers.com/
http://baddaddysburgerbar.com/

**T.M. Enright, Partner**

White Winston
Select Asset Funds

850.570.4793 (Direct Dial)
617.830.2200 (Administrative)

tenright@whitewinston.com

SUPPLEMENTAL INFORMATION PURSUANT TO RULE 3(A)
OF THE RULES OF THE COURT OF CHANCERY

The information contained herein is for the use by the Court for statistical and administrative pu
only. Nothing stated herein shall be deemed an admission by or binding upon any party.

1. Caption of Case: White Winston Select Asset Funds, LLC and GT Acquisition Group, Inc. v. Good Times
Restaurants, Inc.

2. Date Filed: 9/24/2019

3. Name and address of counsel for plaintiff(s):

Richard Barkasy
Daniel M. Pereira
Schnader Harrison Segal & Lewis LLP
824 N. Market Street, 8th Floor, Suite 800
Wilmington, DE 19801

4. Short statement and nature of claim asserted: Action in equity for specific performance of Stock Purchase
Agreement between plaintiff White Winston Select Asset Funds, LLC and defendant Good Times Restaurants,
Inc., or in the alternative for money damages or reliance damages.

| | | |
|---|---|---|
| ____Administrative Law | ____Labor Law | ____Trusts, Wills and Estates |
| _X_ Commercial Law | ____Real Property | ____Consent trust petitions |
| ____Constitutional Law | ____348 Deed Restriction | ____Partition |
| ____Corporation Law | ____Zoning | ____Rapid Arbitration (Rules 96,97) |
| ____Trade secrets/ trademark/ | | ____Other |
| or other intellectual property | | |

6. Related cases, including any Register of Wills matters (this requires copies of all documents in this matter
to be filed with the Register of Wills): None.

7. Basis of court's jurisdiction (including the citation of any statute(s) conferring jurisdiction): Contractual, 6
Del. C. § 2708, 10 Del. C. §§ 341 and 3104.

8. If the complaint seeks preliminary equitable relief, state the specific preliminary relief sought.
Specific Performance of Stock Purchase Agreement.

9. If the complaint seeks a TRO, summary proceedings, a Preliminary Injunction, or Expedited
Proceedings, check here ____. (If #9 is checked, a Motion to Expedite must accompany the transaction.)

10. If the complaint is one that in the opinion of counsel should not be assigned to a Master in the first instance,
check here and attach a statement of good cause. _____

/s/ Daniel M. Pereira DE Bar ID 6450_____
Signature of Attorney of Record & Bar ID