IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

WHITE WINSTON SELECT ASSET
FUNDS, LLC, and GT ACQUISITION
GROUP, INC.

    *Plaintiffs / Counter-Defendants,*

       v.

GOOD TIMES RESTAURANTS, INC.,

    *Defendant / Counter-Claimant.*

No. 1:19-cv-2092-SB

---

Richard Alan Barkasy, Kristi JoLynn Doughty, Stephen A. Fogdall, SCHNADER HARRISON SEGAL & LEWIS LLP, Wilmington, Delaware; Daniel M. Pereira, STRADLEY RONON STEVENS & YOUNG, LLP, Wilmington, Delaware.

    *Counsel for Plaintiffs / Counter-Defendants.*

Catherine A. Gaul, Michael Dean Walker, Jr., ASHBY & GEDDES, Wilmington, Delaware; Peter L. Loh, Davis G. Mosmeyer III, Sara A. Brown, FOLEY & LARDNER LLP, Dallas, Texas.

    *Counsel for Defendant / Counter-Claimant.*

---

**MEMORANDUM OPINION**

May 5, 2022

BIBAS, *Circuit Judge*, sitting by designation.

Negotiating contracts is tricky. A deal can collapse in the blink of an eye. So in complex commercial transactions, parties may try to manage that risk with a preliminary agreement to negotiate. But a preliminary agreement is not the final deal—that still must be hashed out before the parties are bound.

Here, White Winston has a solid argument that Good Times breached a preliminary agreement by blowing up negotiations in bad faith. So White Winston's claim for breach of that agreement may go to trial.

But its other claims may not. White Winston contends that Good Times breached the final deal. But crucially, the parties never signed that agreement. And there is no evidence that the parties intended to be bound by a draft contract. Plus, though White Winston pleads promissory estoppel, the facts undercut its theory. So I grant summary judgment for Good Times on those claims.

## I. BACKGROUND

White Winston haggled with Good Times to buy its chain of burger joints, Drive Thru. D.I. 96, ¶¶ 20–34. To facilitate discussions, the parties signed a Letter of Intent, committing them to "deal exclusively" with one another "so long [as] … [they were] negotiating [the] sale." D.I. 111-3, at 755–56.

Negotiations chugged along for months, and the parties agreed to most of the material terms, including the purchase price: $8 million now plus $1.75 million later. D.I. 96, Ex. C. But just as they were ready to sign a Stock Purchase Agreement to

complete the sale, Good Times torpedoed the deal by asking for $11 million in cash up front. *Id.* ¶ 170.

White Winston thought that demand was a bad-faith ruse designed to axe negotiations, thus letting Good Times talk to other suitors. So White Winston sued for breach of the Letter of Intent, breach of the unsigned Stock Purchase Agreement, and promissory estoppel. Pushing back, Good Times countersued, alleging that by bringing this suit White Winston breached the Letter of Intent.

Now, the parties both move for summary judgment. I may grant those motions only if the moving party "shows that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986). If a reasonable jury could find for the nonmoving party, I must deny summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

## II. DUELING CLAIMS UNDER THE LETTER OF INTENT

Each party argues that the other breached the Letter of Intent. White Winston says Good Times violated its obligation to negotiate in good faith when it hiked the price for Drive Thru just before closing. D.I. 107-1, at 14. Good Times retorts that the Letter bars White Winston from bringing this suit. D.I. 110, at 33–34.

But White Winston has an ace up its sleeve: earlier in this litigation, I read the Letter to support its claim and to undermine Good Times's. Mem. Op., D.I. 93, at 5–7. Thus, I grant partial summary judgment for White Winston.

**A. It is too soon for summary judgment on White Winston's claim**

White Winston plausibly argues that the Letter of Intent required Good Times to negotiate in good faith. But it is too soon to tell whether Good Times breached that term. Start with the text of the Letter:

> Paragraph 7: By signing this letter, [Good Times] agrees that it will deal exclusively with White Winston in connection with the sale of the Company… for so long [as the parties] are negotiating … [they will not] engage in any discussions or negotiations with … any [other] … entity or group.

