IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

WHITE WINSTON SELECT
ASSET FUNDS, LLC; GT
ACQUISITION GROUP, INC.

    *Plaintiffs*,

v.

GOOD TIMES RESTAURANTS, INC.,

    *Defendant*.

No. 19-cv-02092-SB

---

Richard Alan Barkasy, Stephen A. Fogdall, Kristi JoLynn Doughty, SCHNADER, HARRISON, SEGAL & LEWIS LLP, Wilmington, Delaware.

    *Counsel for Plaintiffs.*

Catherine A. Gaul, Michael Dean Walker, Jr., ASHBY & GEDDES, Wilmington, Delaware; Davis G. Mosmeyer III, Peter L. Loh, Sara A. Brown, FOLEY & LARDNER LLP, Dallas, Texas.

    *Counsel for Defendant.*

---

**MEMORANDUM OPINION**

January 25, 2023

BIBAS, *Circuit Judge*, sitting by designation.

    White Winston's deal to buy Good Times' chain of burger joints fell apart in the eleventh hour. But Good Times did not act in bad faith. So I grant judgment in its favor.

# I. BACKGROUND

## A. Jurisdiction

1. This Court has jurisdiction under 28 U.S.C. § 1332. There is complete diversity: both Plaintiffs are incorporated in Delaware with their principal places of business in Massachusetts, while Defendant Good Times is incorporated in Nevada with its principal place of business in Colorado. D.I. 1 at ¶¶ 9–10; *compare* D.I. 27 at 20, ¶¶ 6, 8–9, *with* D.I. 37 at ¶¶ 6, 8–9. And the amount in controversy exceeds $75,000. D.I. 1-1 at ¶¶ 11, 99.

## B. Procedural history

2. White Winston brought various claims against Good Times after its deal to buy Drive Thru collapsed. Good Times countersued. Previously, I granted Good Times' motion for summary judgment on White Winston's claims based on the parties' unsigned Stock Purchase Agreement. D.I. 152 at 7–9. I found that the Agreement was not binding. *Id.* I also granted Good Times' motion for summary judgment on White Winston's promissory estoppel claim. *Id.* at 9–11. Finally, I granted White Winston's motion for summary judgment on Good Times' counterclaims. *Id.* at 6–7. So only two claims proceeded to trial: White Winston's claim that Good Times breached an express duty to negotiate in good faith and its claim that Good Times breached the implied covenant of good faith and fair dealing. *Id.* at 4–6. The parties agreed to a bench trial.

3. Before trial, I decided that White Winston could recover only reliance damages. D.I. 160 at 3–6. The parties also filed several motions in limine but agreed that I should reserve my rulings until after trial.

4. After trial, I denied the parties' motions to exclude each other's experts as moot. D.I. 187. Barry Bell did not testify at trial. Good Times withdrew its objection to Stephen Scherf after White Winston agreed to limit the scope of his testimony. Tr. 2 at 81:17–82:15. Finally, as I explained at trial, I did not find that any expert witness's testimony helped to explain the evidence or determine a fact in issue. Tr. 4 at 83:22–84:5. So I struck it under Fed. R. Evid. 702. D.I. 187. I affirm that decision now: testimony about how typical negotiations proceed does not cast light on whether these parties acted in good faith. That depends not only on their conduct but also, as explained below, the specific terms of the Amended Letter of Intent.

## II. FINDINGS OF FACT

5. Plaintiff White Winston is a private equity fund. Tr. 1 at 37:21–24. Plaintiff GT Acquisition Group is a Delaware corporation created by White Winston to acquire Drive Thru. D.I. 95 ¶ 14; PX 180-1.

6. Defendant Good Times is a publicly traded company that owns Drive Thru, a quick-service burger chain. Tr. 1 at 47:19–48:9.

### A. Good Times decided to sell Drive Thru

7. In the summer of 2018, Good Times decided to sell Drive Thru. Tr. 3 at 8:2–12, 11:4–8. Good Times hoped the chain would fetch $12 to $15 million. Tr. 3 at 12:11–

3

13. That fall, it hired Geraty, an investment bank, to help with the sale. Tr. 3 at 14:4–13.

8. But things did not go as planned. At the time, Drive Thru's sales were suffering. Tr. 3 at 20:7–22:14, 25:16–21; JX 8 at 14. So only two buyers showed interest. Tr. 3 at 19:20–23. One was Hat Creek Burger Company. Tr. 3 at 20:1–6. But Hat Creek did not have the cash to buy Drive Thru. Tr. 1 at 54:14–22.