D.I. 111-3, at 755−56.

Earlier in this litigation, I read Paragraph 7 to include a binding obligation to negotiate in good faith: Good Times's promise to "'deal exclusively with White Winston' … would mean nothing if it could sabotage discussions to find a new buyer." Mem. Op., D.I. 93, at 5 (quoting D.I. 78-1, Ex. C ¶ 7). And I may not read contract terms to be "illusory." *Id.* (quoting *Hudson v. D & V Mason Contractors, Inc.*, 252 A.2d 166, 168−69 (Del. Super. Ct. 1969)). Thus, "when Good Times promised to negotiate, it agreed to do so *in good faith*, even if it did not use those magic words." *Id.* at 6.

Now, Good Times seeks to relitigate that issue. It urges me to find that the Letter is not a "fully binding" agreement and that it contains no express commitment to negotiate in good faith. D.I. 126, at 15−16.

But as controlling law of the case, my earlier opinion forecloses Good Time's argument. "[O]nce an issue has been decided, parties may not relitigate that issue in the same case." *Waldorf v. Shuta*, 142 F.3d 601, 615 n.4 (3d. Cir. 1998); *see also KDH Elec. Sys., Inc. v. Curtis Tech. Ltd.*, 826 F. Supp. 2d 782, 800–01 (E.D. Pa. 2011)

4

("[F]inding that the … Agreement was a valid, binding contract was necessary to [an earlier] holding. Thus, under the 'law of the case' doctrine … a valid contract exists.").

True, before final judgment, I have discretion to reconsider that earlier holding if there is good reason to do so. *See Pepper v. United States*, 562 U.S. 476, 506 (2011) (noting that the law of the case doctrine "directs a court's discretion" but "does not limit the tribunal's power"). But Good Times fails to give any such reason.

First, Good Times says the absence of the words "good faith" in Paragraph 7 "alone should be fatal to [White Winston's] claim for breach of an *express* contractual obligation to negotiate in good faith." D.I. 126, at 16. But that merely rehashes the argument Good Times made when I last interpreted the contract. *See, e.g.*, D.I. 85, at 11.

Second, Good Times argues that the Letter imposes "no binding obligations … upon any party until final contract documents have been signed." D.I. 126, at 15 (quoting *Tchrs. Ins. & Annuity Ass'n of Am. v. Tribune Co.*, 670 F. Supp. 491, 497 (S.D.N.Y. 1987)). But that argument collides with the text of the Letter, which makes the exclusive-dealing provision binding. D.I. 111-3, at 755−56 ("[P]aragraph[ ] 7 … shall constitute a binding agreement."). And the crucial question in determining the scope of a preliminary agreement is what the contract says: as *Teacher's Insurance* put it, "the intentions of the parties and … their manifestations of intent" are of "prime significance." 670 F. Supp at 497.

Even if I am wrong that the parties' contract expressly requires good-faith negotiation, it does so impliedly. "Under Delaware law, every contract contains an implied covenant of good faith and fair dealing, requiring the parties … to refrain from

arbitrary or unreasonable conduct." *TL of Fla., Inc. v. Terex Corp.*, 54 F. Supp. 3d 320, 329 (D. Del. 2014) (internal quotation marks omitted). So too here, an implied good-faith term buttresses the exclusive-dealing provision, preventing the parties from killing the deal in bad faith.

Thus, whether express or implied, the parties' contract has a binding good-faith term. But it is too soon to tell whether Good Times breached it. My earlier opinion said it would be a breach if, as White Winston alleges, "Good Times executives hatched a plan to demand an unreasonable sum for Drive Thru to end negotiations so Good Times could deal with other suitors." D.I. 93, at 6. At this stage, whether Good Times's late-breaking price demand was unreasonable is a disputed issue of material fact.