9. So in December 2018, Geraty connected Hat Creek with White Winston. Tr. 1 at 54:23–55:10; Tr. 3 at 22:18–23. Six months earlier, White Winston had entered into a Loan Agreement with a struggling burger chain called Larkburger. DX 1; Tr. 2 at 114:22–116:1.

10. Though White Winston had heard of the Drive Thru sale back in October, it at first passed on the opportunity. PX 12; Tr. 1 at 52:5–53:10. But introducing Hat Creek into the equation changed things: White Winston liked Hat Creek's management and saw potential synergies in combining Hat Creek, Drive Thru, and Larkburger. Tr. 1 at 54:14–55:23, 56:25–57:7.

11. On January 18, 2019, White Winston submitted a letter of intent to buy Drive Thru for $9.5 million. PX 29; Tr. 1 at 67:22–68:12. Good Times rejected the proposal. PX 33 at 1; Tr. 1 at 73:1–5, 75:10–23. But Good Times' CEO Boyd Hoback and White Winston partner Todd Enright kept discussing a potential deal. Tr. 1 at 75:10–78:12; Tr. 3 at 25:1–2.

## B. Good Times and White Winston signed the initial letter of intent

12. On February 11, 2019, those discussions paid off: White Winston and Good Times signed an initial letter of intent for the sale of Drive Thru. JX 1. Other than a handful of terms governing negotiations, the letter was "not binding." *Id.* at 3. But it laid out certain key terms "for discussion purposes." *Id.* at 6. For price, it proposed $10 million, consisting of $8 million in cash and $2 million in a limited-recourse promissory note. *Id.* at 1.

13. About a month later, White Winston foreclosed on its loan to Larkburger and acquired the right to its assets. Tr. 1 at 162:23–25; Tr. 2 at 122:20–123:15.

## C. Good Times and White Winston kept negotiating

14. Meanwhile, Good Times and White Winston did due diligence. Tr. 1 at 87:3–22; Tr. 3 at 26:11–20.

15. On March 29, 2019, Enright sent Hoback a letter summarizing White Winston's findings. PX 50. The letter noted that Drive Thru's sales were declining. *Id.* at 2. Further decline, it warned, might require White Winston to discuss incorporating a mechanism to adjust the sales price based on performance. *Id.* at 2. The letter also mentioned that some Drive Thru stores and subleases were underperforming. *Id.* at 3.

16. On April 2, Hoback responded to Enright's letter. PX 51-2. He said that Good Times would not entertain a post-closing mechanism tied to sales. *Id.* at 1. But he acknowledged Drive Thru's underperforming stores and subleases and proposed

5

reducing the note component of the sale price by $150,000. Tr. 1 at 96:3–11; PX 51-2 at 2; PX 52 at 2.

17. In early April, Hoback and Enright kept negotiating various deal terms. For instance, they hashed out a misunderstanding about how to treat a working capital deficit. PX 52; Tr. 1 at 96:15–104:9. Good Times anticipated that Drive Thru would have a working capital deficit of $750,000 at closing. Tr. 1 at 99:3–16. Hoback wrote to Enright that Good Times did not intend to absorb that deficit. *Id.*; PX 52 at 2. Enright was taken aback. Tr. 1 at 101:1–102:19; PX 52 at 1. He thought that they had agreed under the initial letter of intent that working capital at closing would be zero. PX 52. Now Good Times was asking White Winston to pay $750,000 more than they had initially agreed, Enright thought. Tr. 1 at 99:6–16. But Hoback was "upfront" and took responsibility for the misunderstanding. Tr. 1 at 103:21–23; PX 52. And the parties came to an agreement: any working capital deficit at closing would be applied to reduce the amount of the note that White Winston contributed toward the purchase. Tr. 1 at 103:17–104:9.

**D. Good Times and White Winston signed an amended letter of intent**

18. On April 29, 2019, White Winston and Good Times signed an amended letter of intent, incorporating the changes that they had negotiated. JX 2. For instance, the letter reflected that the price would now be $9.75 million, consisting of $8 million in cash and $1.75 million in notes. *Id.* at 2–3; Tr. 1 at 104:23–105:5.