Good times says it raised the price in good faith because Drive Thru became more valuable when its revenues increased in mid-2019. D.I. 126, at 25. Indeed, White Winston's own summary-judgment evidence shows that Drive Thru's 2019 sales were "6–7%" higher than the previous year. D.I. 107-4, at 1064. If true, that might be a sound economic reason for the price demand. But it is too early to tell. Perhaps the price hike was genuine; perhaps it was a "pretext to terminate the sale." D.I. 136, at 3. I may not decide that issue today; it is an issue of fact for trial.

**B. Good Times's counterclaims under the Letter fail**

Good Times moves for summary judgment on two counterclaims. Both boil down to the same assertion: White Winston breached either an express or implied term of the Letter of Intent by bringing this lawsuit. D.I. 110, at 34.

6

Good Times's argument rests on Paragraph 8 of the Letter, which disclaims the right to sue "[if] any party … terminates negotiations." *Id.* (quoting D.I. 96, at 117–18). Good Times says this suit violates that paragraph because it "denied [Good Times] … the right to terminate negotiations … without any resulting lawsuit." *Id.*

But that theory conflicts with the plain text of the Letter. True, Paragraph 8 bars most claims for terminating negotiations. But it has a carve-out: claims may be brought for breaches "of paragraph[] 7." D.I. 111-3, at 756. And, as I noted above, Paragraph 7 forms the basis of White Winston's suit. So Good Times's counterclaims fail on their own terms.

### III. THE STOCK PURCHASE AGREEMENT IS NOT A BINDING CONTRACT

Moving beyond the Letter of Intent, White Winston argues about the parties' later negotiations. After signing the Letter, the parties drafted a Stock Purchase Agreement. D.I. 107-3, at 487. It was approved by the Good Times Board in July 2019. D.I. 107-4, at 1003. But the parties did not sign the Agreement before their deal fell apart. D.I. 128, at 16.

Though the draft Agreement was never signed, White Winston says that it is binding because it contained all the key terms. D.I. 107-1, at 23−24. And it contends that Good Times violated the Agreement by failing to use its best efforts to close the deal. *Id.*, at 31.

White Winston's argument is unconvincing. True, in Delaware, a contract need not be signed to have binding effect. *Whittington v. Dragon Grp. LLC*, 2013 WL 1821615, *3 (Del. Ch. May 1, 2013). Yet if the parties "agree that there will be no binding contract until the formal document is executed," then they cannot be bound

7

by a mere draft of that document. *Anchor Motor Freight v. Ciabattoni*, 716 A.2d 154, 156 (Del. 1998).

Here, the parties agreed to be bound only by an executed, formal document. The Letter of Intent stated that "[a]ll obligations and commitments to proceed with the Acquisition shall be contained only in the Definitive Agreement." D.I. 111-3, at 756. And though the Letter does not define "Definitive Agreement," it does say that the parties planned to "execute" it. *Id.* at 755. So that term refers to a final, executed contract—not a draft produced in negotiations. *Cf. id.* at 754 (acquisition schedule noting date for revision of a "draft of the definitive purchase agreement").

Plus, the draft Agreement itself states that it "shall become effective as of the *date of execution* by the last party to execute this Agreement." D.I. 111-3, at 809 (emphasis added). It also included signature blocks for "Duly Authorized Agent[s]" of each company to sign. *Id.* at 810. All this shows that the parties intended to be bound only *after* they signed the contract.

The parties' dealings further confirm that they expected that the Agreement would not be binding until it was signed. On February 1, 2019, a White Winston executive, Todd Enright, emailed Good Times's CEO, Boyd Hoback, with a proposed schedule for drafting the Definitive Agreement. That schedule contemplated that the "definitive agreement [would] be executed within 60 days" of its delivery date. D.I. 111-1, at 151. Then on August 9, after White Winston sent the draft Agreement to Good Times's lawyers, Mr. Enright emailed Mr. Hoback, saying that "it sounds like we are ready to ready to sign Monday AM." D.I. 107-3, at 827. Those exchanges

8

between the parties' key negotiators leave no doubt that they intended to be bound only be a signed contract.