19. But like the initial letter, the amended letter was "not binding." JX 2 at 5. It had "no legal effect whatsoever" except for five paragraphs: paragraphs 7, 8, 9, 10, and 11. *Id.* at 5–6.

20. Most relevant here, paragraph 7 was an exclusivity provision. It required Good Times to

> deal exclusively with White Winston in connection with the sale of [Drive Thru], and until June 25, 2019 and for so long thereafter as [the parties] are negotiating such sale, neither [Good Times, Drive Thru] nor any of its affiliates or subsidiaries … will, directly or indirectly, without [White Winston's] consent, solicit, encourage or initiate any offer or proposal from, or engage in any discussions or negotiations with, or enter into an agreement with, or provide any information to, any … entity or group, other than [White Winston] … involving the sale of any portion of [Drive Thru] …. *Id.* at 5.

21. The other binding paragraphs concerned confidentiality, public disclosure, a representation and warranty about past communications (and a related indemnification), and a date for termination. *Id.* at 6.

22. The parties could "for any reason terminate[] negotiations to effect the Acquisition." *Id.* at 6.

23. After signing the letter of intent, the parties began to put together a stock purchase agreement that would finalize the sale. *Id.* at 4–5; PX 128.

### E. Good Times and White Winston kept preparing for the deal

24. On May 21, 2019, White Winston signed a terms letter with Hat Creek. Tr. 1 at 113:20–114:8; PX 67. The letter set out non-binding terms for a series of transactions that would combine Larkburger, Drive Thru, and Hat Creek. Tr. 1 at 113:12–114:2, 163:9–164:9. A new entity, called Triad Restaurant Group, would hold the three companies. Hat Creek would be transferred into Triad. Tr. 1 at 121:8–122:2.

7

Triad would then buy Larkburger from White Winston with a $4 million loan from White Winston. Tr. 2 at 126:17–24; PX 67 at 4. It would also buy Drive Thru from White Winston with money lent by White Winston. Tr. 1 at 121:8–21. When all was said and done, Hat Creek would own and operate Drive Thru, with White Winston serving as its lender. Tr. 1 at 120:24–122:2.

25. The next day, Good Times' Board met to discuss the Drive Thru sale and unanimously agreed that there was "consensus" for the transaction. PX 71 at 1.

**F. Hoback unsuccessfully tried to get the Board to reconsider the sale**

26. Then, in June, Hoback changed his mind about the Drive Thru sale and tried to get the Board to reconsider. Tr. 3 at 36:1–38:8; PX 82 at 2. On June 7, he wrote the Board, explaining that he thought it was a "fire sale." PX 82 at 2. He emphasized that Good Times had tried to sell Drive Thru "at the worst possible time." *Id.* He recommended trying to either renegotiate the deal with White Winston or try to sell later. *Id.* at 3. He asked to schedule a board meeting for the following Monday, June 10. *Id.*

27. At that meeting, Hoback tried to convince the Board to reconsider the Drive Thru sale. *Id.* at 1. He explained that Drive Thru's sales had improved and Good Times could generate cash by keeping it. *Id.* Plus, he thought that the price was too low. *Id.* But the Board unanimously agreed to move ahead with the deal. *Id.*; Tr. 3 at 38:3–11.

8

### G. Good Times raised an issue with lease guarantees

28. On June 26, 2019, Good Times raised a concern about leases at some Drive Thru locations that it had guaranteed. Tr. 1 at 117:19–118:5; PX 105. The parties explored various options over the next month. PX 114; Tr. 1 at 131:13–132:8. On July 24, 2019, Hoback sent Enright a proposal for dealing with the issue. JX 16.

29. On July 16, the Good Times Board voted to approve a Fairness Opinion that concluded that the contemplated Drive Thru sale was "fair" to Good Times. PX 133-1 at 5; PX 134. The Board paid $100,000 for the Opinion, which was done by an independent third party. Tr. 3 at 57:8–14, 129:20–134:12.