Finally, industry custom suggests that the parties had not finished their negotiations and formed a contract. *See Leeds v. First Allied Conn. Corp.*, 521 A.2d 1095, 1102 (Del. Ch. 1986) (noting that "prior practice or commercial custom" can help illuminate contract formation). Sophisticated parties negotiating multimillion-dollar acquisitions expect to be bound only by signed, formal contracts—not draft contracts circulated during negotiations. D.I. 111-3, at 689.

The draft Agreement is not a binding contract, so White Winston cannot claim that Good Times breached it. Thus, I grant summary judgment for Good Times on White Winston's claims under the Agreement.

### IV. WHITE WINSTON'S PROMISSORY-ESTOPPEL CLAIM FAILS

White Winston says Good Times "repeatedly promised" that it wanted to sell Drive Thru, thus inducing White Winston to invest. D.I. 96 ¶¶ 277–78. White Winston claims that it spent "significant time and resources" in negotiations and on plans to combine another restaurant chain with Drive Thru "only to have the rug pulled out from under [it]." *Id.* ¶ 291.

To proceed with its promissory-estoppel claim, White Winston must show that:

- Good Times made a promise, inducing White Winston to act;
- White Winston acted in reasonable reliance on that promise; and
- it would be unjust to let Good Times renege now.

*Hydrogen Master Rts., Ltd. v. Weston*, 228 F. Supp. 3d 320, 333 (D. Del. 2017).

9

But White Winston's promissory-estoppel claim runs into an immediate problem: "[p]romissory estoppel does not apply … where a fully integrated, enforceable contract governs the promise at issue." *SIGA Techs., Inc. v. PharmAthene, Inc.*, 67 A.3d 330, 348 (Del. 2013). And here, Good Times's alleged promise overlaps with its commitment to negotiate in good faith in the Letter of Intent.

To see why, consider the thrust of White Winston's promissory-estoppel theory. It says Good Times "ke[pt] White Winston at the bargaining table by presenting the unmistakable picture that Good Times was committed to selling Drive Thru." D.I. 128, at 23. To support that statement, it points to representations by Mr. Hoback that Good Times's board had "elected to move forward with the transaction" and that he "hoped to get the SPA signed." D.I. 107-3, at 527, 750.

But those statements are *at best* promises to negotiate over the sale. And Good Times had already made a contractual promise to negotiate in good faith in the binding Letter of Intent. D.I. 111-3, at 755–56. Indeed, when listing evidence to support its promissory-estoppel theory, White Winston points to the Letter as an example of Good Times's promise. D.I. 128, at 23–24. White Winston may not repackage a breach-of-contract claim as a promissory-estoppel claim. *SIGA Techs.*, 67 A.3d at 348.

Even if White Winston's promissory-estoppel claim did not have that fatal defect, it still could not support its own weight. White Winston's reliance on Good Times's promises must be reasonable. *Hydrogen Master*, 228 F. Supp. 3d at 333. But sophisticated parties negotiating contracts at arm's length know to take promises made during negotiations with a grain of salt. *Grunstein v. Silva*, 2014 WL 4473641, at *34

10

(Del. Ch. Sept. 5, 2014), *aff'd*, 113 A.3d 1080 (Del. 2015). And here, the Letter of Intent made clear that any binding agreement would be contained in the "Definitive Agreement." D.I. 111, at 755–56. Thus, relying on aspirational statements by Good Times's CEO would have been unreasonable. So White Winston's promissory-estoppel claim fails.

\* \* \* \* \*

White Winston has a solid argument that Good Times breached a commitment to negotiate in good faith by ruining the deal at the last minute. So its claim for breach of the Letter of Intent may proceed to trial. But its other claims fail. Good Times could not breach an unsigned, non-binding agreement. And White Winston cannot sue for promissory estoppel to enforce a promise already covered by contract. I thus grant summary judgment for Good Times on breach of the Stock Purchase Agreement and promissory estoppel.

Last, Good Times's counterclaims under the Letter are barred by the plain text of the contract. So I grant summary judgment for White Winston on those claims too.