### H. Drive Thru sales remained positive and Good Times worried about delays

30. On July 25, 2019, Hoback emailed Enright, asking for an update about the lease-guarantee issue and expressing concern over how long the deal was taking. JX 18 at 1. He explained that Good Times had wanted to get the Stock Purchase Agreement signed that week and was "concerned" that there were "other issues" it was "unaware of." *Id.* Hoback asked Enright if the only remaining issue was the lease-guarantee issue. *Id.* Enright responded that he would get back to Hoback in the morning "with any open issues." *Id.* Hoback replied, reiterating that Good Times "really" needed to understand where they were with the deal. *Id.* He emphasized that Good Times' business was "very strong." *Id.* And he explained that Good Times needed to "go public with a hard deal early next week to effectively be ready for the transition." *Id.*

9

31. The next day, Enright agreed to Good Times' proposal for the lease-guarantee issue "[i]n the spir[i]t o[f] getting things done." PX 148 at 1. As part of the resolution, Good Times had to put up cash collateral for certain stores. Tr. 1 at 133:23–25; JX 16.

32. On Friday, August 2, Hoback emailed Enright, informing him that Good Times would send final contracts to White Winston on Monday. Hoback explained that Good Times was targeting an effective date of August 21 for closing and asked whether White Winston would be prepared for that. DX 11 at 2; PX 161. He also reiterated that Good Times would like to sign the agreement "asap" and file a press release. DX 11 at 2. Enright responded that White Winston would "need the full 30 days from signing." *Id.* at 1. He also mentioned that he was going on a two-week vacation. *Id.* Hoback replied, asking if the Stock Purchased Agreement would sit idle for the two weeks. *Id.* He said Good Times would need to go public with the deal in some form. *Id.* Enright replied that White Winston's plan was to sign the Stock Purchase Agreement "as soon as [Good Times was] ready." *Id.*

33. On August 6, Hoback sent Enright an email with various contracts. He explained that White Winston's lawyer was "generating the final [Stock Purchase Agreement] after a call between counsel" that afternoon. PX 170. He also noted that Good Times planned to do a "very 'soft'" announcement within the company's earnings release that they were in the process of negotiating a sale. *Id.* Enright responded that White Winston was "of the mind-set that [they were] ready to sign as soon as [they got] through any final edits to the [Stock Purchase Agreement]" that Good Times had. PX 171. He explained that he would review the documents and "plan

10

to sign as soon as the lawyers have addressed any final issues." *Id*. Hoback responded that he thought that after that day's call, they "should be there." *Id*. He asked Enright to "let [him] know if [he] th[ought] otherwise." *Id*.

34. Meanwhile, on August 8, White Winston's lawyer told Good Times' lawyers that proposed changes in certain contracts were acceptable to White Winston except for one minor change about how to compensate for travel time. PX 180. The lawyer also said that he had discussed changes in the Stock Purchase Agreement with White Winston but could not comment on them yet. *Id*. But he expressed hope that the document was at its final version and the parties would be ready to execute. *Id*.

**I. Other Good Times board members rethought the deal**

35. The same day, Good Times' board member Bob Stetson raised concerns to Hoback about the deal, noting the significant improvement in Drive Thru's sales. Tr. 3 at 40:24–41:11; JX 21. After their discussion, Stetson emailed another board member, Charlie Jobson, asking to talk the next day. JX 24. Stetson explained that the purpose of the call was to "revisit" the Drive Thru sale because of the declining net proceeds from the deal and the upswing in Drive Thru's sales. *Id*. He ended the email by noting that the "conversation may be moot anyway" because "the buyers continue to delay." *Id*.

36. On August 9, Hoback, Stetson, and Jobson spoke as planned. Afterward, Stetson recapped the call to another board member. He explained that they had agreed the deal still made sense "strategically" but the "price and cash [were] inadequate particularly given [the] improvement in [Drive Thru's] performance." JX

11

27. Stetson said Hoback would ask for a board meeting, but the "tentative plan" was to go back to White Winston "demanding" $11 million in cash. *Id.* Stetson acknowledged that this demand would "probably kill the deal." *Id.*

37. Hoback scheduled a board meeting for the following Tuesday, August 13. JX 29 at 1. He then sent an update to another Good Times employee. He explained that White Winston was "supposed to have the final [Stock Purchase Agreement]" back to Good Times that week. *Id.* Though White Winston had received it, he explained, they had "not yet reviewed it," and Enright was "on vacation, so it's more of the same." *Id.* Hoback then recapped his call with Stetson and Jobson. He explained that the three agreed the deal was unacceptable at the current price, given Good Times' "turnaround in sales." *Id.* If all board members agreed, he would call Enright and "let them know that [Good Times] would accept $11[ million] in cash" but otherwise, given the "uncertainty of [White Winston's] closing, [and] the delays," Good Times would have to "kill[] the deal as it is." *Id.* Hoback "highly doubt[ed]" that White Winston would agree to the $11 million all-cash demand. *Id.*

38. Hoback also wrote Enright, asking to schedule a call for Tuesday. JX 26; Tr. 3 at 49:11–50:3. In response, Enright said that he was happy to speak and that "it sounds like we are ready to sign Monday [morning]." *Id.* Hoback did not respond.

39. On August 12, Enright followed up with Hoback, asking whether they were "good to go." JX 32. Good Times CFO Ryan Zink responded, explaining that Hoback was out of the office. PX 201 at 1. But Zink said that he thought "the only remaining

item" was the issue about travel time. *Id.* Enright responded that travel time was a "non issue" for him. *Id.*

40. Both Zink and Hoback were aware that Good Times had a board meeting scheduled to consider walking away from the deal. Tr. 3 at 147:16–148:10; JX 29 at 1. But neither knew for sure what the outcome of that meeting would be. Tr. 3 at 51:13–23, 148:6–10.

41. The next day, Hoback responded to Enright, explaining that Good Times had a board meeting that morning and he would call after. JX 32.

**J. The Board decided to demand $11 million in cash**

42. Later that morning, the Board met to consider walking away from the Drive Thru deal. JX 33. The Board reviewed a report that said that Drive Thru's same-store sales were currently 6 to 7% higher than the prior year. JX 31; JX 33. Stetson explained that he "felt now is not the time to sell [Drive Thru]." JX 33. Jobson said that he "continued to believe the Company should, at some point, sell [Drive Thru]." *Id.* Another board member said that "retaining the cashflow generated by [Drive Thru] is better for the Company compared to the current sale terms but that at a sale price of $11M he would proceed with the sale." *Id.*

43. After discussion, the Board unanimously agreed to reject the current offer and require that any offer must net Good Times $11 million in cash. *Id.*

44. After the meeting, Hoback called Enright to deliver the bad news. Enright did not answer, so Hoback left a voicemail. JX 34. Hoback explained that Good Times had decided to "back away from the transaction" for "a number of reasons," including "the

13

length of time" it was taking and the "value of the deal." *Id.* He explained that Good Times was "certainly willing to discuss" a new offer, but that their expectations were "$11 million net cash." *Id.* Hoback understood that this would likely kill the deal. JX 29 at 1.

45. Enright did not respond. Rather, on August 14, White Winston attorneys sent Good Times a letter, asserting that it was bound by the terms of the unsigned Stock Purchase Agreement. JX 35; Tr. 3 at 74:16–75:9. On August 22, 2019, White Winston attorneys threatened to sue Good Times. JX 37.

46. With Drive Thru out of the picture, the plans for Triad Restaurant Group fell apart. Tr. 2 at 33:13–34:1. Drive Thru was essential to Triad's success, as it was cash-flow positive and thus would have provided the combined entity with necessary cash. *Id.*

47. During negotiations with White Winston, Good Times did not negotiate with anyone else. Tr. 3 at 47:20–23. Good Times still owns Drive Thru and never again tried to sell it after the sale with White Winston fell through. Tr. 3 at 149:23-–50:4.

48. During negotiations, work on the Drive Thru sale consumed 50 to 75% of Hoback's time. Tr. 3 at 81:14–17. Several other Good Times employees also spent significant time negotiating and preparing for the sale. Tr. 3 at 81:25–83:11.

### III. CONCLUSIONS OF LAW

49. Before trial, I "narrowed the case to just one claim: was Good Times' price demand a bad-faith tactic of the sort barred by the Letter?" D.I. 160 at 2. I conclude that it was not. Good Times' emails to White Winston did not show bad faith either.

50. To decide whether Good Times acted in bad faith, I must first define what bad faith means in this context. Every contract in Delaware is subject to the implied covenant of good faith and fair dealing. *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 441–42 (Del. 2005). The implied covenant prevents a party from acting "arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably expected." *Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010). Put another way, it prevents acting in bad faith, which "implies the conscious doing of a wrong because of dishonest purpose or moral obliquity." *SIGA Techs., Inc. v. Pharmathene, Inc.*, 67 A.3d 330, 346 (Del. 2013) (internal quotation marks omitted). But it does not forbid all bad behavior. "[O]ne generally cannot base a claim for breach of the implied covenant on conduct authorized by the terms of the agreement." *Dunlap*, 878 A.2d at 441.

51. Here, the Amended Letter of Intent required Good Times to "deal exclusively with White Winston in connection with the sale of the Company." JX 2 at 5. That requirement lasted for a fixed period and then "for so long thereafter as [the parties] are negotiating such sale." *Id.* This did not prevent Good Times from ending negotiations to look for another buyer after the fixed period had run. Rather, the first exclusivity period encouraged Good Times to negotiate with White Winston (as it could not negotiate with any other buyers), and the second exclusivity period prevented Good Times from starting a bidding war. But Good Times could still walk away "for any reason." JX 2 at 6.

15

52. This does not mean, however, that Good Times had no constraints. As I held before, it could not "sabotage discussions to find a new buyer." D.I. 93 at 5. Sabotage implies subterfuge; it means much more than just calling off negotiations. To sabotage negotiations in this context would mean Good Times was lying to White Winston, pretending to negotiate while really intending to call off negotiations to look for a new buyer. Doing so would have dishonestly deprived White Winston of the fruit of its bargain by inducing it to spend time and money in what was no longer really an exclusive negotiation. This is a narrow standard, based on the contractual language and facts of this case.

53. White Winston thinks good faith requires more. It would be bad faith, White Winston says, for Good Times to abandon negotiations or insist on drastically different terms. *See* White Winston Post-Trial Br. 15–17. But the cases it cites involved Type II Agreements in which the parties had already agreed on certain major terms. *See, e.g.*, *Greentech Consultancy Co., WLL v. Hilco IP Servs.*, 2022 WL 1499828, at *13 (Del. Super. Ct. May 11, 2022). Here, by contrast, there were no agreed-upon terms: all terms in the Amended Letter of Intent were "not binding and ha[d] no legal effect whatsoever." JX 2 at 5. So Good Times was allowed to walk away or change its demands.

54. White Winston also says that good faith requires a company to communicate its CEO's personal concerns about a deal to its counterparty, even though its board had considered and rejected those concerns. *See* White Winston Post-Trial Br. 17–18, 21–22. But White Winston does not marshal a single case in support of that

proposition. Nor do I find it likely that Delaware would impose such a duty, which would make negotiations unwieldy and disregard the role of the board of directors as the "proper body" to manage a company's affairs. *See Goldstein v. Denner*, 2022 WL 1671006, at *28 (Del. Ch. May 26, 2022) (internal quotation marks omitted).

55. So the duty of good faith prevented Good Times simply from pretending it was still negotiating with White Winston while really intending to call off negotiations to look for a new buyer. Good Times complied with that duty. The evidence shows that until early August, Good Times was devoted to getting a deal done with White Winston. It spent significant time and money negotiating with White Winston, including $100,000 on a Fairness Opinion. *See* Tr. 3 at 57:8–14, 81:14–83:11. It continually worked to move the deal forward, making concessions and following up with White Winston when it became concerned about delays. *See, e.g.*, PX 51-2 at 2 (proposing price reduction); PX 52 at 2 (same); JX 18 at 1 (expressing concern over delays); DX 11 (same). There is no evidence that Good Times had secretly decided to abandon the deal. Nor is there any evidence that Good Times had its eye on some other buyer.

56. Though Good Times' CEO began to second-guess the deal in June, no other board member did. Tr. 3 at 37:9–38:11. Instead, after discussing the CEO's concerns, the Board unanimously agreed to move forward with the deal. PX 82 at 1. Good Times was not acting in bad faith by continuing to negotiate despite its CEO's personal concerns. The company still intended to close the deal; it was not contemplating finding some other buyer.

57. In June and July, Good Times continued to actively work toward a deal. When an issue with its leases came up, it crafted a solution. *See* JX 16. When delays arose, it followed up with White Winston to move things along. *See, e.g.*, JX 18 at 1.

58. In early August, Good Times pressed onward. Its lawyers continued to work with White Winston's lawyers to put together the Stock Purchase Agreement. PX 170; PX 180. Its CEO was clearly eager to go public with the deal, which would make little sense if the company knew it was going to back out. DX 11 at 1; PX 170. So again, there is no evidence that Good Times was simply pretending to negotiate when it had really decided to kill the deal. Nor is there any evidence that Good Times was hoping to find some other buyer.

59. When three Good Times board members decided on Friday, August 9, that the deal no longer made sense, they acted to let White Winston know as soon as possible. That same day, they scheduled a full board meeting for the following Tuesday so Good Times could reach a final decision about the deal. JX 27. Good Times' CEO also emailed White Winston partner Todd Enright to schedule a call for right after the board meeting. JX 26. This shows that Good Times had no intention of leading White Winston on. Instead, it proactively arranged a phone call so White Winston would know of its decision to back away from the deal at the first possible moment.

60. True, Good Times' officers did not tell White Winston on August 9 that they had scheduled a board meeting to discuss terminating the deal. When Enright emailed Good Times' CEO that day and said it sounded like the parties would be ready to sign the following Monday, the CEO did not correct his misimpression. JX

26 at 1. And when Enright followed up that Monday asking if they were good to go, Good Times' CFO replied that he thought the only open issue was a minor one about travel time. PX 201 at 1. In fact, both the CEO and CFO knew that a board meeting had been scheduled to consider killing the deal. *See* Tr. 3 at 147:16–148:10; JX 29 at 1. But neither could be certain that the Board would do so. *See, e.g.*, Tr. 3 at 51:13–23, 148:6–10. Indeed, notes from that Tuesday meeting shows it was not a mere formality. There was genuine discussion about whether walking away from the deal made sense. *See* JX 33; *see also* Tr. 3 at 51:13–23.

61. All this shows that Good Times' voicemail raising its price to $11 million was not "a bad-faith tactic of the sort barred by the Letter." D.I. 160 at 2. Good Times was entitled to raise its price or even walk away to find another buyer, as long as it did not mislead White Winston about whether it had done so. When its Board voted to raise the price to $11 million, it brought that offer to White Winston immediately. *See* JX 34. True, Good Times knew the price increase would likely kill the deal. *See, e.g.*, JX 27; JX 29 at 1. But the voicemail was honest—Good Times would have gone through with the deal at the new price. *See, e.g.*, JX 33; JX 29 at 1. So the voicemail was not some bad-faith tactic to waste White Winston's time in further negotiations when it had really decided to find a new buyer. And even if it were, White Winston still could not recover because it saw through the ruse and so has no reliance damages.

62. The parties may have been under the impression that Good Times' requirement not to "sabotage discussions to find a new buyer" meant that Good Times

19

could not walk away, honestly or otherwise, to find a new buyer. D.I. 93 at 5. Even if that were the standard, Good Times met it: no evidence emerged at trial that it ended negotiations to find a new buyer. Rather, the evidence shows that Good Times' Board thought the company was worth $11 million and was not willing to sell it for less. *See* JX 33. Good Times would have accepted $11 million from White Winston.

### IV. SANCTIONS

63. At trial, Good Times used a demonstrative aid that included same-store sales figures for July and August 2019. *See, e.g.*, Tr. 3 at 16:12–18:11. It also had its CEO testify about those figures. *See, e.g.*, Tr. 3 at 31:12–22. But the underlying same-store sales data for these two months was never introduced into evidence. And the CEO had no independent recollection of it; his testimony was based on documents his lawyers had shown him in preparation for trial. See Tr. 3 at 92:6–21. Those documents were not produced in discovery. Though I might otherwise sanction this conduct, it was harmless here. Fed. R. Civ. P. 37(c)(1). Good Times was allowed to walk away from the sale at any time for any reason. So it does not matter whether Drive Thru's same-store sales were soaring or plummeting. Thus, I will not sanction Good Times.

\* \* \* \* \*

White Winston is understandably disappointed that its deal with Good Times fell through so late in the game. But Good Times did not violate an express or implied term of the Amended Letter of Intent. So I grant judgment in Good Times' favor on the remaining claims. And I deny as moot any outstanding motions and objections.